IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY WILSON and KIMBERLY WILSON, the parents of Martez Wilson, | ) ) ) ) | |
| | ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CITY OF DOUGLASVILLE, GA, OFFICER COYLEE DANLEY, in his individual capacity, OFFICER ANDREW SMITH, in his individual capacity, SGT. CALDWELL, in his individual capacity, EMT SEAN FLACK, in his individual capacity, PARAMEDIC BRIAN PORTERFIELD, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## **COMPLAINT FOR DAMAGES**

Plaintiffs Anthony Wilson and Kimberly Wilson file this complaint against

Defendants under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth

Amendments of the United States Constitution and violations of Georgia law. This

1

Complaint is brought because the actions of Defendants resulted in the death of the Wilson's son while in police custody. In support hereof, Plaintiffs offer the following.

PARTIES

1.      Plaintiff Anthony Wilson is the father of Martez Wilson, who died while in police custody. Mr. Wilson is a resident of the State of Georgia and over the age of eighteen.

2.      Plaintiff Kimberly Wilson is the mother of Martez Wilson, the decedent in this case. Mrs. Wilson is over the age of eighteen and a resident of the State of Georgia.

3.      Anthony Wilson and Kimberly Wilson hold the right to pursue the claims arising from their son's death; Martez Wilson had never been married and did not have any children.

4.      Defendant City of Douglasville is a municipal corporation created under the laws of the State of Georgia. At all times relevant to this complaint, the City of Douglasville employed Officer Danley and Officer Smith as police officers with the City's police department.

5.      At all times relevant to this Complaint, Defendant Officer Andrew

Smith was employed as a police officer by the City of Douglasville.
Smith's actions were taken in the course and scope of his employment
and he acted under the color of law. Officer Smith is sued in his
individual capacity.

6.      At all times relevant to this Complaint, Defendant Officer Coylee
Danley was employed as a police officer by the City of Douglasville.
Danley's actions were taken in the course and scope of his
employment and he acted under the color of law. Officer Danley is
sued in his individual capacity.

7.      At all times relevant to this Complaint, Defendant Sergeant Caldwell
was a Deputy employed by the Sheriff of Douglas County, Georgia,
and he acted under color of law. He is sued in his individual capacity.

8.      At all times relevant to this Complaint, Defendant Paramedic Brian
Porterfield was a paramedic employed by the Douglas County Fire
Department. He was performing EMS duties for the City of
Douglasville, Georgia, pursuant to an agreement between
Douglasville and Douglas County. Porterfield's actions were taken in
the course and scope of his employment, and he acted under the color

3

of law. Paramedic Porterfield is sued in his individual capacity.

9.      At all times relevant to this Complaint, Defendant EMT Sean Flack was an emergency medical technician employed by the Douglas County Fire Department. He was performing EMS duties for the City of Douglasville, Georgia, pursuant to an agreement between Douglasville and Douglas County.  Flack's actions were taken in the course and scope of his employment, and he acted under the color of law. EMT Flack is sued in his individual capacity.

<u>JURISDICTION AND VENUE</u>

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question under 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

12.     Upon service of process, this Court acquires personal jurisdiction of the Defendants under Fed.R.Civ.P. 4(k)(1)(a).

13.     Venue is proper in the Northern District of Georgia under 28 U.S.C. §
        1391(b) because all actions complained of occurred within the
        boundaries of this district and Defendants reside within this district.

                            FACTUAL ALLEGATIONS

14.     On the evening of Tuesday, March 3, 2015, officers with the
        Douglasville Police Department were dispatched to a business located
        at 6408 Fairburn Road. The officers suspected that an attempt was
        being made to burglarize that property.

15.     After persons seen at the business ran from the location, Officer
        Danley was instructed to drive to a nearby residential neighborhood.

16.     While searching with his patrol car's spotlight, Officer Danley saw
        Martez Wilson lying face down in the driveway of a home located at
        8465 Lynn Ave, Douglasville, Georgia.

17.     As Officer Danley approached, Wilson was not moving. Wilson's
        pants were at his ankles. Wilson's underwear was below his crotch,
        around mid-thigh.

18.     Danley did not know who Wilson was. Danley did not see any of
        Wilson's actions before viewing him lying down in the driveway.

                                    5

19.     Officer Danley approached and asked Martez Wilson, "Who are
        you?" When Mr. Wilson did not respond, Officer Danley drew his
        gun and said that, "You better show me your fucking hands right now.
        Both of them, motherfucker. Put them behind your back."

20.     Mr. Wilson mumbled in response to Wilson that "I can't." He did not
        move. At this point, it was obvious that Mr. Wilson was in the midst
        of a medical emergency and was helpless.

21.     Ignoring the obvious signs of Wilson's medical emergency, Officer
        Danley threatened, "You put your fucking arms behind your back or
        I'm going to do it for you, and it ain't gonna to be nice."

22.     Mr. Wilson did not and could not respond to Officer Danley's
        commands. Officer Danley then placed handcuffs on Mr. Wilson.

23.     Officer Danley then asked Mr. Wilson, "Where's your partner?
        Where's your partner?" Mr. Wilson was only able to mumble an
        incoherent response. Mr. Wilson did not move.

24.     Officer Danley then noticed another person approaching. That person
        was Carlos Burroughs. Officer Danley ordered Mr. Burroughs to lay
        down, and Mr. Burroughs complied. Officer Danley handcuffed Mr.

6

Burroughs. Mr. Wilson did not move.

25.     Officer Danley then radioed that he had two suspects in custody and needed another officer to assist him. Danley did not report that Wilson required medical attention.

26.     Officer Smith then arrived on the scene in a separate patrol car. At or just following Smith's arrival, Danley put Burroughs into the back of Danley's police car. While Danley placed Burroughs in the police car, he continued to ignore Wilson's condition.

27.     Officer Smith approached Wilson. Smith saw that Wilson was not moving. While preparing to move Mr. Wilson to the patrol car, Officer Smith asked, "What's wrong with your leg?" Mr. Wilson, again, was only able to mumble an incoherent response. Officer Danley responded by saying, "Guess what? We don't give a fuck right now. Get up."

28.     Soon thereafter, Mr. Wilson was able to coherently say, "I can't breathe." Officer Danley responded, "You can breathe. You're talking." Mr. Wilson then mumbled incoherently in response.

29.     Sgt. Caldwell arrived on the scene. Officer Danley explained that he

found Mr. Wilson lying face down in the driveway. As Officer Danley explained the situation to Sgt. Caldwell, Mr. Wilson again stated, "I can't breathe." The officers ignored Mr. Wilson.

30.     When Officer Smith was in radio communication with dispatch and stated that Wilson said that he "can't breathe," Danley immediately and falsely declared via that same radio communication that "he's [referring to Wilson] screaming it." Danley misreported Wilson's medical condition even as another officer reported the need to summon medical personnel to assess and aid Wilson.

31.     Officer Danley spoke with Mr. Burroughs and obtained Mr. Burroughs' name and date of birth. While Danley spoke to Mr. Burroughs, Mr. Wilson again said repeatedly to Smith and Caldwell, "I can't breathe." One of the officers responded by saying, "Just get up." Wilson did not and could not get up.

32.     Mr. Wilson again stated, "I can't breathe." Officer Danley shouted back, "You're breathing!" Wilson's breathing was very shallow and halting; he could not and did not fully expand his lungs. This condition was apparent to Smith, Danley, and Caldwell.

8

33.     After placing Mr. Burroughs in his patrol car, Officer Danley moved
        to assist the other officers in placing Mr. Wilson in Officer Smith's
        patrol car.

34.     Either Smith or Caldwell told Mr. Wilson to "stand up," and then
        asked, "What's the matter with you?" when Mr. Wilson was not able
        to stand. Mr. Wilson responded, almost incoherently, that he could not
        breathe. The officer responded asking, "Why? Because you're in
        handcuffs?"

35.     Either Smith, Danley or Caldwell told Wilson as he lay on the ground
        unable to move, "Let me tell you right now. You're going to jail either
        way." Another officer, either Danley, Smith or Caldwell responded,
        "Yeah, bro, it don't matter. You're still going to jail. I don't give a
        shit."

36.     All three officers then lifted Mr. Wilson by his arms and legs and
        carried him to Officer Smith's patrol car. Wilson's body was limp as
        the officers carried him into the car. When the officers reached the
        patrol car, Wilson was unable to stand.

37.     Exhibit 1 is an accurate representation of the manner in which Danley,

9

Smith, and Caldwell carried Mr. Wilson toward the patrol car.

*Exhibit 1*



38.     Because he could not move or stand on his own, in order for Wilson

to get into Smith's car, the officers had to lift him into the back seat.

Danley mocked Wilson by saying, "Have some decency about

yourself" despite the fact that Wilson was clearly helpless.

39.     Mr. Wilson was unable exercise any control of his body. He was

completely limp as the Officers placed him in the patrol car. Officer

Danley said to Mr. Wilson, "You gonna be that guy. Really?"

10

40.     When Wilson was unable to move his body on his own so as to sit in
        the police car, Officer Danley angrily said, "Sit down! See, now
        you're fighting me. You want to be like that?" Danley falsely claimed
        that Wilson was intentionally resisting being loaded into the back of
        Smith's police car, in spite of the fact that Wilson obviously could not
        move.

41.     The Officers continued to place Mr. Wilson in the patrol car, Officer
        Danley said, "I can feel your body being rigid, you idiot. Don't fight
        me." The Officers then told Mr. Wilson to, "Sit up." Officer Danley
        again said, "I can feel your body being rigid. Stop being a fucking
        idiot." Wilson's body was not rigid; he could not control his own
        movement.

42.     After securing Mr. Wilson in the backseat of the patrol car, the
        Officers then fastened Mr. Wilson's seat belt. Officer Danley declared
        that Mr. Wilson was, "A fucking retard." There was no point in time
        prior to being strapped into the back seat of Smith's car that Wilson
        stood up on his own or walked on his own or moved his arms or legs
        on his own power. He was helpless and unable to move. His inability

11

to move and his helplessness were visible and obvious to Danley, Smith and Caldwell.  He was dying because of lack of oxygen to his brain.

43.     Officer Smith then spoke to Wilson, asking him questions. Mr. Wilson did not verbally respond, and could not respond. Wilson was dying.

44.     After Mr. Wilson was placed in the back of the patrol car, Officer Smith closed the door and the Officers left Mr. Wilson unattended for approximately ten minutes.

45.     Officer Danley then asked Mr. Burroughs, "Why your boy being stupid." Mr. Burroughs said that he did not know Mr. Wilson.

46.     Officer Danley did not ask Mr. Burroughs what happened to Mr. Wilson, whether Mr. Wilson was injured, or whether Mr. Wilson had a medical emergency.

47.     When the officers initiated the call for EMS to come to the scene, Wilson continued to be unable to speak but a few words; he was not moving on his own; he continued to ask for help by saying that he could not breathe. Each of the Defendant officers observed that

condition. Every reasonable police officer would have recognized that Wilson was in a medical crisis and in need of immediate medical aid.

48.   As a result of the initiation of the call for EMS to come to the scene, employees Porterfield and Flack of the Douglas County Fire Department were dispatched to where Wilson and the arresting officers were located.

49.   On March 3, 2015, there were a number of policies and procedures regarding patient care and transport. Defendants Flack and Porterfield were to follow those policies. Those policies included the following:

a.   Persons for whom law enforcement have requested a patient evaluation shall be considered a patient.

b.   A patient must have a complete assessment and appropriate documentation completed.

c.   Any evaluation requested by law enforcement (even without a patient complaint) is to result in a "Complete Standard PCR or Pt. Refusal", per section 2 of chapter 800.10.

d.   Appropriate evaluation for adult patients complaining of or showing signs of weakness or general malaise "must have a

13

minimum of one 12-lead recorded."

e.   Following a complete assessment of a patient, personnel "shall generally offer patients transport to an area hospital emergency department via ambulance."

f.   "Standard Procedure - Assessment: Adult" Treatment Guideline of the DCFD declared that the procedure of assessment is to include, among other things,: (3) Assess mental status (AVPU); (7) Baseline vital signs should be obtained; baseline vital signs may include the following depending on the patient's chief complaint... "Always - pulse, blood pressure, respirations"

50.   When EMS personnel arrived, the Officers stated only that when Mr. Wilson was arrested he complained that he was having trouble breathing. The Officers knowingly misrepresented the severity of Mr. Wilson's condition to EMS personnel.

51.   The Defendants did not report that Mr. Wilson was found face down in the driveway, or what Mr. Wilson was unable to walk or stand. Instead the Defendants told Flack and Porterfield that Wilson was afraid of going to jail, or simply did not want to go to jail. Instead, the

14

Defendants indicated to Flack and Porterfield that Wilson's was making a false complaint of illness and that this was not a medical emergency.

52.     The Defendants did not report that Wilson had to be carried to the patrol car because he could not walk; nor did they report that when they got Wilson to the patrol car, they had to fasten his seatbelt to hold him erect inside the car.  Nor did they report that he was unresponsive throughout.

53.     When Flack and Porterfield asked Mr. Wilson questions, Mr. Wilson did not respond. Wilson only stared straight ahead with his eyes open. One of the Defendant officers, in the presence of the others, then falsely reported that they had been speaking with Mr. Wilson recently, and that Wilson's problem was that he was likely upset because he was going to jail 'for a long time.'

54.     The Defendant officers knowingly under-reported and misreported the history of their contact with Wilson and Wilson's physical condition.

55.     Porterfield and Flack observed Wilson as he was sitting upright strapped into the seat of the patrol car. They did not conduct a

15

complete assessment of Wilson. They did not complete any on scene documentation of their contact with Wilson. Neither of them prepared any report or record of their contact with Wilson as relates to what they saw or did until long after he was dead. It was obvious to them that Wilson was weak or in general malaise, but they did not follow their policies and procedures which required a complete assessment and left them no discretion to decline to perform one. Neither of them offered to transport Wilson to an area hospital emergency department. Neither of them assessed his blood pressure.

56.     Porterfield and Flack failed to follow the policies and procedures of the Douglas County Fire Department in their contact with, and reporting of their contact with, Mr. Wilson. They were to follow these procedures when providing services to the City of Douglasville.

57.     No reasonably trained medical personnel having the same or similar information available to them about the physical and medical and mental condition of Mr. Wilson could have concluded that he did not need immediate medical assessment and treatment.

58.     All reasonably trained medical personnel in the position of Porterfield and Flack would have concluded that Wilson should immediately be transported to an area hospital emergency room. Porter and Flack were responsible for that transportation.

59.     Instead of transporting Wilson, their patient, or performing a complete assessment, Porterfield and Flack quickly ceased any steps to evaluate Wilson and left the scene.

60.     Before they left, neither Porterfield or Flack gave any instructions to either of the law enforcement officers as to monitoring or safeguarding Wilson's deteriorating medical condition.

61.     When they left, Porterfield and Flack knew that Wilson would remain in the police vehicle without medical attention and that he would be transported to the Douglasville City jail where there were no on duty medical personnel to diagnose or treat Wilson's medical condition upon his entry to the jail.

62.     Before they left, Porterfield and Flack asked the Defendant officers if they wanted anything to be done to provide medical assistance to Wilson and, when they were told 'no,' they left. Porterfield and Flack

17

based their decision to leave on the statement of the officers rather than their own medical judgment or training or the policies which governed their actions.

63.     After Porterfield and Flack left the scene, Smith entered his police car. Wilson remained strapped in the back seat with a seatbelt. Wilson's eyes were closed. Wilson did not respond in any way to Smith when Smith asked him questions as Smith drove Wilson to the lock up at the Douglasville Police Department.

64.     Smith drove Wilson to the police department jail while Officer Danley transported Mr. Burroughs.

65.     Officers Danley and Smith arrived at the Police Department simultaneously and parked in the sally port adjacent to the jail.

66.     Officers Smith and Danley walked Mr. Burroughs into the Police Department's jail and began the booking process.

67.     While transporting and booking Mr. Burroughs, Officers Smith and Danley left Mr. Wilson in Officer Smith's patrol car unattended.

68.     From the time the Officers Danley and Smith arrived at the Police Department, Mr. Wilson remained unchecked in the backseat of

18

Officer Smith's patrol car for 12 minutes.

69.   After placing Mr. Burroughs in a holding cell, Officers Smith and
      Danley returned to retrieve Mr. Wilson and transport him into the jail.

70.   In spite of knowing that Wilson complained he could not breathe,
      knowing that Wilson remained unresponsive and unable to move, and
      knowing that the paramedics performed only a cursory assessment,
      Danley and Smith failed to check Wilson's physical condition for
      approximately 20 minutes from the time Porterfield and Flack left the
      site of the arrest until transporting Wilson inside the police
      department.

71.   When the Officers returned to Mr. Wilson, he remained unresponsive.

72.   Upon seeing Wilson still unresponsive, not moving or speaking,
      neither Smith nor Danley checked Mr. Wilson's vital signs or called
      EMS personnel. Wilson was not breathing. His eyes were closed and
      he was unconscious.

73.   Every reasonable officer presented with the same circumstances
      would have known that Mr. Wilson was in need of emergency
      medical care and sought that care. Instead of calling for immediate

medical care, they pulled him from Smith's patrol car and dragged

Wilson into the jail by grabbing and pulling his body by the arms

while his legs dragged on the ground behind him.

74.     Exhibit 2 accurately represents the method by which Danley and

Smith dragged Mr. Wilson from the patrol car and into a holding cell.

75.     After dragging Wilson into the jail, they dragged him, still

handcuffed, along the floor of the hallway leading from the booking

area to a holding cell. Wilson was not breathing; he had no pulse; they

*Exhibit 2*



were dragging a dead man.

76.      The image above is a true and accurate image of Smith and Danley

dragging Mr. Wilson along the floor toward a holding cell.

77.      After placing Mr. Wilson into a holding cell, Officers Danley and

Smith briefly stared at Wilson. They again saw that Mr. Wilson was

not responsive and not breathing. When they spoke to Wilson, there

was no reaction, no movement. His body completely limp, the officers

pressed their hands to his neck and held his wrist, confirming again

and again that he had no pulse. Wilson was in the holding cell,

motionless, for over three minutes before the officers left the cell and,

for the first time after arriving at the jail, placed a radio call for

medical help. By then, Wilson was already dead.

78.     Officers Danley and Smith then used CPR methods on Mr. Wilson's

body.

79.     Douglas County Fire Department medical personnel came to the jail

and were also unsuccessful in resuscitating Mr. Wilson.

## COUNT I
*Negligence and Abuse in Being Arrested*
*against the City of Douglasville for the Actions of Danley and Smith*

80.     Attached here to is a true and correct copy of the letter written to

Harvey Persons, Mayor of the City of Douglasville, Georgia, by Brian

Spears, on behalf of plaintiff Anthony Wilson. The letter is dated July

2, 2015. It was delivered July 6, 2015. The Letter constitutes an ante-

litem notice pursuant to OCGA § 36-33-5, concerning the claims

against the City of Douglasville, Georgia, arising from the death of

22

Martez Wilson.

81.    At all times pertinent to the claims made by this lawsuit, the City of Douglasville was an insured pursuant to an insurance agreement providing for indemnification for liability arising from the operations of the City, including but not limited to the City's police department and the conduct of law enforcement officers employed by the City. The City's policy of insurance was with and through the Georgia Interlocal Risk Management Agency.   Attached hereto is a copy of the declarations page for said policy of insurance.

82.    By virtue of its purchase of insurance affording it coverage as described above, the City is liable for the negligent actions of Danley and Smith  by operation of the doctrine of respondeat superior.

83.    Each Douglasville officer on the scene had a duty of care to act in a reasonable manner to assess whether Mr. Wilson was in need of immediate and emergency medical attention.

84.    Smith and Danley breached their duty of care by withholding material information from Porterfield and Flack related to Mr. Wilson's health. Smith and Danley's negligence included, but was not limited to, their

23

failing to report that Wilson was found face down on the ground with his pants at his ankles, complained repeatedly of being unable to breathe, displayed labored breathing, was otherwise non-communicative, and had been limp and helpless from the moment the officers arrived on the scene.

85.     Smith and Danley breached their duty of care by allowing false information to be reported to Porterfield and Flack concerning Wilson's condition prior to EMS' arrival.

86.     The Officers' statements and negligent conduct included comments to Porterfield and Flack to the effect that Wilson's pleas to the effect that he could not breath were false and that no medical care was needed. The Officers specifically stated that no further medical assessment was necessary following Porterfield's and Flack's initial cursory assessment.

87.     Officers Danley and Smith breached the duty of care owed to Mr. Wilson by delaying any further assessment for approximately twenty minutes after transporting Wilson from the scene of the arrest thereby depriving Wilson of obviously needed emergency medical assessment

24

and treatment.

88.    The negligent breach of the duty of care owed to Mr. Wilson by Danley, Smith, Porterfield and Flack caused Mr. Wilson pain and suffering while he was still alive and was the proximate cause of Mr. Wilson's death.

89.    The City of Douglasville is not protected by the defense of qualified immunity under Georgia law.

90.    The Georgia Constitution extends the affirmative right to all persons that they shall not "be abused in being arrested, while under arrest or in prison."

91.    Instead of providing medical care to a dying man, Defendant Danley repeatedly mocked, taunted and belittled Mr. Wilson during his arrest, and abused Wilson by hauling his helpless, lifeless body along the floor of the jail and into the holding cell.

92.    Danley's actions constituted a breach of Wilson's constitutional right under Georgia law to be free from abuse in being arrested and constituted the intentional infliction of emotional distress, all of which is conduct for which the City of Douglasville, Georgia is liable.

25

## COUNT II
*Negligence*
*against the City of Douglasville for the Actions of Porterfield and Flack*

93.     At all times relevant to this Complaint the City of Douglasville was a

party to an agreement with the government of Douglas County,

Georgia. By virtue of that agreement, the City contracted with the

County for the County to provide emergency medical services within

the city limits of the City of Douglasville, Georgia. The County

obligated itself to provide emergency medical services including

temporary emergency care and/or transportation for an injured or sick

person to a place where medical or hospital care is furnished. The

County obligated itself to provide emergency medical services

personnel to respond to calls by police officers for the City of

Douglasville to provide medical services to persons in custody. Sean

Flack and Michael Porterfield were dispatched to the site of Martez

Wilson's arrest in accordance and pursuant to the agreement. When

they arrived at the site of Wilson's arrest, they engaged in contact

with Wilson at the request of the Douglasville police officers.

26

94.     The insurance policy carried by the City of Douglasville afforded

coverage to persons acting under the control of covered Members. At

all times pertinent to their actions as described in this lawsuit, Danley

and Smith constituted covered Members under the policy. Porterfield

and Flack were persons acting under the control of covered Members.

The actions taken by Porterfield and Flack described in this complaint

are therefore covered by the insurance policy of the City of

Douglasville.

95.     By virtue of its purchase of liability insurance affording it coverage

for the actions of Porterfield and Flack, the City is liable for the

negligent actions of Porterfield and Flack under the doctrine of

respondeat superior.

96.     Porterfield and Flack breached their duty of care owed to Mr. Wilson

by failing to competently assess Mr. Wilson's health and vital signs.

97.     Even without a complete assessment of Mr. Wilson's health,

Porterfield and Flack breached their duty of care by failing to

transport Wilson to an emergency medical facility rather than permit

him to be transported to the City jail. Wilson's dire need for

immediate medical treatment was visible without further medical assessment.

98.     Porterfield and Flack breached their duty of care by neglecting the professional standard of care and abdicating their medical judgment to Danley and Smith and allowing the officers to determine whether additional treatment or assessment should be rendered.

99.     If Porterfield and Flack had performed a competent assessment they would have detected Wilson's need for immediate medical care and transported Wilson to the hospital for emergency treatment.

100.    The actions of Porterfield and Flack were the legal and proximate cause of Mr. Wilson's suffering and death.

## COUNT III

*Deliberate Indifference to Medical Needs under the Fourth and Fourteenth Amendments of the United States Constitution*
*against Officer Danley, Officer Smith, and Sgt. Caldwell, and Defendants Porterfield and Flack*

101.    As detailed in this Complaint, Danley, Smith, Caldwell, Porterfield and Flack were each individually aware of Mr. Wilson's need for immediate medical attention during their contact with him.

102.   Danley, Smith and Caldwell were each aware that false information had been communicated to the EMS workers who arrived on the scene, and that the EMS workers performed only a cursory assessment.

103.   Each officer was aware that the actions of EMS personnel were influenced by the false information communicated to the EMS officers. Each officer was aware that the actions of EMS personnel did not resolve the question of whether Mr. Wilson was in the midst of a medical emergency.

104.   Porterfield and Flack were each aware that Mr. Wilson had complained that he could not breathe, was non-responsive to medical personnel, and exhibited signs that he needed immediate medical attention.

105.   In spite of that knowledge, each Defendant  denied Wilson medical care by engaging in conduct which caused Wilson to be transported to the jail with only a cursory check by Porterfield and Flack. Each Defendant knew that the actions of Porterfield and Flack did not resolve the urgent question of Mr. Wilson's failing health.

29

106.     Each individual Defendant acted with deliberate indifference to Mr.

Wilson's medical needs.

107.     Officers Danley and Smith continued to act with deliberate

indifference by failing to check or assess Mr. Wilson's condition from

the time the officers departed the scene until 20 minutes after

departing from the scene.

108.     The actions of Danley, Smith, Porterfield, and Flack were objectively

unreasonable under the Fourth Amendment and under the Fourteenth

Amendment to the United States Constitution.

109.     The officers' deliberate indifference and objectively unreasonable

actions resulted in pain and suffering to Mr. Wilson during his

lifetime and were the proximate cause of Mr. Wilson's death.

## COUNT IV
*Breach of Ministerial Duty*
*against EMS Flack and Paramedic Porterfield*

110.     On March 3, 2015, there were a number of policies and procedures

regarding patient care and transport promulgated by the Douglas

County Fire Department.

30

111.    Defendants Flack and Porterfield were to follow those policies.

112.    Those policies included the following:

    a.    Persons for whom law enforcement have requested a patient evaluation shall be considered a patient.

    b.    A patient must have a complete assessment and appropriate documentation completed.

    c.    Any evaluation requested by law enforcement (even without a patient complaint) is to result in a "Complete Standard PCR or Pt. Refusal"

    d.    Appropriate evaluation for adult patients complaining of or showing signs of weakness or general malaise "must have a minimum of one 12-lead recorded."

    e.    Following a complete assessment of a patient, personnel "shall generally offer patients transport to an area hospital emergency department via ambulance."

    f.    "Standard Procedure - Assessment: Adult" Treatment Guideline of the DCFD declared that the procedure of assessment is to include, among other things,: (3) Assess mental status (AVPU);

31

(7) Baseline vital signs should be obtained; baseline vital signs

may include the following depending on the patient's chief

complaint... "Always - pulse, blood pressure, respirations"

113.    The circumstances presented to Defendants Porterfield and Flack were

covered by the policy of the Douglas County Fire Department and that

policy directed that they were to conduct a complete assessment and

complete appropriate documentation of their assessment; they were to

conduct a Complete Standard PCR or Pt. Refusal; they were to

perform a minimum of one 12-lead assessment; they should have

offered to transport Wilson to an area hospital emergency department

and they should have completed the requisite assessments. They did

not do so.

114.    Wilson was Porterfield and Flack's patient.  Once he became their

patient, they were required to exercise their own medical judgment

and were not to defer to medical decisions made by police officers.

115.    Porterfield and Flack negligently performed or failed to perform said

actions. As a result, they each breached ministerial duties imposed

upon them.

116.    If Porterfield and Flack had performed the required evaluations, they would have detected that Wilson was in the midst of a medical emergency and immediately rendered emergency care and transport to a hospital for continued treatment.

117.    Their breach of their ministerial duties resulted in additional pain and suffering to Mr. Wilson during his life and caused his death.

## COUNT V
*Expenses of Litigation under OCGA § 13-6-11*

118.    This count is alleged against the City of Douglasville and Defendant Danley under OCGA § 13-6-11 for the conduct of Defendant Danley.

119.    Plaintiffs are entitled to recover expenses personally of litigation under OCGA § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and/or caused Plaintiffs unnecessary trouble and expense.

120.    OCGA § 13-6-11 applies to tort actions arising under State law.

## COUNT VI
*Punitive Damages*

121.    This count is alleged against Defendant Danley in his individual

capacity arising from his breach of the rights of Mr. Wilson arising

from the Fourth and Fourteenth Amendments of the United States

Constitution.

122.    Danley acted with reckless or callous indifference to Mr. Wilson's

helpless condition – a condition which called for providing emergency

medical treatment.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following:

a.    award special and compensatory damages against the City of

Douglasville and Defendants Danley, Smith, Porterfield and

Flack;

b.    award of punitive damages against Defendant Danley;

c.    award pre-judgment and post-judgment interest;

d.    award court costs and attorneys' fees under 42. U.S.C. § 1988;

and an award of the expenses of litigation against Danley and

the City of Douglasville;

e.    a trial by jury as to all issues authorized by law;

f.    order such relief as the Court deems just and equitable.

Respectfully submitted, this 20th day of February, 2017.


s/Brian Spears                          s/Jeffrey R. Filipovits
G. Brian Spears                         Jeffrey R. Filipovits
Georgia Bar No. 670112                  Georgia Bar No. 825553

1126 Ponce de Leon Avenue               FILIPOVITS LAW, PC
Atlanta, Georgia 30306                  2900 Chamblee-Tucker Road
Phone: 404-872-7086                     Building 1
Fax: 404-892-1128                       Atlanta, Georgia 30341
bspears@mindspring.com                  Phone: 770-455-1350
                                        jeff@law.filipovits.com