IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY WILSON and KIMBERLY WILSON, the parents of Martez Wilson, and the ESTATE OF MARTEZ WILSON, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 1:17-CV-00634-ELR |
| | ) | |
| CITY OF DOUGLASVILLE, GA, OFFICER COYLEE DANLEY, in his individual capacity, OFFICER ANDREW SMITH, in his individual capacity, SGT. CALDWELL, in his individual capacity, EMT SEAN FLACK, in his individual capacity, PARAMEDIC BRIAN PORTERFIELD, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

_____

### Expert Report of John J. Ryan

1.  My name is John Ryan.  I have been actively involved in police practices and law enforcement since 1981.  I was an active police officer for twenty years.  In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2.  My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island;  a Master of

1

Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3.  From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.   In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4.  Since 2000, I have written several manuals for use by police officers.  Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are:  Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000.  The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees.  These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful

2

Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement. This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com. Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part

3

of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges.  I have provided training in the following areas:

    a.   Policy development for public safety agencies.

    b.   Legal Issues in police use of force.

    c.   Legal Issues in internal affairs investigations.

    d.   Police misconduct/civil liability.

    e.   Legal/Liability Issues in Narcotics Operations.

    f.   Arrest, Search and Seizure, & Interrogation.

    g.   Racial profiling.

    h.   Legal issues in public schools.

    i.   Media relations for public safety agencies.

    j.   Constitutional update for law enforcement officers.

    k.   Basic training for detectives.

    l.   Law enforcement officers' bill of rights/due process in administrative investigations.

    m.   Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

      n.  Legal and policy Issues for hostage negotiators.

      o.  Legal and liability issues for SWAT operations

      p.  Legal and liability issues for jails

      q.  High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff. During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers. Participants in these courses have come from thousands of law enforcement agencies around the United States. Officers in attendance have

come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.  These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13.  As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit,

6

emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill.  In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law

enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program.   I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches.   I have been published annually in materials from Georgetown Law Center related to this program.   The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program.  My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.  It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law

enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death. This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide.  As part of this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association. The presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training. My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either

a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.  I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

1.  Complaint
2.  First Amended Complaint
3.  Expert Report – Roger Clark
4.  Deposition Transcript – Roger Clark
5.  EMS Reports
6.  GBI Interviews – Audio and Transcripts: Porterfield, Smith, Danley, and Flack
7.  Jail Security Camera Videos and Notes
8.  Autopsy produced by Littlefield
9.  Goodyear Tract – Cobb GIS
10. Incident Reports – Smith and Danley
11. Douglasville PD Standard Operating Procedures
12. Patrol Car Videos
13. PD Surveillance Videos – Sally Port
14. Comprehensive Timeline by Dianna Lee
15. Cell Phone Video of Wilson lying in holding cell
16. Ross Autopsy Report – from Plaintiff
17. Transcript – Cadwell Dash Audio 1 and 2
18. Transcript – Danley Dashcam video
19. Expert Report – Carlton Dampier MD
20. Expert Report – J.C. Upshaw Downs, M.D.
21. Deposition Transcript – Brian Porterfield
22. Deposition Transcript and exhibits – Andrew Smith
23. Deposition Transcript – Coylee Danley
24. Deposition Transcript – Sean Flack
25. Expert Report and Deposition Transcript – Kris Sperry, M.D.

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses.  In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event reviewed in this report occurred on March 15, 2015 in Douglasville, Georgia. It is noted that the call for the early morning burglary occurred 0017:09 hours at Freewheeling Motorsports located at 6408 Fairburn Road, Douglasville, Georgia

Officer Danley Deposition

53. Officer Danley testified that the events with Mr. Wilson began when Officer Duke went to the Freewheeling Motorsports and as soon as he pulled into the

driveway subjects fled on foot jumping the back fence of the business. (54). Danley said he initially thought it was two subjects who fled but learned while on the scene that it was three subjects.  (55).

54. Officer Danley reported that when he found Wilson, Wilson's pants and underwear were down around his ankles (correcting) just below his knees, and Wilson was face down in the driveway. (38).

55. Officer Danley testified that he did not draw his gun upon seeing Wilson but did draw his gun when the second suspect emerged from behind the house. (40).

56. Officer Danley testified that when he initially observed Wilson, he believed that he was one of the suspects testifying: "I know this—I've responded to calls in this neighborhood before.  Most of the residents here are elderly.  At the time when I was initially stationed, I was scanning the scene with the spotlight and I—when I saw him, I believed he was actually low crawling under my spotlight to keep me from spotting him. (57-58).   Danley acknowledged that as he approached he was giving Wilson verbal commands to put his hands behind his back, and telling Wilson that if he did not, Danley would use force to accomplish handcuffing. (58-59).  Danley reported that Mr. Wilson complied and put his hands behind his back for handcuffing. (60).    Officer Danley acknowledged that at 15 minutes 20 seconds on Danley's video, Wilson is handcuffed. (60).  Danley said that at 15 minutes and 50 seconds Burroughs appeared from behind the residence and surrendered. (61).  Danley said he had to give Burroughs more than one command before he got on the ground and

agreed that once Burroughs was on the ground, Danley handcuffed Burroughs. (61-62).   Danley agreed that at 16 minutes and 17 seconds on his video both Burroughs and Wilson were handcuffed. (62).   Danley agreed that at 16 minutes and 37 seconds a homeowner was standing in the doorway providing additional information. (63).   Officer Danley acknowledged that Officer Smith called for EMS at approximately 19 minutes and 15 seconds on Danley's video. (70). Thus, approximately 3 minutes and 55 seconds passed between Danley apprehending and handcuffing Wilson, apprehending and handcuffing Burroughs, Danley speaking with a neighbor, Danley calling for another officer, and Smith calling for EMS as the result of Wilson's complaints that he could not breathe.  Danley did note that by 18 minutes and 41 seconds on his video, Smith had Mr. Wilson seated upright, against Smith's leg. (69).

57. It is noted that from a timeline perspective, Danley reported seeing someone laying in the driveway at 8465 Lynn at 00:27:25 and reported that this subject [Wilson] was detained at 00:28:24.   (CAD)   At 00:32:29, approximately 4 minutes later, Smith advised dispatch that Wilson was indicating that he could not breathe. (CAD).  At 00:33:38 R11 [EMS] is dispatched to the scene. (CAD). I note that since dispatchers type the CAD notes into a CAD system, the times cannot be longer (because the dispatcher would have to see into the future) but the times could be even shorter than listed in the CAD report since the dispatcher may type a note after something is aired rather than in real time.

16

58. Officer Danley acknowledged that it was him who told Wilson that he was going to jail either way and that Smith indicated the same thing. (77).

59. Officer Danley testified that it was he, Officer Smith, and Sergeant Caldwell who were present at the scene when EMS arrived. (23).   Officer Danley indicated that he was the officer in charge of the scene. (24).   Officer Danley acknowledged that he thought Wilson was playing possum. (36).  Danley noted that many subjects are passively resistant and "try to choose the hospital over jail. (37).   Danley described why he thought Wilson was faking testifying: "He was, he was speaking but he was also—He was limp. A lot of people just go limp and force us to pick them up, carry them, that sort of thing." (37).   Danley said that the fact that there had been a burglary and that Wilson had been caught added to his belief that Wilson was faking. (38).

60. Officer Danley testified that Officer Smith called for EMS and said: "I didn't call EMS because I was securing the scene.  There was a second subject.  We also learned that there was a third subject.  I was just looking out for my own safety." (43).

61. Officer Danley testified that once EMS responds, EMS personnel have the final decision as to where the person will be transported and that officers cannot override the decisions of EMS. (25). Danley said that officers generally provide EMS with information as to the subject's complaint, however Danley noted that he did not speak to EMS in the event with Wilson. (26-27). Danley reported that Officer Smith spoke with EMS and he believed that Sergeant Caldwell spoke

17

with EMS. (27).  Danley reported that Officer Smith informed him, that EMS had cleared Wilson for transport to the jail. (48).

62. Officer Danley testified that it was a common experience for suspects, particularly those who have run from law enforcement to report having difficulty breathing. (21).  Danley reported: "If someone complains that they're not able to or having trouble breathing then we always call EMS.  We call EMS on any complaint. (22).

63. Officer Danley testified that he transported Burroughs while Smith transported Wilson. (42).  Officer Danley acknowledged that the officers took Burroughs into the jail first and then returned for Wilson. (45). Danley noted that when the officers returned for Wilson, Wilson was handcuffed behind his back and seat belted upright. (45-46).  Officer Danley acknowledged that it took about six minutes for the officers to move Mr. Burroughs into the jail before returning to Mr. Wilson in the sally port. (96).

64. Officer Danley testified that at the jail, upon realizing Wilson was in a medical crisis, he ran from the holding cell to the patrol room to get an AED. (100). Danley acknowledged that Smith called for EMS and that he and Officer Smith began CPR on Wilson in an attempt to revive him.  (105-106).

65. Officer Danley testified that he has received basic CPR training. (12-13). Danley testified that he has been trained to call EMS as soon as possible when someone is injured or complains of injury. (13).  Officer Danley testified that he has been trained on positional asphyxia which he described: "it's when a subject

18

is usually hogtied.  If the subject is restrained with his arms behind his back, if

he's laying on his chest his own body weight would suffocate him." (34).

Paramedic Porterfield

66. Paramedic Porterfield acknowledged that Wilson was his patient when

Porterfield was out at the scene. (8). Porterfield acknowledged that no blood

pressure measurement was taken of Wilson. (10).  Porterfield described that he

did look at Wilson's chest to measure his respiration. (10).   Porterfield said his

memory was that Wilson's respiration by viewing his chest was 15-20 per

minute, but acknowledged that he had not documented that number. (11).

Porterfield reported that he can determine if a person is moving air sufficiently

by watching the rise and fall of the chest and that Mr. Wilson was within normal

limits. (12).

67. Paramedic Porterfield described what he was told by officers, testifying: "That

they arrested an individual in which he was involved in a chase of some sort for

burglary.  He was placed in the back of the vehicle, and he was saying initially

that he was unable to breathe.  But after discussions with the patient, he n longer

wanted to talk with anybody." (17).   Porterfield acknowledged that when

someone complains of being unable to breathe that it is the medical

professional's responsibility to make a preliminary assessment and if unable to

do so, the medical professional would be required to call "medical control" or a

supervisor. (25).   Paramedic Porterfield acknowledged that when a patient is in

police custody and EMS is called. EMS has responsibility for the medical

assessment of the patient and EMS makes the decision as to medical treatment and where the patient will be transported. (63-64).   Porterfield acknowledged that he made the decision that Wilson would not be transported [to a hospital] before Porterfield left Wilson in the backseat of the police car. (64).

68. Paramedic Porterfield acknowledged that he did utilize a pulse oximeter on Mr. Wilson. (25).   Porterfield testified that based on his observations of Wilson, Porterfield "did not feel any further assessments were necessary at the time." (30).

69. Paramedic Porterfield acknowledged that after he evaluated Mr. Wilson, he cleared Wilson for transport to the jail. (108).   Porterfield agreed that the officers at the scene, who are not medically trained, relied on Porterfield's assessment to decide whether Wilson would go to the hospital or jail.  (113).

### Officer Andrew Smith

70. Officer Smith testified: "When-when I got on scene, we actually propped him up on to my knee, so that way he was sitting upright.  So that way his oxygen—his lungs were able to inflate and deflate.  I could feel his—his lungs compressing and contracting back and forth while he was actually on my knee."

71. Officer Smith testified that based on his military experience and training, " a lot of times where somebody stops breathing normally, they get them to talk.  So that way they get out of the cycle of holding their breath or not actually taking oxygen into the lungs." (32).  Smith indicated that he called EMS as soon as he concluded that Wilson may be having trouble breathing. (34).

Danley In-Dash Video

72. In watching Officer Danley's in-dash camera video I note that while Danley gave strong verbal commands it was calm and controlled during the detention of both subjects.  It is noted that during the initial detention officers were also dealing with searching for an additional suspect.  It is clear from the audio that Danley tells Smith that there is they need to help Wilson get his pants back up and it is also clear the officers are assisting Wilson to get off the ground.  On the in-dash cam, officers can be heard telling the dispatcher that Wilson was indicating that he could not breathe.  While an officer is interviewing the second suspect, Wilson can be heard yelling out, "I can't breathe."  (Approximately 8:30 on Part 2).

Opinions

73. It is my opinion, based upon my specialized background, training, education and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide, that Officer Danley and Smith's actions in calling for EMS in less than five minutes from the initial encounter with Wilson was timely and consistent with generally accepted policies, practices, training, as well as legal mandates trained to officers for application in field operations.

74. Under the facts presented by the material provided to date, it is clear that for the initial portion of the 4 minutes and 39 seconds from observation of Wilson until the calling of EMS, Officer Danley was the only officer on the scene.  While

alone at the scene Danley detained Wilson in handcuffs; apprehended and detained Burroughs in handcuffs, spoke to the homeowner; and called for additional support.   It is noted that when Smith arrived at the scene and learned that Wilson was complaining of difficulty breathing EMS was called to the scene.   It is noted that plaintiff's expert Roger Clark acknowledged that Officer Smith called EMS within seconds of arriving at the scene. (Clark 139).

75. As noted by Danley, it is well known in law enforcement that suspects claim they cannot breathe or feign some other illness/injury in order to avoid arrest and/or jail.   On multiple occasions during my career as a police officer, detention officer, and supervisor, I have had prisoners claim breathing issues, chest pains, stomach, issues, and pregnancy related issues in their attempts to avoid a stay in jail.   More importantly, officers are trained that scenes must be secured before EMS will even respond directly to the area.   As noted, Danley was dealing for a portion of this time with apprehending and detaining two suspects, while radio traffic indicated a third suspect was still at large.

76. It is also my opinion that allowing Mr. Wilson to remain on his stomach with no weight on his back for a short period of time until the arrival of Smith was consistent with generally accepted policies, practices, and training particularly in light of the fact that Danley had a second suspect to contend with and possibly a third suspect on the loose in the area.

77. It is my opinion, based upon my specialized background, training, education and experience as well as my continued research, authoring, auditing, consulting,

and training on law enforcement practices nationwide, that Officer Danley and Smith's reports to the medical personnel were consistent with generally accepted policies, practices, and training.

78. As noted by Paramedic Porterfield and consistent with my experience, officers lack medical training which is why they call upon and rely upon emergency medical services.  Officers are not trained in the details of symptomology or diagnosis particularly where there is no trauma or other clear information as to what is causing the complaint.  Paramedic Porterfield noted that he was aware that Mr. Wilson was complaining of trouble breathing and that there had been a foot pursuit.

79. This was not a case where it is alleged that officers played any role in Mr. Wilson's condition for example as in a use of force case.  Thus, officers had no information as to what led to this condition.   Smith's initial broadcast to dispatch when seeking EMS was that Mr. Wilson was complaining of having trouble breathing, which is exactly what occurred.

80. All law enforcement is trained that once emergency medical services are called to a scene to evaluate a suspect, all care, custody, and control decisions are placed with the medical personnel and issues related to arrest become secondary. It is noted that the officers and Paramedic Porterfield acknowledged that once Porterfield was called decisions with respect to detention and transport were in the authority of Porterfield and not the officers.   It is noted that plaintiff's expert acknowledged that the medical personnel cleared Mr. Wilson for jail and that it

is the Paramedic who makes this medical decision and not the officers.   As such all officers are trained that irrespective of officer's opinions or information, it is the emergency medical personnel that are trained to identify illness or injury based on a complete evaluation and make determinations as to the appropriate course of action.   Thus, any information provided by an officer would not change the level of evaluation or care conducted by EMS.

81. It is my opinion, based upon my specialized background, training, education and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide, that Officer Danley and Smith's remaining at the scene for a period of time after EMS cleared to complete their investigation as well as leaving Wilson in the vehicle while they secured Burroughs in the jail was consistent with generally accepted policies, practices, and training.

82. At the outset I note that plaintiff's expert, Roger Clark has indicated that Wilson may have been dead by the time the officers arrived at the jail.

83. A common practice in law enforcement is to secure suspects in police vehicles while officers conduct further investigation at the scene; speak with supervisors; gather information from suspects; and complete any other tasks necessary for their investigation.   Here, the officers were told by EMS that Wilson's oxygen was fine and that he was cleared for jail.   Any reasonable and well-trained officer would have concluded that leaving Mr. Wilson, seated in an upright

position in the police car was consistent with generally accepted policies, practices, and training.

84. All law enforcement is trained that when moving prisoners at a jail, the best practice is to have two officers conduct this movement.  Thus, moving one suspect at a time into the jail by Danley and Smith was consistent with generally accepted policies, practices, and training.   Additionally, by moving one prisoner at a time, the two officers outnumber the single prisoner should any resistance or violence occur.   I note that in conducting audits of jail nationwide, it is common practice to leave prisoners in the secure police vehicle in the secure area of the jail for a short period of time so that additional prisoners can be safely booked into the jail.   Any reasonable and well-trained officer would conclude that leaving Wilson, who had already been cleared by EMS, in the police car for a short period of time while Burroughs was booked in, was consistent with generally accepted policies, practices, and training.

85. At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

86. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

87. My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 23rd day of April 2018, in Greenville, R.I.

_____*s/John J. Ryan*_____
John J. Ryan