IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANTHONY WILSON and KIMBERLY )
WILSON, the parents of )
Martez Wilson, and the ESTATE OF )
MARTEZ WILSON )
                               )        Case No.
        Plaintiffs, )   1:17-CV-00634-ELR
                                )
        v. )
                                )
CITY OF DOUGLASVILLE, GA, et al., )
                                )
        Defendants. )

## <u>DECLARATION OF ROGER CLARK</u>

1. My name is Roger A. Clark. I have been identified as an expert witness by the Plaintiff's in this case on the subject of police practices.

2. The expert report attached hereto as Exhibit A is the expert report which I prepared for this case. I hereby adopt all statements contained in that report as if they are set forth fully in this declaration. Exhibit B is a copy of my resume, which is true and correct.

3. The purpose of this declaration is to set forth the professional duties that governed Officers Danley and Smith when they encountered and arrested Mr. Wilson, and my opinion that Officers Smith and Danley breached those duties.

4. This declaration concerns identical subject matter to my expert report and that which was covered in my deposition. It is based upon the same evidence which I reviewed in preparing my expert report and which was discussed at my deposition.

1

EXHIBIT "7"



5.    When I refer to "the Officers" in this case, I am specifically referring to Officers Danley and Smith. I recognize that we do not currently know whether both of these officers communicated with EMS, although it appears that there is testimony that the officers employed by the City of Douglasville did indeed communicate with EMS personnel at the site of Wilson's arrest. I also understand that there is video evidence that appears to show Danley speaking with EMS. It is also clear that, regardless of the extent to which Officer Smith was the officer who spoke to EMS, that the video evidence shows that Officer Smith was present at his car for the duration of the EMS assessment. Because there is evidence that both Officers were at the very least present during the officers' communication with EMS, I will assume in my assessment that both officers communicated with EMS and were aware of the substance of the information communicated by the other officers.

*Duty to Communicate with EMS*

6.    In my expert report, I stated that when Mr. Wilson stated that he could not breathe, the officers on the scene had a duty to summon EMS and give them a veracious account of the facts and circumstances, known to the officers, which led them to summon EMS. In addition, officers have duty to provide all information they learned concerning the subject of the call after summoning EMS and before EMS's arrival.

7.    This duty arises from the standards and practices that govern law enforcement across the nation. As detailed in my expert report and my accompanying resume, I derive these duties from my extended career in law enforcement, and my knowledge of the standards which govern law enforcement officers, including training standards. That career is detailed in my resume, which is attached as Exhibit B.

8.    Law enforcement officers who observe an individual prior to the arrival of EMS gain unique and relevant information, and it is universally understood in law enforcement that this information could be relevant—or determinative—to the assessment and treatment provided by EMS.



9.    If Danley and Flack had conformed to the duty I outlined above, they
      would have provided EMS the following information which was known:
      (a) that Wilson was found lying face down in a driveway, apparently
      having collapsed while running; (b) that Wilson was gasping for air
      initially, and complaining of an inability to breathe; (c) that Wilson
      became less and less responsive during the time the officers were on the
      scene, and that the officers observed Wilson go from being able to speak
      audibly to being completely non-responsive; (d) that Wilson never stood
      or walked under his own volition; (e) that Wilson had to be carried to the
      back seat of Officer Smith's patrol car, and that he was seat belted into the
      seat to ensure he would remain upright; (f) that since moving to the patrol
      car, Wilson had ceased responding entirely.

10.   In addition to those details which were omitted, the evidence shows that
      Danley and Smith specifically told Porterfield and Flack that Wilson had
      stopped talking because he was afraid, and that Wilson was remaining
      silent because he was afraid of being locked up. There is no evidence that
      Wilson ever made statements to this effect.

*Duty to Not Interfere with Medical Treatment By Imposing Final Decision Making*

11.   Police officers have a duty not to interfere with the medical judgment of
      medical providers, either by providing false information about a prisoner,
      by failing to provide a medical provider with information concerning the
      prisoner, or by directly hindering treatment by making a medical
      judgment about medical care and imposing that medical judgment on a
      medical provider.

12.   This duty derives from the basic premise that law enforcement officers are
      wholly unqualified to make a medical determination and, to the extent
      they are qualified,

13.   In this case, Officers Danley and Smith breached these duties. Either or
      both of those officers breached this duty by stating to EMS that Mr.
      Wilson was "faking" when he said that he could not breathe. The officers

3



also breached this standard of care by declaring to EMS that Mr. Wilson's failure to respond to the EMS's personnel's questions was simply because Wilson did not want to go to jail. According to statement of a medical technician on the scene, the decision to not transport Mr. Wilson to the hospital was made by law enforcement officers, rather than by EMS personnel. If the officers made the decision not to transport Wilson rather than the medical personnel, then their actions were inconsistent with the standard of conduct expected from officers facing like and similar circumstances.

14.   A law enforcement officer has a duty to respect the autonomy of EMS personnel and to allow them to make a full, complete, and independent assessment of an arrestee. The Officers here breached that duty by stating that Mr. Wilson was faking, and imposing their assessment upon the EMS personnel to the effect that Mr. Wilson should not go to the hospital. The duty to provide medical care also includes the duty to allow medical care to be provided without interruption or interference.

I swear under the penalty of perjury that the foregoing is true and correct.

This _18_ day of December, 2018.

_____
ROGER A. CLARK

4

EXHIBIT A

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

November 1, 2017

Mr. G. Brian Spears, Esq.
Law Offices of G. Brian Spears, P.C.
1126 Ponce de Leon Ave, NE
Atlanta, Georgia 30306

Jeffrey R. Filipovits, Esq.
Filipovits Law Firm, P.C.
2900 Chamblee-Tucker Road, Building 1
Atlanta, Georgia 30341

**Regarding:   *Anthony Wilson, et al., vs. City of Douglasville, GA, et al.., Case No.:
1:17-cv-00634-ELR.***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the March 3, 2016 in-custody death of Mr. Martez Wilson (Mr. Wilson) while under the aegis of Douglasville Police Department (DPD) Officers Coylee Danley (Officer Danley) and Andrew Smith (Officer Smith) and Douglas County Fire Department (DCFD) Paramedic Brian Porterfield (Medic Porterfield) and EMT Sean Flack (EMT Flack). Pursuant to the requirements of Federal Rule of Civil Procedure, Rule 26, I have studied the DPD reports, photographs, video and audio recordings, autopsy report, and other materials provided to me thus far (as listed below) regarding this case. I am advised that additional data is pending - including transcripts from scheduled depositions. Please be advised that if/when any additional information is submitted, it is likely that a supplemental report will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered by the Defendants versus those proffered witnesses, I do not opine for

Page 1 of 16

the trier of fact regarding who are the more believable witnesses. The resolution of any such conflicts are obviously the purview of a jury to decide.

## **Materials Reviewed Thus Far:**

1. Complaint for damages.

2. Interview Transcripts:
   a. Officer Andrew Smith.
   b. Officer Coylee Danley.
   c. EMT Sean Flack.
   d. Paramedic Bryan Porterfield.

3. Douglasville Police Department, Report and Supplemental Reports.

4. Autopsy Report, State of Georgia Bureau of Investigation, March 4, 2015, Case # 2015-1005060.

5. DCFD Bryan Porterfield Report, CQI#2517.

6. Douglas County Fire Department, Out of Hospital Care Report.

7. Transcriptions of Video:
   a. Transcript of Sergeant Caldwell's Dash Camera Audio, 53 Minutes (Video 1 and 2).
   b. Transcript of Officer Coylee Danley's Dash Camera Video Recording.

8. Audio:
   a. Sergeant Smith Interview.
   b. DCFD EMT Sean Flack Interview.
   c. DCFD Paramedic Bryan Porterfield Interview.
   d. Officer Bobby Dukes Interview.
   e. Officer Coylee Danley Interview.

9. Video recordings:
   a. Officer Danley Dash Camera.
   b. Sergeant Smith Dash Camera.
   c. Sally Port Videos.
   d. Booking Surveillance Video.

10.    Overview of the incident scene via the internet.

11.    Douglasville Policy Department Standard Operating Procedure 10-15-01.3 – Arrest Procedures

## Brief Overview of Events and Commentary:

*Incident*:

On the evening of Tuesday, March 3, 2015, officers with the Douglasville Police Department were dispatched to a business located at 6408 Fairburn Road. The officers suspected that an attempt was being made to burglarize that property.

After persons seen at the business ran from the location, Officer Danley was instructed to drive to a nearby residential neighborhood. While searching with his patrol car's spotlight, Officer Danley saw Martez Wilson lying face down in the driveway of a home located at 8465 Lynn Ave, Douglasville, Georgia.

At this point in the sequence of events, there were four different recordings of the incident (Officers Danley and Smith's dash cameras, DCD vehicle sally port, and booking hallway cameras). The interaction between the Defendant Officers and Mr. Wilson appear to have been captured to a great extent. However, he audio portion of the recording made by Danley's dashcam video cuts off before the video portion of the recording ends; the copy of Smith's dash cam video contains no audio portion.

The following paragraphs briefly detail the incident based on the initial contact Officer Danley made with Mr. Wilson, until the time Officers Smith and Danley realized Mr. Wilson was not breathing.

### *Arrival to Minute 1 and Seconds 15 (Officer Danley Dash Camera and Audio)*

After searching for two suspects, Officer Danley located Mr. Wilson, with his pants to his ankles, non-responsive, and prone in the driveway of 8465 Lynn Avenue. (Lynn avenue runs north and south, and 8465 Lynn Avenue is on the west side of the block.) As Officer Danley exited his patrol car, he announced his location, and proceeded to walk up the driveway of 8465 Lynn Avenue. Officer Danley's patrol car was facing south, so the driveway of 8465 Lynn Avenue was not within the dash camera view, but Officer Danley's body recorder captured his interaction with Mr. Wilson. After walking past the hood of his patrol car, Officer Danley asked Mr. Wilson, "Who are you?" Mr. Wilson did not reply. Officer Danley then ordered Mr. Wilson to place his hands behind his back.

Mr. Wilson mumbled an unintelligible response. Officer Danley ordered Mr. Wilson again to place his hands behind his back, or he (Officer Danley) would do it, and it "won't be nice". After Danley handcuffed Mr. Wilson, Carlos Burroughs (Carlos) walked to the driveway of 8465 and Officer Danley ordered Carlos to the ground, handcuffed him, and asked him if he knew Mr. Wilson.

*Minute 1 seconds 16 - Minute 2 seconds 58 (Officer Danley Dash Camera and Audio)*

Officer Danley detained both Mr. Wilson, and Carlos (who had been with Mr. Wilson earlier that evening). Officer Danley spoke to Carlos and Mr. Wilson, but Mr. Wilson was unable to utter any intelligible response. After calling in that he (Officer Danley) was in possession of two suspects, Officer Danley called for backup assistance. As Officer Danley awaited backup, Mr. Wilson lay wooden, in a prone position on the same spot of the driveway he lay when Officer Danley discovered him (Wilson). Officer Smith's patrol car came into view, traveling north on Lynn Avenue, and then stopped in front of Officer Danley's patrol car.

*Minute 2 seconds 59 - Minute 3 seconds 57 (Officer Danley Dash Camera and Audio)*

Officer Smith alighted his patrol car and walked toward the three men. Officer Smith and Danley interacted briefly. Shortly after Officer Smith arrived, Mr. Wilson, apparently in distress, stated that he couldn't move, and Officer Danley replied, "We don't give a fuck." Officer Danley walked to his patrol car and retrieved another set of handcuffs, and then walked back to Mr. Wilson. At approximately 3 minutes and 56 seconds, the resident of 8465 Lynn Avenue opened his door and stepped outside. Officer Danley and Smith ordered the resident to go back inside his house. At this point in the sequence of events, Mr. Wilson uttered his most intelligible statement, "Okay, Sir, I can't breathe." Officer Danley responded, "You can breathe, you're talking." Officer Smith said, "Yep, you're talking." No emergency personnel were summoned, and Mr. Wilson continued to lay in the driveway of 8464 Lynn Avenue - struggling to breathe.

*Minute 3 seconds 58 - Minute 5 seconds 40 (Officer Danley Dash Camera and Audio)*

Officer Danley and Smith ordered Carlos Burroughs to stand up. They told Carlos to pull his legs underneath his buttocks and then counted, "one, two, three" and lifted Carlos. After lifting Carlos, the Officers asked him several questions, which Carlos answered.

*Minute 5 second 44 - Minute 10 second 07(Officer Danley Dash Camera and Audio)*

Officer Danley and Officer Smith began a conversation. Officer Smith called an EMS unit to the scene. Officer Danley said, "He's [Mr. Wilson] screaming for EMS". Sergeant

Cadwell arrives on the scene and converses with Danley and Smith. However, Officer Danley did not call for EMS. Mr. Wilson was heard in the background saying he could "barely" breathe. Officer Danley responded, "You're breathing". Mr. Wilson was asked what's wrong with him, and he responded that he couldn't breathe. An Officer asked why, but Mr. Wilson did not respond. The Officer said, "Cause you're in handcuffs." Then Officer Danley said, "I'll tell you right now, you're going to jail either way." Next, three Officers (Sergeant Cadwell, Officer Smith, and Officer Danley) carried Mr. Wilson, in a prone position, and placed him in Officer Smith's patrol car. Officers were recorded calling Mr. Wilson a "fucking idiot", "fucking retard", and accusing him of resisting the Officers by stiffening his body.

*Minute 10 seconds 08 - Minute 12 seconds 07(Officer Danley Dash Camera and Audio)*

The Officers talked with the resident of 8465 Lynn Avenue, and began to search the area. They searched a motor home. As Officer Danley walked back toward a tree in the middle of the yard, he was met by Sergeant Cadwell. After nearing Sergeant Cadwell, Officer Danley's audio stopped - possibly shut off.

*Minute 12 seconds 07 - Minute 21 seconds 21 (Officer Danley Dash Video Camera)*

The Officers continued to search the area, but did not locate any other suspects. Officer Smith walked by his patrol car and shone his flashlight on Mr. Wilson, but did not enter the patrol car. After several minutes, Officer Smith returned to his patrol car, opened the rear driver's side door, and leaned on the door. Officer Smith did not check Mr. Wilson's pulse or enter the patrol car to check on Mr. Wilson. Douglasville paramedic Porterfield and EMT Flack arrived and stood at Officer Smith's patrol car. The two EMS personnel appeared to stand at the door and got a reading of Mr. Wilson's oxygen level. The EMS workers stayed on scene for approximately five minutes, and then departed.

Additionally, according to Sergeant Cadwell's dash video and audio, during the time the EMS personnel were present, Sergeant Cadwell states "he is foaming at the mouth now, just so you know" after observing Wilson. It does not appear this information was communicated to the EMS workers.

*Minute 21 seconds 22 - minute 35 seconds 20(Office Smith Dash Camera Video)*

Officers Smith and Danley remained at the scene for approximately 9 minutes after EMS departed, and then drove to the Douglasville Police Station. Officer Smith drove, non emergency, to the station and arrived approximately 35 minutes after Mr. Wilson was discovered on the driveway of 8465 Lynn Avenue, prone and unresponsive.

_Minute 35 seconds 21 - Minute 47 second 24(DPD Vehicle Sally Port Camera Recording)_

Officer Smith pulled into the sally port and parked. He did not check on Mr. Wilson. Officer Danley arrived approximately 2 minutes after Officer Smith. Officer Danley pulled into the sally port and parked his patrol car behind Officer Smith's. The Officers walked to the rear passenger's side of Officer Danley's patrol car and retrieved Carlos, whom they decided to process first - despite Mr. Wilson's earlier complaints of breathing problems. As the Officers processed Carlos, Mr. Wilson remained handcuffed in the back of Officer Smith's patrol car. For nearly 11 minutes, Mr. Wilson had no contact with any Officer. The Officers walked into the sally port, and Officer Danley pulled Mr. Wilson out of the rear passenger's door of Officer Smith's patrol car. Mr. Wilson, apparently unable to walk - was dragged into the booking area.

_Minute 47 seconds 25 - Minutes 53 seconds 25(DPD Booking Camera Recording)_

Mr. Wilson was dragged into the booking area by his arms - still in handcuffs. Mr. Wilson was lifeless from the time he was dragged out of Officer Smith's patrol car to the moment he was captured on the booking video recording. After six minutes, Officer Danley and Officer Smith checked Mr. Wilson's pulse and found that he did not have a pulse. EMS was summoned, but Mr. Wilson was expired.

When EMS personnel arrived to the site of Wilson's arrest, the Officers stated that, only when Mr. Wilson was arrested did he complain that he was having trouble breathing. However, they did not give a full account of Mr. Wilson's condition.

The Officers did not report to the EMS personnel that Mr. Wilson was found face down in the driveway, or that Mr. Wilson was unable to walk or stand. Instead the Officers told EMT Flack and Medic Porterfield that Mr. Wilson was afraid of going to jail, or simply did not want to go to jail.

Furthermore, the Officers did not report that Mr. Wilson had to be carried to the patrol car, because he could not walk, nor did they report that when they got Mr. Wilson to the patrol car, they had to fasten his seatbelt to hold him erect inside the police unit. The Officers further did not report that Mr. Wilson became less and less responsive during the time they were on the scene, and went from being able to articulate that he could not breathe and supplying his last name to officers to being completely non-responsive by the time he was in the back seat of the patrol car.

When EMT Flack and Medic Porterfield asked Mr. Wilson questions, Mr. Wilson did not respond. Mr. Wilson only stared straight ahead with his eyes open. Medic Porterfield and EMT Flack observed Mr. Wilson as he was sitting upright strapped into the seat of

the patrol car. They did not conduct a complete assessment of Mr. Wilson. They did not complete any on-scene documentation of their contact with Mr. Wilson. Neither of them prepared any report or record of their contact with Mr. Wilson, as relates to what they saw or did until long after he was dead. Before they left, neither Medic Porterfield or EMT Flack gave any instructions to either of the law enforcement officers as to monitoring or safeguarding Mr. Wilson's condition, and none of the officers on the scene asked for any such guidance.

## Officer Danley Interview Excerpt:

| | |
|---|---|
| Q: | He never fought with you? Nothing like that? |
| Danley: | No. |
| Q: | Never resisted arrest other than. |
| Danley: | Other than just being limp. |
| Q: | Non-cooperative. Did he ever say anything that you recall other than I can't put my hands behind my back. |
| Danley: | He did say I can't breathe a couple of times and that's why we called EMS. |
| Q: | And he never gave you a name or anything like that? |
| Danley: | He never gave me a name. I never heard his name and the other guy referred to him as. he said "I only know him as Ted" He said they met, they know each other from college. Apparently they go to Benedict College. He said they were here for vacation. He kept saying spring thing.. I'm sure he meant spring break. But he could never give me a full name. He just said I only know him as Ted. |
| Q: | And what were they arrested for? |
| Danley: | Right now they are being charged with Criminal Trespass and Theft by Taking. |
| Q: | Did they have anything on them that you found? |
| Danley: | I patted the Burroughs subject down. All he had in his pocket was a Kleenex and two condoms his cell phone and headphones. |
| Q: | What about the other subject? |
| Danley: | I did not pat him down. I know he did have a cell phone and a little bit of cash on him also. I'm not sure of the amount of cash for either subject though. |
| Q: | Alright, anything else you can think of that may have happened, said, you witnessed, anything like that? |
| Danley: | Nah, that's everything. |

Q:         And about how much time transpired from when you located
           them on the driveway and headed back to the jail.

Danley:    That could be anywhere from 20 to 30 minutes.

**Opinions Thus Far:**

1.    Officer Danley, as the first responder, had a duty to protect the life
      and safety of Mr. Wilson, who was detained and under the legal
      aegis of Officer Danley.  When Mr. Wilson reported that he could
      not breathe, Officer Danley had a duty to immediately summon
      emergency personnel and give them a veracious account.  Instead,
      Officer Danley ignored his duty and policy, and allowed Mr. Wilson
      to lay, prone, and unresponsive on the driveway until the arrival of
      later officers..

2.    Each of the Officers on the scene of Mr. Wilson's arrest knew that he
      was found motionless, face down, in a drive way.  Each Officer
      knew that Mr. Wilson had repeatedly complained that he could not
      breathe, and that Mr. Wilson's ability to respond deteriorated during
      his interactions with the Officers. Each Officer assisted in carrying
      Mr. Wilson to Officer Smith's patrol car, and could see that Mr.
      Wilson was completely limp and unable to move his body.  Each
      Officer knew that Mr. Wilson had been seat belted into the back of
      the patrol car, which would give EMS personnel a false impression
      that Mr. Wilson could sit up right when he could not.  Each Officer
      knew that Mr. Wilson had recently run from the scene of an
      attempted theft after being spotted by other police officers.  Each of
      the Officers had a duty to provide this information to DCFD medic
      Porterfield and DCFD EMT Flack after they arrived on the scene.
      Instead, no Officer gave a full and accurate account of the encounter
      with Mr. Wilson, or the full reason that EMS had been summoned.
      Instead, Officers misrepresented Mr. Wilson's condition and
      indicated that the cause of Mr. Wilson's complaint was simply that
      he did not wish to go to jail and he was therefore faking a medical
      emergency.  Each Officer on the scene had a duty to accurately
      provide their known information to the EMS personnel, and every
      reasonably trained police officer would know that the information
      they provided would weigh heavily on the assessment and treatment
      given to Mr. Wilson.  This duty became greater after Wilson was no
      longer talking and, as reported by the EMS personnel, he was not

responsive to any questioning. Taking into account the conduct – and the verbal statements – of the three officers, my opinion is that the Officers on the scene deliberately chose not to provide that information. The extreme disregard for standard procedure in this situation, and the vast departure from the established standards of conduct imply a willful intent to do wrong, rather than mere incompetence.

3.     My opinion that the officers deliberately misrepresented Mr. Wilson's condition is reinforced by the Officers' behavior during the scene. During my career, I have participated in investigations and taken statements made by officers during an incident that are considered to be evidence of their subjective intent and mental state. In this case, the Officers immediately assumed Mr. Wilson was faking his medical condition, mocked him by calling him a "fucking retard," accused him of resisting arrest, laughed about his inability to breathe. Sergeant Cadwell made the particularly chilling comment that, "I don't want him making no phone calls, even though it's hard for the dead to make phone calls." Other Officers laughed. In addition to the objective failure of the Officers to supply EMS personnel with information relevant to Mr. Wilson's emergency, these statements evince a total disregard for the substantial danger faced by Mr. Wilson.

4.     After EMS personnel left the scene, each of the Officers had a continuing duty to monitor Mr. Wilson. Douglasville Police Department Procedure 10-15-01.3 states that, when transporting an detainee, officers "are not to lose sight of the detainee." This policy is consistent with standard training and police practices. Officers Smith and Danley disregarded this policy. Neither officer checked on Mr. Wilson, never asked Mr. Wilson if he was okay, and left Mr. Wilson unattended in the backseat of a patrol car while they first transported Mr. Burroughs into the jail. Both Officer Smith and Danley failed to follow policy and training, and deliberately ignored Mr. Wilson's ongoing health crisis.

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision,

Page 11 of 16

various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1550 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police

Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp2nd.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a

suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and taser weapons.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part

from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certification as an expert in the general use and deployment of the TASER weapon occurred in San Francisco, California on January 29, 2015 in *Andre Little, an Individual, v. City of Richmond, et al.*, Case No: CV-1302067-JSC.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed November 1, 2017 at Santee, CA.


Roger A. Clark

EXHIBIT B

**ROGER A. CLARK**

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458.  Fax: (619) 258-0045.*

EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present.................................................................. **23 years**

I have been certified by Federal and State courts as expert in jail and police procedures in Federal and State Courts.  I select my cases carefully and have consulted in approximately 1500 cases thus far since my retirement from the Los Angeles County Sheriff's Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003........................................................................ **9 years**

I substitute teach at all levels in the school district (elementary to high school).  As a volunteer, I wrote and managed a $85,000.00 federal grant for our Central High School.  This grant is in its sixth year and has generated $510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties in the Seventh Judicial District.  As such, I worked closely with Probation Officers, County Commissioners, Judges, other state agencies, private care providers, etc. in the implementation of the new Idaho Juvenile Corrections Act of 1995.  I wrote or participated in the writing of several federal grants for the District.  I conducted training - both formal and informal - and developed a series of new therapy programs for juveniles with private care providers.  I also served as the Director of the Detention Center and the State Placement Coordinator during this time.

-1-

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:**  In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

**Service as a Lieutenant (15 Years, 0 Months):**

1.  **Field Operations Region I**
    **NORSAT**                     11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders.  This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County.  The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees.  The 1992 budget set at $1.5 million.  The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

•        Increase in participating police agencies.
•        Direct participation with corporate (private) agencies.
•        Formation of a reserve and volunteer unit.
•        Establishment of NORSAT Foundation private funding.
•        Computerization of the unit.
•        Promotion of fourteen personnel.
•        Fleet expansion from 13 to 28 vehicles (donated).
•        Formation of the DEA Valley Task Force.
•        Field Operations Directive 89-3.

2.      **Executive Offices**
        **Reserve Forces Bureau**      05/01/84 to 11/15/87 **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

volunteers, and 450 law enforcement explorer scouts.  The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.


3.    **Field Operations Region I**
      **Crescenta Valley Station**     04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station morale.

4.     **Custody Division**
       **Central Jail**                    04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of California, with a daily inmate population of seven thousand (7,000), an assigned staff of six hundred (600), and two hundred (200) civilian personnel. My service at this command was equally divided into two major assignments:

•     Training and Logistics Lieutenant (04/01/79 to 04/01/80).
•     Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

•     "Hot Fire" Training program, which is now a State (POST) mandated training module for all custody personnel throughout California.
•     The "Defend in Place" fire safety operational plan for jail facilities.
•     New fire safety specifications for jail bedding and mattresses.
•     The development of fire safe jail mattress material.
•     The development of a facility emergency response plan.
•     The computerization of training, timekeeping, and scheduling for the facility (800 sworn and 200 civilian personnel).
•     "Spouse day at CJ"--A program for spouses of employees.

**Service as a Sergeant (6 Years, 4 Months):**

5.     **Administrative Division**
       **Federal Surplus Property**   01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my previous assignment (Emergency Operations Bureau). The unit provides millions of dollars in free federal excess and surplus food and property from clothing to heavy equipment and aircraft to the department each year. I am very proud of this contribution to the Department.

6.     **Patrol Division**
       **Emergency Operations**   02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the activities of the Department's planning   unit with emergency operations planning and preparation. I was assigned as the Personnel and Logistics Sergeant.

-4-

Significant contributions while assigned at this command are:

- Formation of a new County Emergency Operations Center.
- Participation in the 1974 Federal earthquake studies of Los Angeles County.
- Development of the Department's specialized Field Command Post equipment.
- Development of the Department's Field Booking Team.

7.    **Patrol Division**
      **Civil Defense Bureau**      12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

8.    **Patrol Division**
      **San Dimas Station**      12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant.  I also frequently served as the Watch Commander.

9.    **Technical Serviced Division**
      **Communications Bureau**   12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

10.   **Patrol Division**
      **San Dimas Station**
      **Detective Bureau**      01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch.  I handled the first response to all crimes requiring investigations.  I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

-5-

11.     **Patrol Division**
        **San Dimas Station Patrol**     01/29/68 to 01/01/70 **24 months**

I performed all duties assigned to Station Patrol:  Jailer, Desk, Watch Deputy, Patrol, and Traffic.


12.     **Technical Services Division**
        **Transportation Bureau**     11/01/67 to 01/29/68 **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.


13.     **Custody Division**
        **Central Jail**     05/06/66 to 11/01/67 **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy.  I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.


14.     **Administrative Division**
        **Academy**     01/17/66 to 05/06/66 **04 months**

I was a Sheriff's trainee assigned to Class #110.


15.     **Custody Division**
        **Central Jail**     12/01/65 to 01/17/66 **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.


## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |