UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY WILSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: |
| | ) | |
| v. | ) | 1:17-cv-634-WMR |
| | ) | |
| CITY OF DOUGLASVILLE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO CITY OF DOUGLASVILLE, DANLEY, AND SMITH'S MOTION FOR SUMMARY JUDGMENT

## I.     Statement of Facts[1]

Officers found Mr. Wilson laying face down in the middle of a driveway. Pl. SMF ¶ 7–9. Wilson, then twenty-one years old, matched the description of a suspect in a burglary of a local ATV dealership. *Id.* ¶¶ 1, 15–16. When Officer Danley found him, it was apparent that he had collapsed while running from the site of a burglary. *Id.* ¶ 88. Mr. Wilson was largely non-responsive to law enforcement when they arrived, but he did make one thing clear: he was having difficulty breathing. *Id.* ¶¶ 17–74. The officers did not believe him, and ignored

---

[1] Plaintiffs offer this brief factual summary, and reference additional facts as they are relevant to the argument, *infra*. Plaintiffs incorporate all facts set out in the separate statement of material facts by reference.

1

signs that Wilson was telling the truth. Wilson could not stand. He became less and less responsive, and ultimately, he was non-responsive. *Id.* ¶¶ 35, 74, 88, 101, 110.

The officers did not care. They told him "if you can talk, you can breathe." Pl. SMF ¶ 40, 64.[2] Danley called him a "fucking retard." *Id.* ¶ 98. Both officers independently told Wilson that he was "going to jail *no matter what*," and that they "did not give a shit" if he couldn't breathe. *Id.* ¶¶ 76, 77, 79, 80. Nevertheless, Officer Smith summoned EMS. *Id.* ¶ 46. But they still made true on their promise that, no matter how often Wilson pled he could not breathe, he was going to jail.

Before EMS arrived, the officers carried Wilson's limp body to Smith's patrol car and strapped him in so he would remain upright. Pl. SMF ¶¶ 81–108.[3] When EMS personnel arrived on the scene, the officers told them that Wilson was faking, that he had "just been talking to them," and that he was scared of going to jail. *Id.* ¶¶ 109–128. These statements were false. The officers rushed the EMS responders performing the assessment. *Id.* ¶¶ 129–145. Ultimately, the officers declared that if Wilson did not want to talk, he did not want to go to the hospital. *Id.* ¶¶ 138, 139. In contravention of protocol, the officers, not EMS, decided not to

_____

[2] This mantra was completely inapplicable to the situation, and applies only to individuals with obstructed airways. *See* Pl. SMF ¶¶ 209, 222.

[3] City of Douglasville officers are trained not to move someone who is injured until EMS arrives. Pl. SMF ¶ 291.

transport Wilson to the hospital. *Id.* ¶ 143, 203, 204.

After EMS left the scene, the officers joked about Wilson's inability to breathe. Pl. SMF ¶¶ 174, 176, 187. When Deputy Cadwell mentioned that he took Wilson's phone, but it did not matter because "the dead can't make phone calls," the officers laughed. *Id.* ¶ 187. Meanwhile, Wilson was in the backseat of Officer Smith's patrol car, slowly dying. After EMS left, both Officers confirmed to one another that Wilson was non-responsive. *Id.* ¶¶ 182–183. The officers knew that Wilson was foaming at the mouth, and believed that Wilson would not be able to be booked into the jail because he would not "wake up." *Id.* ¶¶ 179–183. After EMS left, Smith noted that he needed buckle Wilson in to prevent him from rolling over and "getting positional asphyxia." *Id.* ¶ 180.[4] In spite of knowing that Wilson was non-responsive, they delayed leaving the scene for nine minutes, and never checked on him. *Id.* ¶ 188. After a five minute ride to the jail, they left Wilson—unattended—in the backseat of a patrol car for an additional seven minutes. *Id.* ¶¶ 189, 191. Finally, the officers dragged Wilson's lifeless body out of the patrol car and into the jail cell. *Id.* ¶ 193. More than twenty minutes after EMS left, and when

---

[4] This belies any belief that Wilson was simply faking, and shows that Smith knew that Wilson could not move under his own power, and was not non-responsive simply because he was faking his condition.

3

they knew that Wilson was limp, foaming at the mouth, and would not "wake up," the officers opened the patrol car door and dragged Wilson's limp and lifeless body into a jail cell, while still berating him. Pl. SMF ¶ 192–193. At that point, Wilson was dead.

## II.   <u>Standard of Review</u>

The court may grant summary judgment only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All facts and reasonable inferences must be taken in the light most favorable to the plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

## III.   <u>Argument and Citation of Authority</u>

### a.   **Violation of the Fourteenth Amendment[5]**

_____

[5] In the interest of preserving an issue for appeal, Plaintiffs urge that their claims should be assessed under the objective reasonableness standard. Plaintiffs acknowledge that precedent that is binding upon this Court holds that Plaintiffs' claim must be governed by the Fourteenth Amendment. Nevertheless, Plaintiffs' claims should be governed by the Fourth Amendment rather than the Fourteenth Amendment because, at the time of the denial of medical care, Plaintiff was not detained pursuant to legal process and therefore his seizure should be analyzed under the Fourth Amendment. This analysis has been adopted by the Seventh Circuit. *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Second, even if this Circuit applies the Fourteenth Amendment to claims by an arrestee for inadequate medical treatment, those claims should be governed under the objective reasonableness standard announced in Plaintiffs submit that these holdings should be revisited in light of *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015). *See Richmond v.*

To prove a Fourteenth Amendment violation, a plaintiff must show the objective unreasonableness of an officer's decisions concerning medical care in addition to: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence.[6] *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).[7]

### 1.   *Objective unreasonableness*

A medical need satisfies the objective component if it "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994).

The officers argue that Mr. Wilson was not suffering from an objectively

---

*Huq*, 885 F.3d 928, 938 (6th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (each adopting the objective reasonableness standard). Plaintiffs readily admit that the Eleventh Circuit has not adopted this approach. *See Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Florida*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (rejecting the argument in dicta, and continuing to apply the deliberate indifference standard).

[6] Defendants cite the standard as "more than *gross* negligence." That is not the standard. *See Melton v. Abston*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016).

[7] The standard for Eighth and Fourteenth Amendment claims for deliberate indifference to medical needs are identical, and "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Cottrell*, 85 F.3d at 1490.

serious medical need that would have been obvious to a lay person despite knowing that: he collapsed and became nearly motionless after running; he was found nearly naked on the pavement of a residential driveway; he repeatedly pleaded to the officers that he could not breathe; he had no ability to stand or move on his own; he became less and less able to respond in any way to the officers until he eventually was silent, motionless, and non-responsive. Then, after EMS left, he was foaming at the mouth, unable to wake up, and unable to sit up.

Under these facts, it is clear that a lay person would have *easily* recognized the necessity of a doctor's attention. *See Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005), *abrogated non other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015) ("No one disputes that Haggard had a serious medical need once his breathing was impaired and he became unconscious.").

### 2. *Subjective awareness and culpability*

"Whether each of the defendants had the requisite knowledge of the seriousness of [the plaintiff's] medical needs is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997)

(citing *Farmer v. Brennan*, 511 U.S. 825, 840, (1994)).[8] An officer cannot escape liability merely by claiming they did not believe a subject's complaints. *See, e.g.*, *Goebert v. Lee County*, 510 F.3d 1312, 1327–28, 1331 (11th Cir. 2007) (holding jail captain who decided to disbelieve a pregnant inmate's medical complaints that she was leaking fluid could be found deliberately indifferent); *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 864 (8th Cir. 2006) (rejecting officers' claims that they did not believe that the plaintiff was having trouble breathing because, at the time, the plaintiff could still yell). The ultimate question is whether the defendant knew facts indicating a serious risk and deliberately disregarded those facts, not whether the defendant simply chose to disbelieve an arrestee's otherwise legitimate complaints. *See Goebert*, 510 F.3d at 1328 ("The problem is that Captain Weaver did not believe Goebert, and the reason he did not believe her smacks of deliberate indifference. His deposition testimony, read in the light most favorable to Goebert, leads to the conclusion that Weaver automatically disbelieved any medical

---

[8] "A defendant will rarely make the admission of an awareness and appreciation that the inmate was in serious need of medical care to avoid the risk of harm, because to do so is an admission of subjective indifference, i.e., admission of a culpable state of mind and liability." *Howard v. City of Columbus*, 239 Ga. App. 399, 404 (1999).

complaint by an inmate.").[9]

The officers rely on their claimed belief that Wilson was faking his condition, writing that Wilson was "*refusing* to verbally respond," and "*refused* to sit up or stand on his own." Doc. 132-1, at 20 (emphasis added). What was Danley's justification for his belief that Wilson was faking? He claimed that sometimes people who are arrested feign illness, that Wilson was limp, and Wilson said he could not breathe—and nothing else. *See* Danley, at 37:5–10. Danley also acknowledged he watched Mr. Wilson's condition deteriorate from the time he arrived on the scene until Wilson was placed in Smith's patrol car, and that Wilson went from being able to audibly say he could not breathe to not speaking at all. Pl. SMF ¶ 110. This decline in Wilson's condition occurred over the course of approximately nineteen minutes. *See* Danley Vid. at 14:23–33:30. Danley also knew that Wilson collapsed while he was running, and was laying face down on

---

[9] "When [officials] ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference. *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990). *See also Estate of Carter v. City of Detroit*, 408 F.3d 304, 310, 312-13 (6th Cir. 2005) (holding a defendant who knew the plaintiff was exhibiting "the classic symptoms of a heart attack" and did not arrange transportation to a hospital could be found deliberately indifferent).

the ground when he arrived.[10] Pl. SMF ¶¶ 9–25, 88.

Smith knew the same information as Danley. He knew that Wilson had collapsed while running, that he said little more than that he could not breathe, and that he could not stand under his own power. He knew that the retort he used against Wilson—if you can talk, you can breathe—was meaningless. *See* Pl. SMF ¶ 209. Smith also watched Wilson's condition deteriorate up to the point that EMS arrived. Officer Smith further claims that he believed that Wilson was not in a medical emergency because, at one point, he could feel Wilson "huffing" while he was braced against Smith's legs. Pl. SMF ¶¶ 42–44. By the time Wilson was in the back seat of the patrol car (and completely non-responsive), Wilson was no longer moving air as actively, and his eyes were closed. In short, a jury could easily find Smith knew there was something seriously wrong.

The officers' justification mirrors that of the defendant in *Goebert*, who

_____

[10] The officers' brief claims that the fact that Wilson was running may have meant only that Wilson was out of breath, and experiencing temporary difficulty breathing. But the facts show that Wilson was initially compliant with officers, and became less responsive. A person who is initially compliant and out of breath does not become less responsive as they recover. *See* Pl. SMF ¶ 221. The fact that the officers knew that Wilson had been running makes it much more likely that he was in fact experiencing a medical crisis—such as a heart attack, asthma attack, or other exertional illness. Contrary to Defendants' argument, the officers did not have to know that Wilson was in the midst of a *sickle cell crisis* to know that he faced a crisis.

automatically disbelieved inmates' medical complaints. Under these facts,

Plaintiffs submit that a jury could find that Danley had subjective knowledge that

Wilson faced a serious risk of harm if he did not receive immediate—and adequate

—medical attention. Officers cannot escape liability "if the evidence showed that

[they] merely refused to verify underlying facts that [they] strongly suspected to be

true, or declined to confirm inferences of risk that [they] strongly suspected to

exist." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008).[11]

### 3.    *Smith and Danley's disregarded the known risk to Wilson*

An arrestee may show deliberate indifference in a number of ways: (1)

actual knowledge of a serious need for medical care, plus a failure to treat; (2)

delay in treatment, potentially "even for a period of hours"; (3) "grossly inadequate

---

[11] This case stands in stark contrast to *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009), relied upon by the officers. In *Mann*, officers arrived on the scene, they encountered the plaintiff who they learned had used methamphetamine and was violent, aggressive, and delusional. The court noted the plaintiff's "physical resistence [sic] and verbal communication" also suggested that, "although agitated, [the plaintiff] was not in immediate medical danger." *Id.* The court specifically noted that there was nothing indicating that the plaintiff's behavior was anything other than "a temporary reaction to the known use of methamphetamine[,]" and that the officers had no awareness that the condition "could lead to death if not promptly treated." This case, on the other hand, involves a man who could not breathe, was limp, and was non-responsive. As outlined above, the officers had ample reason to believe that Mr. Wilson was in the midst of a medical crisis, and the reason they chose not to believe him "smacks of deliberate indifference." *Goebert*, 510 F.3d at 1328.

care"; (4) "a decision to take an easier but less efficacious course of treatment"; or (5) "medical care which is so cursory as to amount to no treatment at all." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). An officer's conduct may constitute deliberate indifference even if the officer took "some measure in response" to a known medical risk. *Olson v. Bloomberg*, 339 F.3d 730, 738 (8th Cir. 2003). *See also Valderrama v. Rousseau*, 780 F.3d 1108, 1121 (11th Cir. 2015) (finding the officers were deliberately indifference in spite of summoning EMS).

Before proceeding, Plaintiffs note that in considering a deliberate indifference claim, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Here, there is a fundamental factual dispute concerning which of the two City police officers communicated with EMS personnel. *See* Pl. SMF ¶ 292. It is clear from the video evidence that Officer Smith spoke to EMS personnel for the duration of the time they were on the scene. Officer Danley, on the other hand, claims he did not speak to EMS and did not know what information was communicated to them. The problem for Danley is that the video evidence clearly shows him speaking to EMS personnel. For the statements by officers to EMS discussed *infra*, the testimony from the EMT on the scene is that the statements

11

were made by City police officers, i.e., Smith or Danley. A jury will have to determine whether Smith, Danley, or both are responsible.[12]

First, given the officers' duty to inform EMS of the circumstances of Wilson's emergency, a reasonable jury could find that Danley and Smith misrepresented Wilson's condition. First, they omitted key information, including that Wilson had collapsed, was non-responsive, and deteriorated over the time when they were on the scene. They omitted that Wilson was found face down, with his pants around his ankles, non-responsive, could not stand, had to be carried into the patrol car, and seat belted in so that he would not fall over. Pl. SMF ¶¶ 109–126. Instead, they told EMS that Wilson had "just been talking to them," *id.* ¶ 121, and that Wilson did so because he was trying to get out of going to jail. *Id.* ¶ 128. They told EMS that Wilson was faking his condition. *Id.* ¶ 114.

Second, a reasonable jury could find that Danley and Smith interrupted EMS's assessment and imposed their decision that Wilson should not be taken to the hospital. There is no dispute that EMS *should* have the final decision over all

---

[12] Defendants cannot escape liability by claiming that Plaintiffs cannot identify which of the two officers communicated with EMS. *See Nesmith v. Alford*, 318 F.2d 110, 119 (5th Cir. 1963) ("As to the issue of individual liability, each of the three defendants . . . acted as one. Although there was no prior plan devised to bring about the arrest and imprisonment of the plaintiffs, each of the three had a substantial role in bringing about the results.").

medical treatment, including whether to transport an arrestee to the hospital. But that is not what happened here. The officers rushed EMS, and ultimately made the final decision not to transport Wilson, in spite of EMS's offer to do so. *See* Pl. SMF ¶ 129–145.

### 4.   *The officers' conduct amounts to more than negligence*

The standard of culpability is simply "more than mere negligence." *See Melton v. Abston*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016) (explaining that the standard of culpability—more than negligence—is controlled by the court's decision in *McElligott*).[13] It does not require a showing that officers acted with "very purpose of causing harm or with knowledge that harm will result . . . ." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

The language used on the scene is part of the totality of the circumstances in assessing the officers' subjective state of mind. *See Brown v. City of Hialeah*, 30 F.3d 1433, 1436 (11th Cir. 1994) (accepting that words spoken while actions are being taken can be useful to one seeking to determine from all the circumstances the reasonableness of the actions); *Evans v. Stephens*, 407 F.3d 1272, 1281–82 &

---

[13] Plaintiffs position is that they prevail under either the "more than negligence" or "more than gross negligence" standard, but that this Court should apply the standard re-affirmed in *Melton*: more than mere negligence.

n.12 (11th Cir. 2005) (involving the use of threatening and racist language during a search).

Here, a reasonable jury could find that Defendants determined that Plaintiff would not be allowed to go to hospital even before EMS's arrival and thereafter intentionally misled EMS. The officers' statements at the scene are circumstantial evidence of their mental state. *See* Pl. SMF ¶¶ 50, 76, 77, 84, 86, 87, 90, 95, 97, 98, 108, 175, 176, 184, 187. Specifically, the officers' statements that Wilson would go to jail no matter what, that Wilson could breathe if he hadn't been "stealing shit."

A jury could also find that the officers did so in direct contravention of their training and the official policies of the City of Douglasville, and industry standards that govern law enforcement officers. *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) ("[W]e find persuasive the correctional officers' disregard of prison protocols, which describe the actions that officers should take when an inmate makes certain medical complaints or exhibits certain medical symptoms."). *See* Pl. SMF ¶¶ 196–222 (explaining the policies and standards which the officers disregarded).

### 5.   *Causation*

#### A.   Mr. Wilson's estate's claim

14

It is important to distinguish between the claim brought on behalf of Mr. Wilson's estate and the survivor claims brought by Mr. Wilson's parents. The claim on behalf of Mr. Wilson's estate is based upon damages Wilson suffered before his death. Georgia law, which controls questions of whether a claim abates after the death of a plaintiff, allows for such a claim. *See Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1049 (11th Cir. 2011) (recognizing that, under Georgia law, a § 1983 claim survives a decedent's death— "[H]ad the events in this case occurred in Georgia instead of Alabama, Gilliam's § 1983 claim would have survived his death") (citing O.C.G.A. § 9-2-41). *See also Am. Gen. Life & Acc. Ins. Co. v. Ward*, 509 F. Supp. 2d 1324, 1334 (N.D. Ga. 2007) (holding that claims for civil rights violations survived following the decedent's death and could be maintained by the decedent's personal representative).

Since a claim for damages survives Mr. Wilson's death even if the officers did not cause his death, there is no need to show that the inadequate treatment was the proximate cause of Wilson's death. The causation question in a § 1983 case does not look to whether a defendant caused a particular aspect of a plaintiff's damages; rather, it looks to whether the defendant's conduct caused the *constitutional violation*. "The final requirement for a deliberate indifference claim

is that a defendant have a causal connection to the *constitutional harm*. Causation, of course, can be shown by personal participation in the constitutional violation." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (emphasis added). *See also Valderrama*, 780 F.3d at 1116 ("Mr. Valderrama does not necessarily need to show that the delay in medical care exacerbated his condition because the delay in care is, itself, a wanton infliction of pain and a constitutional violation.").[14]

If Defendants caused the constitutional violation—here the denial of medical care—then the extent of Mr. Wilson's damages is a jury question. Here, Wilson remained locked in the back of a patrol car, dying, while the officers did nothing. The last thing Wilson heard anyone say was that he did not deserve treatment, and then they closed the door and walked away. *See Monk v. Dial*, 212 Ga. App. 362, 362 (1994) (rejecting the argument that there was no evidence that the decedent consciously experienced pain and suffering where the jury could infer that, shortly

---

[14] *See also Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004) ("Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment . . . their conduct in causing the delay creates the constitutional infirmity. In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.").

16

before a collision, the decedent was aware of the impending crash and, from those circumstances, extrapolate the probable mental state of the decedent in the last moment of consciousness). Moreover, even in absence of evidence of damages, Wilson's estate would be entitled to recover nominal damages for deliberate indifference to his medical needs. "It has long been recognized in the caselaw of the Supreme Court and our Circuit that nominal damages serve to vindicate deprivations of certain absolute rights that are not shown to have caused actual injury." *Brooks v. Warden*, 800 F.3d 1295, 1308 (11th Cir. 2015) (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that plaintiffs in a § 1983 due process claim would be entitled to nominal damages if they could not prove actual damages arising from the constitutional violation)). This is true in the context of claims for deliberate indifference to a person's medical needs. *See Brooks*, at 1295 (holding that an inmate could recover nominal damages for deliberate indifference to his medical needs even if he could not show the indifference resulted in a physical injury); *Magwood v. Sec'y, Florida Dep't of Corr.*, 652 Fed. App'x 841, 845 (11th Cir. 2016) (same). And even if the estate could only recover nominal damages, the officers would still be subject to punitive damages.[15]

---

[15] An award of even nominal damages would expose Officers Smith and Danley to a claim of punitive damages. *See Amnesty Int'l, USA v. Battle*, 559 F.3d

17

B.   Mr. Wilson's parents' claim

In contrast, the claim by Mr. Wilson's parents for their son's death requires proof that the tortious act resulted in death. *See* O.C.G.A. §§ 51-4-4; 19-7-1. On this point, Defendants falsely claim that the only testimony on the issue of causation is from Dr. Dampier, who opined that Wilson would likely have died based on his condition when Danley first encountered him. Defendants completely ignore the testimony of Plaintiffs' survivability expert, Dr. Kris Sperry. Dr. Sperry testified that that oxygen and immediate transport to a hospital would have, more likely than not, saved Wilson's life. EMS personnel clearly testified that, if they had known the information known to the officers, they would have treated Mr. Wilson differently. EMS personnel testified that, had they been given all information that officers had available at the scene, they would have given Wilson additional assessments and gotten him to the hospital. The treatment protocol for EMS shows that Wilson would have been given oxygen and immediate transport to a hospital, which was minutes away. Defendants have not shown any undisputed

---

1170, 1177-78 & n.3 (11th Cir. 2009) (noting that if plaintiff organization is successful on its claim of a First Amendment violation permitting nominal damages, then "punitive damages may be available" as well); *Davis v. Locke*, 936 F.2d 1208, 1214 (11th Cir. 1991) (affirming award of punitive damages even though jury awarded plaintiff nominal damages but not compensatory damages).

facts concerning whether Wilson would have survived if he had been given proper treatment. These Defendants have not raised any issue concerning Dr. Sperry's qualifications, or the reliability of his opinions. They have simply tried to ignore disputed facts by citing one expert's testimony that Wilson would have died regardless of what Danley and Smith did, and by ignoring testimony to the contrary. That testimony creates a clear factual dispute. *See* Pl. SMF ¶ 285–290.

### 6.   *Qualified immunity*

The final question is whether Smith and Danley should have known, in light of existing law, that withholding information from EMS, deliberately misrepresenting Wilson's condition, and ultimately sending EMS away, despite EMS's offer to transport Wilson to the hospital, would constitute deliberate indifference to Wilson's medical needs.

In the context of deliberate indifference cases, the Eleventh Circuit has generally defined the law at a higher level of abstraction than other types of § 1983 cases. For example, in *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), the court observed that "one simply cannot say that a prisoner has a clearly established right to adequate psychiatric care but that that right is not violated by a particular treatment amounting to grossly inadequate care unless some prior court has

expressly so held on 'materially similar' facts. Such an approach would add an unwarranted degree of rigidity to the law of qualified immunity." *Id.* at 834 n.10.[16] Similarly, *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176 (11th Cir. 1994), recited the proposition that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Id.* at 1186 (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992).[17] The Eleventh Circuit has remanded cases medical indifference cases for trial based solely on a factual dispute concerning the underlying constitutional violation, without addressing qualified immunity. *See Bowden v. Stokely*, 576 Fed.App'x 951, 955

---

[16] *See also Whitehead v. Oderinde*, 219 Fed. App'x 857 (11th Cir. 2007) (denying qualified immunity on the basis that previous cases established that "that a delay in treating an inmate's pain can render defendants liable as if they had inflicted the pain themselves, thereby becoming an Eighth Amendment violation"); *Benson v. Gordon Cty., Ga.*, 479 Fed. App'x 315, 319 (11th Cir. 2012) (denying qualified immunity on the basis that "[o]ur cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference").

[17] Notably, *Hill* is one of the cases the Supreme Court disapproved in *Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002), although it idd not disapprove the section quoted here. Instead, the Supreme Court noted that the Eleventh Circuit's requirement of a "materially similar" prior binding case to overcome qualified immunity was a " rigid gloss on the qualified immunity standard" that was not consistent with Supreme Court precedent. *Id.*

(11th Cir. 2014) (holding that where "the plaintiff has sufficiently alleged or shown a material dispute of fact as to an [Eighth Amendment] claim, summary judgment based on qualified immunity is not appropriate").[18] Given the subjective component of the deliberate indifference standard, this is consistent with the Supreme Court's observation that qualified immunity does not protect those who are plainly incompetent or "who *knowingly* violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis added).

The law governing this case is set out in *Valderrama v. Rousseau*, 780 F.3d 1108, 1121 (11th Cir. 2015).[19] In *Valderrama*, one of two officers shot the plaintiff during a traffic stop. The officers called an ambulance about three minutes later, but only reported that the plaintiff had suffered a laceration. Nevertheless, the officer requested that EMS "on the three," meaning it should arrive as quickly as possible. The court concluded that a jury could find that the officer who reported

_____

[18] *See also Farrow v. West*, 320 F.3d 1235, 1249 n.22 (11th Cir. 2003) (remanding for trial without reaching the qualified immunity question); *Estrada v. Stewart*, 703 Fed. App'x 755, 760 (11th Cir. 2017) (same).

[19] Although *Valderrama* was decided approximately two weeks after this incident, it still governs this case because the court did not recognize any new right, or set forth a new constitutional rule. The court denied qualified immunity to the defendants based on conduct that occurred in 2006, and the principles announced therein were clearly established well before the present incident occurred.

the plaintiff's wound (who was not the officer who fired the shot) as a "laceration" rather than a gunshot was deliberately indifferent to the plaintiff's medical needs. The court specifically rejected the officer's argument that, because they summoned EMS as quickly as possible, a jury could not find deliberate indifference. In rejecting that argument, the court looked to the conversation between the officers and actions they took during the increased delay allegedly caused by reporting the injury only as a laceration. The court then turned to qualified immunity, and found that it was "clearly established . . . that an official acts with deliberate indifference when he intentionally delays providing . . . access to medical treatment, knowing that the [arrestee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Id*. at 1122 (citing *Lancaster v. Monroe Cnty.*, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997)).[20]

*Valderrama* makes it clear that officers cannot escape liability merely by

---

[20] *Rivas v. City of Passaic*, 365 F.3d 181, 196 (3d Cir. 2004), also demonstrated that lying about an individual's condition and thereby preventing medical treatment constitutes deliberate indifferent. *Rivas* held that EMTs who could be found to have falsely accused a patient of acting violently, and thereafter abandoning the patient to the police, engaged in conduct that shocked the conscience. "If Garcia and Rodriguez misrepresented the assault, not only did they abdicate their duty to render medical assistance, but they placed Mr. Rivas in greater danger by falsely accusing him of acting violently. A jury could find, depending on whose testimony it credits, that such conduct shocks the conscience." *Id*.

summoning EMS to the scene, and that the subjective motives of officers—including assessing their language and motives—plays a key role in the deliberate indifference analysis. If the officers in *Valderrama* should have known that reporting a gunshot as a laceration—even in spite of calling an ambulance to arrive as quickly as possible—violated the Constitution, then Smith and Danley should have known that deliberately misrepresenting Wilson's condition to EMS would do the same. *Valderrama* also reinforces the high level of abstraction at which the Eleventh Circuit defines the law for the purposes of assessing qualified immunity for deliberate indifference cases.

For the foregoing reasons, the officers' motion for summary judgment should be denied.

### b.  Plaintiffs' state law claims against the City of Douglasville

#### 1.  The City is liable for the actions of Danley and Smith

##### A.  The City has purchased insurance that provides coverage for the torts of Danley and Smith

Municipalities enjoy sovereign immunity by operation of law, but a municipality's immunity will be waived to the extent it has purchased liability insurance. O.C.G.A. § 36-33-1(a) provides that if a municipality purchases an

insurance policy which covers the loss, the municipality has waived its sovereign immunity to the extent of its liability coverage. "[M]unicipal corporations may be liable for a city employee's negligence in performing their job to the extent the city has waived its governmental immunity through the purchase of liability insurance." *Cameron v. Lang*, 274 Ga. 122, 127 (2001). Douglasville's insurance policy covers the claims at issue here. *See* Pl. SMF ¶¶ 257–263.

> B.  The City's purchase of liability insurance means it is liable for the torts of Officers Danley and Smith under the doctrine of respondeat superior

If a city purchases liability insurance which extends coverage for its law enforcement activities, then it waives its sovereign immunity for state law claims which arise from the misconduct of police officers to the extent of that coverage. *Rodriguez v. Kraus*, 275 Ga. App. 119 (2005). Once a municipality has waived its sovereign immunity it becomes subject to liability in the same manner as would a private entity. That liability may be imposed for state law based torts committed by city employees by application of the doctrine of respondeat superior. *Durben v. Am. Materials*, 232 Ga. App. 750 (1998). Even if an individual official is protected from individual capacity liability by official immunity, that does not protect the municipality. *Gray v. Ector*, 541 F. App'x 920, 926 (11th Cir. 2013); *Gilbert v.*

24

*Richardson*, 264 Ga. 744, 753–54 (1994).

The City offers two responses. First, it claims that it is not subject to liability for the actions of Danley and Smith under O.C.G.A. § 36-33-3 which states "[a] municipal corporation shall not be liable for the torts of policemen or other officers engaged in the discharge of duties imposed on them by law." Df. Br., Doc. 29-2, at 19. The City does not disclose any of the precedent that clearly forecloses its claim. *See Ekarika v. East Point*, 204 Ga. App. 731 (1992) (rejecting the argument in the context of a waiver of sovereign immunity due to the purchase insurance covering motor vehicles); *Williams v. Solomon*, 242 Ga. App. 807, 810 (2000), *aff'd sub nom.*, *Cameron v. Lang*, 274 Ga. 122 (2001) ("Under O.C.G.A. § 36-33-3, a municipal corporation is not liable for torts committed by its police officers while engaged in their official duties. That immunity may be waived, however, to the extent the City has purchased liability insurance to cover Solomon's actions in operating his police car."). Although the waivers in *Ekarika* and *Williams* involved O.C.G.A. § 33-24-51, precisely the same considerations govern waivers under O.C.G.A. § 36-33-1(a). *See Govan v. City of McIntyre*, 5:16-CV-00503-TES, 2018 WL 3762997, at *16 (M.D. Ga. Aug. 8, 2018) (holding that a waiver of immunity under O.C.G.A. § 36-33-1(a) defeats any immunity under § 36-33-3); *Stefani v.*

25

*City of Grovetown*, 2016 WL 4611575, at *10-11 (S.D. Ga. Sept. 2, 2016) (same).

The City's next response is that, if it can be subject to liability for the actions of Danley and Smith, it can only be subject to liability if Plaintiffs show that the officers acted with gross negligence. It draws this argument from O.C.G.A. § 35-1-7, which states that "[a] law enforcement officer shall not be liable at law for any action or actions done while performing any duty at the scene of an emergency except for gross negligence, willful or wanton misconduct, or malfeasance."

There is no authority to support the City's invocation of this statute in a claim against the City under the doctrine of respondeat superior, and by its plain text, the statute applies only to a law enforcement officer. Here, Plaintiffs do not seek to recover against Danley and Smith for individual capacity state law claims. In the context of official immunity, for example, if a city waives its sovereign immunity for a claim, then it cannot assert the officer's official immunity. *Gilbert*, 264 Ga. at 744–54 ("Under the doctrine of respondeat superior, a principal has no defense based on an agent's immunity from civil liability for an act committed in the course of employment.") (citing Restatement (Second) of Agency § 217(b)(ii) (1958)). Given that the statute plainly applies only to an individual officer, there is no basis to depart from the established principle that an employer is not protected

by the immunity of its agents.[21]

    C.   <u>Smith and Danley negligently withheld information from</u>
          <u>EMS personnel and interfered with the medical assessment</u>

To establish a claim of negligence,[22] a plaintiff has to show: "(1) a legal duty
to conform to a standard of conduct; (2) a breach of this duty; (3) a causal
connection between the conduct and the resulting injury; and (4) damage."
*Greenway v. Northside Hosp.*, 317 Ga. App. 371, 380 (2012).

*i.   Legal duty*

"[T]he first essential element is a legal duty, that is, a duty to conform to a
standard of conduct raised by the law for the protection of others against
unreasonable risks of harm . . . ." *Bradley Center v. Wessner*, 250 Ga. 199, 200
(1982). Generally, a plaintiff may show the existence of a duty of care by pointing
to an obligation created by statute. *See Rasnick v. Krishna Hosp., Inc.*, 289 Ga.
565, 566–67 (2011) ("[a] duty can arise either from a valid legislative enactment,
that is, by statute, or be imposed by a common law principle recognized in the

---

[21] The statute does not apply for the additional reason that, while Plaintiffs'
claims against Danley and Smith are based on a theory of negligence, those claims
involve affirmative acts of malfeasance.

[22] The City argues that a finding of deliberate indifference "would foreclose
any corresponding claim against [the officers] under state law for 'negligence.'"
This argument fundamentally misconstrues the law. The deliberate indifference
standard requires a level of culpability that is *higher* than negligence.

caselaw"). In the alternative, when a negligence claim involves one who is performing a "skilled service," the duty arises to use reasonable care, skill, and ability which is generally undertaken by those in the same profession. *Monitronics Int'l, Inc. v. Veasley*, 323 Ga. App. 126, 141 (2013).

In this case, Danley and Smith's duty to provide medical treatment for Wilson is based on the United States Constitution and the laws of the State of Georgia. Both create an obligation to seek medical treatment for an arrestee in need of it. *See* O.C.G.A. § 42-5-2(a) (imposing a duty to provide medical treatment to prisoners and arrestees[23]); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (recognizing that the Constitution imposes an "obligation to provide medical care for those whom it is punishing by incarceration" upon the government).

### ii.   *The standard of care*

The next question is how to define the standard of care. In cases involving skilled services, a plaintiff may introduce expert testimony to establish the applicable standard of care in a given industry. *See Thurman v. Applebrook Country Dayschool, Inc.*, 278 Ga. 784, 786 (2004) (holding that expert testimony establishing industry standard was admissible against a daycare being sued for

---

[23] *See Macon-Bibb County Hosp. Auth. v. Houston County*, 207 Ga. App. 530 (1993) (holding that "inmates" includes arrestees).

28

placing an infant in an improper sleeping position). Generally speaking, "[e]xpert

testimony as to the practices of an industry is admissible" in a negligence action.

*Gilbert v. CSX Transp., Inc.*, 197 Ga. App. 29, 31 (1990) (quoting *Dan Gurney Ind.*

*v. Southeastern Wheels*, 168 Ga.App. 504, 506 (1983)). The standard of care can

also be established a defendant's own testimony, or from testimony of a

defendant's supervisor. *See Landis v. Rockdale Cty.*, 206 Ga. App. 876, 879 (1992)

(finding a police officer's standard of care in a negligence action was established

by the testimony of a police expert, the sheriff, and the defendant ,all of whom

testified that, under the facts the defendant encountered, he had a duty to make an

arrest), *vacated on other grounds*, 212 Ga. App. 700 (1994).[24] Finally, although not

determinative, plaintiff may introduce an employer's own training and policies to

establish a standard of care. *See, e.g.*, *Medley v. Home Depot, Inc.*, 252 Ga. App.

398, 401 (2001) (holding that summary judgment not be appropriate where a jury

could determine that Home Depot was negligent for failing to follow its own

policies); *Schofield v. Hertz Corp.*, 201 Ga. App. 830, 831 (1991) ("Violations of

---

[24] Although *Landis* was superseded by a later opinion issued in light of the
Georgia Supreme Court's application of the public duty doctrine in *City of Rome v.
Jordan*, 263 Ga. 26 (1993), that superseding opinion did not deal with the issue of
what evidence could be used to establish a negligence claim against a police
officer.

private guidelines do not establish negligence per se, but can be illustrative of what is considered reasonable behavior for employees.").

In this case, the jury will have ample evidence to determine that the standard of care required Danley to affirmatively disclose—rather than conceal—all facts they knew concerning Wilson's medical emergency, as well as to avoid using their authority to interrupt Wilson's evaluation and foreclose the possibility that he be transported to the hospital. *See* Danley, at 26:20–27:2; Smith, at 56:23–57:7; Douglasville 30(b)(6), at 56:19–57:10; 57:11–18. Plaintiffs' police practices expert reaffirmed this principle, and specifically sets forth what information Danley and Smith should have communicated. *See* Clark Decl. ¶ 9.

Second, the standard of care requires that police officers refrain from directly interfering with the decision of whether to transport an arrestee to the hospital. When an arrestee is assessed by EMS, all medical decisions must be made by medical personnel, including the decision of whether to transport the arrestee to the hospital instead of jail. *See* Clark, at 81:7–23; Ryan, at 72:13–22; Danley, at 25:19–24; Smith, at 107:20–22; Douglasville 30(b)(6), at 56:11–18.

### iii.    *Breach of the standard of care*

The next question is whether Danley and Smith negligently breached the

30

duty of care. It is obvious that they did.[25] As set forth *supra*, Danley and Smith

affirmatively misrepresent Wilson's condition, withheld evidence that was

obviously relevant to assessing his state, and interfered with the assessment by

rendering a final decision as to whether he would be transported to the hospital.

*See* Pl. SMF ¶¶ 50, 76, 77, 84, 86, 87, 90, 95, 97, 98, 108, 175, 176, 184, 187

(setting out the withholding of, and misrepresentation of, information concerning

Wilson); *id.* ¶¶ 196–222 (setting out the policies and standards which the officers

disregarded).

### iv.  Damages

As set forth above in Part III.a.3, there are two separate causation questions.

Plaintiffs incorporate those same arguments in this section, and reiterate that the

City is not entitled to summary judgment on the issue of causation for the claims

on behalf of Wilson's estate or the claims on behalf of Wilson's parents.

---

[25] Plaintiffs maintain that the City is not protected by the heightened gross negligence standard of O.C.G.A. § 35-1-7. *See supra* Part III.b.1.A.ii. Nevertheless, a jury could easily find that Plaintiffs meet that standard. Gross negligence is defined as the absence of slight diligence. O.C.G.A. § 51-1-4. "[S]light diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." *Id. See also Morgan v. Horton*, 308 Ga.App. 192, 197–98 (2011). Whether conduct alleged amounts to gross negligence is, as a general rule, a question to be resolved by the jury and not by the court as a matter of law. *Id.*

### 2.    *The City is liable for EMS's negligence*

#### A.    The City has waived sovereign immunity

As set forth above in Part III.b.1.A.i, *supra*, the City's purchase of liability

insurance that provides coverage for a claim will waive the City's sovereign

immunity up to the limits of coverage. In addition to law enforcement liability

coverage, the insurance policy purchased by the City provides coverage arising

from "Incidental Malpractice." Ex. 4, at 32, § I.C.3. "Incidental Malpractice" is

defined as "professional medical services rendered or which should have been

rendered to any person or persons (other than employees of the Named Member

injured during the course of their employment) by any duly qualified medical

practitioner, nurse, or technician employed by or *acting on behalf* of the Named

Member . . . ." *Id.* at 32, § I.C.3 (emphasis added).

There is no meaningful dispute that Porterfield and Flack were "acting on

behalf" of the City of Douglasville because they were performing emergency

medical services within the City of Douglasville pursuant to an agreement between

the City of Douglasville and Douglas County. *See* Douglasville 30(b)(6), at 9:25–

16:17, Ex. 2.[26] The City has therefore waived sovereign immunity.

[26] It does not appear that the City of Douglasville contests the point that the
insurance agreement provides coverage for the actions of Porterfield and Flack.
Instead, the City only raises the issue of whether it can be held liable for their

B. <u>Liability for Porterfield and Flack's actions</u>

There are two alternative theories under which the City can be held liable for the torts of Porterfield and Flack.

### i. *Joint enterprise liability*

When a city and a county government enter into an agreement to provide for the joint provision of services pursuant to the authority vested in them by Ga. Const. of 1983, art. IX, § III, ¶ I(a), the City may be subject to liability for the negligence of county employees in the course of carrying out the joint enterprise so established. *Eatonton v. Few*, 189 Ga. App. 687 (1988).

In *Eatonton*, an individual drowned while swimming in a pool owned by the City but over which Putnam County had actual day-to-day operational control. In this case, the City of Douglasville retained ownership over facilities out of which EMS services are supplied to its residents. In *Eatonton*, the City and County pooled their respective labor resources to operate the city's pool for the mutual benefit of their citizens. The court in *Eatonton* also noted that the city and county entered into their swimming pool agreement on the basis of the Constitutional authority to "contract . . . with each other . . . for joint services" found at art. IX, § III, ¶ I(a) of the Georgia Constitution. Even though Douglasville no longer directly actions.

33

manages the provision of EMS services in the city, it need not have operational

control over the services to be involved in a "joint enterprise" with the County.

Relying upon the Georgia Supreme Court's decision in *Seckinger & Co., v.*

*Foreman*, 252 Ga. 540 (1984), *Eatonton* held that "a 'joint enterprise' may

nevertheless be found to exist even though a profit motive and mutual control are

otherwise lacking." *Eatonton*, at 689.

The facts here track those of *Eatonton*. In March of 2015, Douglasville and

Douglas County provided for Emergency Medical Services throughout Douglas

County, including within Douglasville, through a "Agreement for Provision and

Funding of Fire Protection Services and Emergency Medical Services." *See* Ex. 6.

The parties entered into the agreement "pursuant to authority granted by Article IX,

Section III, Paragraph I of the Georgia Constitution." *Id.* Noting that the "City

desires the County to provide fire protection services within the boundaries of the

City," the agreement required that the County "provide emergency medical

services throughout the County," through, among other things, the use of City

owned station facilities located at 6771 Church Street and 7792 Highway 92, "both

within the City, for the provision of . . . emergency medical services." *Id.* at 4–5.

The Agreement provided that the two stations, along with two fire trucks, were to

34

be returned to the City at the conclusion of the Agreement. *Id.* at 6. To carry out this joint enterprise, the County established a "fund entitled the Douglas County Fire Protection Services and Emergency Medical Services Fund ). *Id*. at 3. The City agreed to pay "one-half of the total anticipated annual costs of providing" fire and emergency medical services for the entire county. In return, the County agreed to not levy any taxes on property within the City for providing these services. *Id.* Going forward, the Fund would be used for the construction of any new or additional fire and EMS facilities within the County. *Id.* Consistent with this theory, the City has purchased insurance which covers the acts of Douglas County medical providers who are acting on behalf of the City. *See* Pl. SMF ¶¶ 265–266.[27]

Under Georgia law, where, as here, there is evidence of the City and County's joint venture, then the negligence of County employees while engaged in the services of the joint venture subjects the City of Douglasville to liability for the actions of Porterfield and Flack. *Accord Dekalb County v. Lenowitz*, 218 Ga. App. 884 (1995) (affirming trial court finding that the city and county engaged in a joint

---

[27] Douglasville provided its own Fire and related services until it entered into an agreement with Douglas County in the 1980's. Douglasville 30(b)(6), at 11:8–21. Thereafter, Douglas County has been the only provider of EMS services within the City. *Id.* The City does not have a license to furnish ambulance services itself, even for people in police custody. *Id.* at 12:25–13:2. There are no medical staff at the city police station. *Id.* at 14:4–6.

enterprise in operation of a sewer system where city and county jointly owned parts of the system); *Bowman v. Fuller*, 84 Ga. App. 421 (1951).

### ii.   Non-delegable duty

Even if the contract between the City and County merely creates an independent contractor relationship, then the City is liable for the actions of the County employees performed pursuant to that agreement because the City has a non-delegable duty imposed by statute.

Georgia law provides that an employer, such as the City of Douglasville, is liable for the negligence of contractors whom the employer has engaged to perform a duty "imposed by statue." *See* O.C.G.A. § 51-2-5(4). Here, the City of Douglasville is statutorily required to provide "needed medical and hospital attention" to inmates in its custody. O.C.G.A. §42-5-2 (a). Therefore, the City bore a statutory responsibility to perform the service of providing "needed medical and hospital attention" to him. Where there is negligence on the part of the provider of such services, a jury may find that the City is liable for the negligence of the contractor.[28]

---

[28] The City of Douglasville admits that with respect to the supplying of emergency medical services, it supplies those services through its contract with Douglas County. Douglasville 30(b)(6), at 22:23–23:8. Indeed, the City admits that local governments must either contract for EMS services or provide those services

36

Because the City has a statutory obligation to provide treatment for its

inmates, and because Mr. Wilson was considered an inmate, the City had a non-

delegable duty to provide care. Thus, even if the agreement between the City and

the County created only an independent contractor relationship, the City remains

liable for those actions under O.C.G.A. § 51-2-5(4).

C.   Porterfield and Flack negligently assessed Mr. Wilson[29]

There are two categories of negligence upon which Plaintiffs rely in arguing

that Porterfield and Flack were negligent in their performance of medical services.

The first category is professional negligence, i.e., the negligent delivery of

professional medical services.[30] There is no dispute whatsoever that Martez Wilson

was a patient for whose medical care EMS became responsible upon their arrival.

---

themselves. *Id.* at 24:12–20. The City does so with the understanding that state law
requires it. *Id.* at 24:24–25:9.

[29] The City has not raised the issue of whether Porterfield and Flack were
negligent in their assessment of Mr. Wilson, and has rested on the argument that
the City is simply not liable for their actions. Where the City has not argued that
Porterfield and Flack were not negligent, the City has presumably waived that
issue for the purposes of summary judgment. Yet out of an abundance of caution,
Plaintiffs will set forth the broad basis of their claims for EMS negligence and,
respectfully incorporate herein the arguments for EMS negligence described more
fully in their response to Defendant Porterfield and Flack's motion.

[30] Unlike the theory of negligence against Porterfield and Flack in their
individual capacities, there is no need for Plaintiffs to prove the existence of a
ministerial duty to avoid official immunity. *See Gilbert*, 264 Ga. at 753–54.

37

Porterfield, at 8:22. And having the duty to care for Wilson, EMS personnel were required to exercise the degree of skill and care "which under similar conditions and like surrounding circumstances is ordinarily employed by the medical profession generally." *Hayes v. Brown*, 108 Ga. App. 360, 363 (1963).

As is more fully described in Plaintiffs' Brief in Opposition to Porterfield and Flack's Motion for Summary Judgment, there are several categorically negligent acts by EMS. They deviated from the standard of care governing their actions by failing to perform a minimal physical assessment. They failed to obtain standard vital signs, including blood pressure. Pl. SMF ¶ 140, 148. The failure to obtain vital information "about the circumstances occurring with Wilson prior to their arrival "constituted a substantial deviation from the standards of care . . . ." Pl. SMF ¶ 253. Even knowing that their assessment was not completed, *Id.* ¶ 140. EMS failed to transport Wilson despite the fact they had clear indications that he was in the midst of a medical crisis.. *Id.* ¶¶ 255. Instead, Porterfield's and Flack's actions were "tantamount to no assessment and to no medical treatment at all." *Id.* ¶ 173. In fact, EMS chose to not even complete a mandatory Patient Care Report, which is further indication of their failure to assess and treat. *Id.* ¶ 178. Porterfield made a conscious decision not to do so. *Id.*

38

The second broad category of EMS's negligence, is their breach of ministerial duties, i.e., tasks which they were required to perform by virtue of the policies and procedures of Douglas County. There are guidelines for patients in an "altered mental status," which applies to patients who are "disoriented, weak, dizzy, confused or are unconscious. " *See* Ex. 12, EMS Treatment Guidelines, at 3–5. Wilson clearly met this description. Porterfield could not tell whether or not Wilson was aware of his surroundings. Pl. SMF ¶ 168. Porterfield could not even tell the extent to which Wilson was even conscious, or whether Wilson was able to respond to his questions. Pl. SMF ¶ 134. Responding to those patients, the guidelines direct that EMS personnel are to "administer oxygen as needed to maintain an adequate SpO2." *See* Ex. 12, at 3, ¶ 3. Patients treated under these guidelines "must have continuous cardiac monitoring" and EMS personnel are to "monitor vital signs and transport." *Id.* EMS did neither of these tasks.

Douglas County's General Treatment Guidelines also include directions contained within what is called the "Universal Patient Care Guideline." *See* Exhibit 11, Porterfield Depo. By its own terms, the Universal Patient Care Guidelines "applies to all patients." The Guideline directs that "Oxygen shall be utilized on all patients with an SpO2 level less than 94%. Oxygen shall also be applied for any

medical / traumatic event in which the patient could benefit from oxygen

administration. This includes, but is not limited to, patients who present with . . .

altered mental status . . ." Wilson was not only in an "altered mental status" when

EMS arrived, but his percentage of oxygenation when measured using the Sp02

(the pulse/ox device) was erratic and below the level which called for

administration of oxygen. Wilson's oxygenation level was in the low 80's when

first read by EMS personnel. According to Porterfield, Wilson's oxygenation level

"started out in the low '80's." *See* Ex. H, GBI Porterfield Int., at 2:25. At another

time, Wilson's oxygenation level was at 92. Pl. SMF ¶ 160. EMS's failure to

supply oxygen to Wilson, despite having it available on their truck, *id.* ¶ 171,

constituted yet another negligent breach of a ministerial duty.

## IV.   Conclusion

Defendants' motion for summary judgment should be denied.

Respectfully submitted, this 21st day of December, 2018.

s/G. Brian Spears _____          s/Jeffrey R. Filipovits _____
G. Brian Spears                    Jeffrey R. Filipovits
Georgia Bar No. 670112             Georgia Bar No. 825553

1126 Ponce de Leon Avenue          2900 Chamblee-Tucker Road, Bldg. 1
Atlanta, Georgia 30306             Atlanta, Georgia 30341
404.872.7086                       678.237.9302
brian@brianspearslaw.com           jeff@law.filipovits.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed Plaintiffs' Response to Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Harvey Gray

Dianna Lee

Sun Choy

Sarah Brochstein

Brian Dempsey

This 21st day of December, 2018.

s/Jeffrey R. Filipovits
Jeffrey R. Filipovits
Georgia Bar No. 825553