UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY WILSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: |
| | ) | |
| v. | ) | 1:17-cv-634-WMR |
| | ) | |
| CITY OF DOUGLASVILLE, et al. | ) | |

### PLAINTIFFS' RESPONSE TO STATEMENT OF MATERIAL FACTS BY DEFENDANTS CITY OF DOUGLASVILLE, COYLEE DANLEY, AND ANDREW SMITH

1. On March 3, 2015, in response to a 911 call received at approximately 12:15 a.m. reporting a burglary in process, several law enforcement officers from two different agencies, the Douglasville Police Department and the Douglas County Sheriff's Office ("DCSO"), were dispatched to the scene of the reported burglary at Freewheeling Motor Sports in Douglasville, Georgia. (Exh. A - Douglasville CAD Report, pp. 7-10; Exh. B - DCSO CAD Report).

RESPONSE: Undisputed.

2. Danley and Smith, both of whom were duly-certified law enforcement officers employed by Douglasville, and DCSO Cadwell, were among the responding officers. 2 (Doc. 57, ¶¶ 16, 26, 29).

RESPONSE: Undisputed.

3. In connection with Danley and Smith's interactions with Martez Wilson on March 3, 2015, they were each acting solely and exclusively within their discretionary authority as a duly certified law enforcement officer and within the course and scope of their employment with Douglasville at all relevant times herein. 3 (Doc. 57, ¶¶ 5-6).

RESPONSE: Undisputed.

4. The responding officers were advised over dispatch that two black males had cut the fence at Freewheeling Motor Sports and were fleeing on foot into a residential neighborhood behind the business. (Exh. C - Danley Depo. 54:10 to 55:23).

RESPONSE: Undisputed.

5. Danley, as well as the other responding officers, canvassed the residential neighborhood in search of burglary suspects. (Exh. A - Burglary CAD, p. 1; Exh. C - Danley Depo. 55:9-21).

RESPONSE: Undisputed.

6. Using his patrol vehicle's spotlight, Danley scanned the area where the suspects had been seen fleeing, and observed a black male, later identified as Martez Wilson, laying in the middle of a driveway in front of 8465 Lynn Ave, a residential home located in a neighborhood with mostly elderly residents. (Doc. 57, ¶ 16; Exh. A - Douglasville CAD Report, p. 1; Exh. C - Danley Depo. 57:3 to 58:4).

RESPONSE: Undisputed.

7. Based on Danley's initial observation of Wilson from his patrol vehicle, it appeared to him that Wilson was on the ground and "low crawling" under Danley's spotlight to avoid detection. (Exh. C - Danley Depo. 57:3 to 58:4, 125:20 to 126:4).

RESPONSE: Disputed that a jury would be compelled to believe that Danley had anything other than an initial impression that Wilson was "low crawling" that was immediately dispelled. Danley testified that he saw a person laying on the ground who was not moving. Danley, at 57:11–12, 58:2–4. Otherwise, undisputed.

8. Danley was the only officer in the immediate area where Wilson was found.

RESPONSE: This allegation is not supported by citation to any evidence, and therefore should not be considered. *See* Local Rule 56.1(B)(1)(a) ("The court will not consider any fact . . . not supported by a citation to evidence (including page or paragraph number)").

9. Danley approached Wilson in the driveway and directed him to put his hands behind his back. (Exh. D - Danley Video at 14:40; Exh. C - Danley Depo. 39:24 to 40:1, 58:5 to 59:23)

RESPONSE: Undisputed.

10. Wilson placed his hands behind his back without Danley's assistance and was handcuffed by Danley. (Exh. D - Danley Video at 15:20; Exh. C - Danley Depo. 60:3-8).

RESPONSE: Undisputed.

11. Before any other officer had arrived, a second black male, later identified as Carlos Burroughs, unexpectedly appeared from behind the residence, in response to which Danley pulled out his weapon, apprehended Burroughs, and placed him in handcuffs.10 (Exh. D - Danley Video at 15:40; Exh. C - Danley Depo. 40:5-7; 61:13 to 63:19).

RESPONSE: Undisputed, though it is notable that Mr. Burroughs readily surrendered and there was no physical struggle. Danley, at 61:13–62:14.

12. Danley was then advised over dispatch that a third burglary suspect was also in that area, (Exh. D - Danley Video at 16:05) following which the owner of the home came to the doorway and advised Danley that he had seen someone else run behind his home. 12 (Exh. D - Danley Video at 16:40).

RESPONSE: Undisputed.

13. Because Danley was the only officer in the area and had two burglary suspects handcuffed and laying on the ground, with a third suspect still at large in the immediate residential area, he requested officer assistance at his location over dispatch. 13 (Exh. D - Danley Video at 16:55; Exh. A - Douglasville CAD Report).

RESPONSE: The citation does not support the statement that Danley was the only officer in the area, and it is readily apparent that he was not. See Danley Vid., at 13:17 (showing two other patrol car in view). Otherwise, undisputed.

14. Smith and Cadwell responded to Danley requests for back-up at the driveway. (Exh. D - Danley Video at 17:33 (Smith arrival), at 20:06 (Cadwell arrival).

RESPONSE: Undisputed.

15. Because Wilson refused to stand or sit up on his own, Wilson was seated upright on the ground in the driveway with his legs in front of him and with his back propped up against Smith's legs.(Exh. E - Smith Depo. 33:4-13) (explaining that he and Danley "propped [Wilson] up on to my knee, so that he was sitting upright [on the ground]. So that way his oxygen – his lungs were able to inflate and deflate"), 62:7 to 63:8).

RESPONSE: It is disputed that Wilson "refused" to stand or sit up on his own, and the citation to the record here does not support that allegation or facts that support it. For that reason alone, that portion of the allegation should be disregarded.

In the event it is not disregarded as unsupported, whether the officers actually believed Wilson was faking, or merely accused him of it due to their

deliberate indifference, is one of the ultimate issues in this case. Both Danley and Smith recognized that there was something wrong with Wilson's legs. Danley, at 66:5–8. It was apparent to Officer Smith that Wilson could not stand. Smith, at 41:23–42:2, 42:6–7. Wilson was limp during Cadwell's entire interaction with him. Cadwell, at 14:21–23. Wilson's condition had deteriorated while the officers were on the scene. Danley, at 136:22–25. Furthermore, the justifications offered by the officers for the reason they disbelieved Wilson would permit a jury to reject that their belief was sincere.  Danley, at 37:5–10, 136:22–137:6. This issue is discussed more fully in Plaintiffs' response brief, Part III.a.2.

Plaintiffs do not dispute that Smith propped Wilson on his knee, and felt Wilson making a coughing-type sound as he attempted to breathe. Smith, at 33:19–22. Wilson also fell over twice while leaning against Smith's knee and had to be picked up off the ground, Smith, at 33:19–22, 62:7–19, further undermining any claim that the Officers meaningfully believed that Wilson was faking.

16. Although Wilson was complaining that was having trouble breathing, Smith testified that he "could feel his – [Wilson's] lungs compressing and contracting back and forth" against his legs, and thus confirmed that Wilson was in fact breathing. (Exh. E - Smith Depo. 33:4-13, 34:17 to 35:7 ("I could actually feel him breathing on my legs. I could feel he was taking a lot of air at that point, in between those big huffs he had."), 75:6-18 ("I could feel it just on my legs. . . . I could feel his lungs inflating going back, because he was moving up, and then he would move back, and then he would move up.").

RESPONSE: Undisputed that Smith could feel Wilson attempting to breath, and that Wilson was making a coughing sound that is audible on the patrol car videos. A jury could infer from these sounds that is was clear that Wilson's breathing was not healthy and Wilson could not stand under his own power. Smith, at 33:19–22; Danley Vid., at 18:20; Cadwell Vid., at 35:30.

17. Wilson never requested medical attention from the officers. (Exh. E - Smith Depo. 66:21-24, 68:21 to 69:2).

RESPONSE: Undisputed that Wilson did not explicitly request medical attention and merely repeatedly exclaimed that he could not breathe.

18. After observing that Wilson appeared to be out of breath, (Exh. E - Smith Depo. 33:16-22, 76:2-4) which the officers attributed to Wilson being out of shape after fleeing the scene of the burglary on foot, (Exh. C - Danley Depo. 21:11-20) Smith radioed dispatch and requested EMS at the scene, advising that Wilson was complaining that he "can't breathe."(Exh. D - Danley Video at 19:17; Exh. F - CAD Report re: Smith's request for EMS).

RESPONSE: Undisputed that Wilson appeared to have difficulty breathing. Undisputed that Smith radioed to dispatch and reported that Wilson was complaining that he could not breathe. The statement that "officers attributed [Wilson's breathing difficulties] to him being out-of-shape is not supported by the record citation. See Danley, at 21:11–20 (testifying only that other suspects have reported being out-of-breath after running). Moreover, a person who is out of

breath should not become less responsive as they recover, and should recover after about a minute. *See* Pl. SMF ¶ 220–221.

19. Smith requested medical assistance be sent to the scene to assess Wilson less than five (5) minutes after Danley had first come upon Wilson in the driveway, and less than two (2) minutes after Smith had arrived at the scene. 21 (Exh. D - Danley Video at 14:40 (Danley's first verbal interaction with Wilson in driveway), at 17:33 (Smith's arrival at driveway), at 19:17 (Smith requests EMS assistance); Exh. C - Danley Depo. 59:5-13).

RESPONSE: Undisputed.

20. In response to the information Smith provided to dispatch regarding Wilson's complaints stating that he could not breathe, two Douglas County Fire Department emergency medical units, Squad 10 ("S10") and Rescue 11 ("R11"), were dispatched to Danley and Smith's location. 22 (Exh. G - Porterfield Depo. 65:4 to 66:4; Exh. H - Porterfield Depo. Exh. 17, p. 1).

RESPONSE: Undisputed.

21. While both units were en route to the scene, Porterfield decided to cancel the second unit because, in his words, he believed that "no further resources were thought to be necessary to address this incident." 23 (Exh. G - Porterfield Depo. 65:4 to 66:4; Exh. H - Porterfield Depo. Exh. 17, p. 1).

RESPONSE: Undisputed.

22. After medical assistance had been requested, the officers secured Wilson and Burroughs in the backseats of Smith and Danley's patrol vehicles. (Exh. C - Danley Depo. 74:8-17, 77:10-16).

RESPONSE: Undisputed.

23. Because Wilson refused to stand up on his own, Cadwell, Smith, and Danley carried Wilson and secured him in the backseat of Smith's patrol vehicle and secured Burroughs in the backseat Danley's vehicle. (Exh. C - Danley Depo. 74:8-17, 77:10-16).

RESPONSE: Again, Plaintiffs dispute the characterization that Mr. Wilson "refused" to stand on his own. This is an inference Defendants are attempting to draw in their favor. Plaintiffs incorporate their response to ¶ 15 to that point. *See also* Local Rule 56.1(B)(1)(c) (prohibiting statements of fact which state "an issue or a legal conclusion"). Otherwise, undisputed that the officers secured Wilson and Burroughs in the back of separate patrol cars.

24. While the officers were opening the door of Smith's patrol vehicle to place Wilson therein, Smith confirmed that Wilson was able to keep his body upright while kneeling on the ground. (Smith Depo. 69:3-12).

RESPONSE: Disputed. Danley testified that Wilson was completely limp as officers carried him to his car. Danley, at 81:5–7. Cadwell gave the same testimony, and stated that Wilson was limp during Cadwell's entire interaction with him. Cadwell, at 14:21–23. It is undisputed that the Officers accused Mr. Wilson of resisting.

25. At this time, Danley and Smith both believed that Wilson was "playing possum" by intentionally making his body go limp and refusing to sit or stand up on his own because Wilson did not want to go to jail. 26 (Exh. C - Danley Depo. 36:20 to 37:25, 44:10-19, 118:16 to 119:6, 125:20 to 126:4; Exh. E - Smith Depo. 65:11-23 ("A lot of suspects, they just go dead weight. They don't -- when I say "dead weight," they just basically go limp. They don't try to stand up on their own or anything like that. That

was my perception at the time, what he was doing, was that he just wanted to go limp."), 65:25 to 66:9 ("[M]y perception was that he was just trying to go limp. It's not that he couldn't walk. That he didn't want to walk, was my perception."), 68:10-19).

RESPONSE: The issue of the officer's subjective beliefs is one of the fundamental issues in this case. It is disputed. *See supra* ¶ 15; Pl. Br., Part III.a.2. *See also* Local Rule 56.1(B)(1)(c) (prohibiting statements of fact which state "an issue or a legal conclusion").

26. Porterfield and Flack, members of Rescue 11, arrived at the scene to evaluate Wilson's complaints. (Exh. D - Danley Video at 33:20; Exh. E - Smith Depo. 88:13-15; Exh. G - Porterfield Depo. 65:4 to 66:4; Exh. H – Porterfield Depo. Exh. 17, p. 1).

RESPONSE: Undisputed.

27. At all relevant times herein, Flack and Porterfield were employed by Douglas County, were subject to the policies and procedures established by Douglas County, were not subject to any polices or procedures of Douglasville, in no manner were they acting in any capacity on behalf of Douglasville, and neither of them was an agent nor employee of Douglasville in connection with their interactions with Martez Wilson on March 3, 2015. (Exh. G - Porterfield Depo. 6:16-23, 107:7-19; Exh. I - Flack Depo. 4:2 to 5:7, 81:1 to 82:14).

RESPONSE: First, this allegation is not a statement of fact and it contains numerous conclusions of law (e.g., Porterfield and Flack were not acting as "agents" or "employees" of Douglasville, were not "acting in any capacity" on behalf of the City). It should therefore be disregarded under Local Rule 56.1(B)(1)(c) as it states an issue or legal conclusion. With regard to the ultimate legal issue,

Porterfield and Flack were performing services as a joint enterprise between the City and the County. *See* Pl. Br., at Part III.b.2.B.i.

The factual allegations that are embedded here are either immaterial or disputed. For example, Plaintiffs agree it is undisputed that the City of Douglasville does not set the policies that govern Porterfield and Flack, but as set forth in Plaintiffs' brief, that is not germane to the legal analysis.

The remaining factual allegations that are embedded in the statement that EMS were not "acting in any capacity on behalf of Douglasville" is disputed. Porterfield and Flack were performing services on behalf of the City of Douglasville pursuant to an Emergency Services Agreement entered into by the City and Douglas County. *See* Douglasville 30(b)(6), at 9:25–16:17; Ex. 6, Emergency Medical Services Contract. Under that agreement the City and County shared the cost of providing services, property to be used in providing emergency services, and the County fulfilled the City's statutory obligation to provide emergency medical services to inmates and arrestees. *See* Douglasville 30(b)(6), at 12:4–6, 13:3–8, 17:11–23. Under the contract between Douglas County and the City of Douglasville, Douglas County is granted use of two station facilities owned by the City of Douglasville, as well as one fire truck, and one aerial fire truck. Douglasville 30(b)(6); Ex. 6, at 6.

28. Upon the EMTs' arrival at the scene, the officers advised Flack and Porterfield that "they arrested an individual in which he was involved in a chase of some sort for a burglary. He was placed in the back of the vehicle, and he was saying initially that he was unable to breathe. But after discussions with the patient, [was told by the officers that] he no longer wanted to talk with anybody." (Exh. G - Porterfield Depo. 17:9-25).

RESPONSE: Undisputed, although as set forth in Plaintiffs' statement of additional material facts, the Officers made additional statements to EMS. *See* Pl. SMF ¶¶ 109–145.

29. Porterfield, a certified paramedic, assessed Wilson's condition and conducted an objective medical evaluation of Wilson while he was seated in the backseat of Smith's patrol vehicle. (Exh. G - Porterfield Depo. 115:11 to 116:3).

RESPONSE: Disputed. Porterfield did not conduct an "objective" medical evaluation. Porterfield's evaluation was wholly inadequate and guided by the Officers' statements that Wilson was faking, and that the Officers did not want Wilson transported to the hospital. *See* Pl. SMF ¶¶ 129–173.

To the extent Porterfield relied on tools that provide objective readings, i.e., a pulse oximeter, the actual readings from those devices is disputed. Smith stated that Wilson's pulse was 111 beats per minute. Smith, at 44:20–24. Porterfield stated that Wilson's pulse was in the 50s. Ex. H, Porterfield Interview, 02:44. Flack stated the pulse was in the 60s. Ex. I, Sean Flack Interview, at 02:13.

Smith also stated that Wilson's oxygen level was 92. Smith, at 47:15–48:19; Ex. A, filename: 134 Holding Cell 7, at 14:20–14:45 (explaining to the paramedic attempting to resuscitate Wilson in the jail that Wilson's oxygen level was 92). But Porterfield claims the oxygen level was 98 or 99. Porterfield, at 90:22–25, Ex. 17. 160.

There is no objective recording of Wilson's pulse or oxygen level because those readings are not saved by the Zoll monitor and Porterfield did not create any log of the readings. Porterfield, at 60:18–62:5; Flack, at 57:18–58:5.

30. Neither Danley nor Smith impeded or interfered in any manner with Porterfield's medical assessment of Wilson.

RESPONSE: This allegation is not supported by any citation to evidence, and therefore should be disregard. *See* Local Rule 56.1(B)(1)(a) ("The court will not consider any fact . . . not supported by a citation to evidence (including page or paragraph number) . . . ."). It is also disputed. *See* Pl. SMF ¶¶ 109–145.

31. Porterfield later prepared a written report summarizing his assessment of Wilson, reflecting that he had observed Wilson seated upright in the back seat of Smith's patrol car with his eyes open; that he felt Wilson's face and confirmed that his skin was warm and dry to the touch; that Wilson's lips were moist and pink; and that Wilson "did not appear to be in any distress, airway was patent, no tripoding, no irregular breathing patterns identified, and no immediate life threats noted upon initial impression of the patient." (Exh. H - Porterfield Depo. Exh. 17, p. 1).

RESPONSE: The text of Porterfield's report is undisputed, but that does not mean that Plaintiffs accept the statements as true. For example, during EMS's assessment, Cadwell observed that Wilson was foaming at the mouth, and stated "he's foaming at the mouth now, just so you know." Cadwell Vid., at 48:40; Composite Vid., at 35:25. This statement was directed to Porterfield. Cadwell, at 31:3–6. Porterfield's assessment reflect that Wilson's lips were moist, but that is obviously meant as an indication that there was no irregular appearance, which a jury could reject. Porterfield's report also states that Wilson's eyes were open, when other evidence contradict that. Smith, at 104:22–105:1. (Porterfield's report also states there was no tripoding, i.e., supporting himself with one arm while leaning over. But Wilson had his hands cuffed behind him, so it was obvious impossible for him to do so. This inane claim by Porterfield to justify his treatment of Wilson underscores that a jury could reject Porterfield's report and observations contained in it.)

It is also notable that Porterfield did not prepare the report until after he learned of Wilson's death, and after he had been disciplined for failing to follow policy by not creating a report immediately after assessing Wilson. Porterfield, at 13:9–14:5.

32. Following Porterfield's visual and physical assessment of Wilson, Porterfield's report reflects that he and Flack used a ZOLL Monitor to

objectively evaluate Wilson's pulse and oxygen saturation levels, which they reported was within normal limits. 32 (Exh. H - Porterfield Depo. Exh. 17, pp. 1-2).

RESPONSE: Disputed. As set forth in response to ¶ 29, the readings from the ZOLL monitor are in dispute. If the jury believes Smith's recitation of the readings, then those readings were cause for immediate concern. If Wilson's pulse was over 100 beats per minute (as Smith reported), Porterfield should have taken additional steps to diagnose Mr. Wilson. Porterfield, a 42:8–10, 42:23–43:4, 105:13–14. A pulse rate of over 100 would have required an EKG and blood pressure check. Flack, at 90:7–91:11.

If Wilson's oxygenation level was 92 (as Smith reported), that was also immediate cause for concern as a level below 94 should cause a paramedic immediate concern. *See* Krause, at 139:18–22.

33. Flack and Porterfield readily admit that Wilson did not appear to them to be experiencing any medical issues, serious or otherwise. (Exh. I - Flack Depo. 86:3 to 87:15, 88:17 to 90:3; Exh. G - Porterfield Depo. 112:5-12).

RESPONSE: Disputed. As set forth above, EMS knew that Wilson was foaming at the mouth, had his eyes closed, was non-responsive, and had previously complained of difficultly breathing. A jury could find that Wilson's pulse and blood-oxygen levels were outside the normal range. *See supra*, ¶¶ 29, 31, 32.

34. Porterfield then advised the officers that Wilson was experiencing no medical issues and that he was cleared Wilson for transport to the jail.

>   (Exh. G - Porterfield Depo. 112:5-12; Exh. J - Smith Video at 18:55 (EMTs depart the scene after evaluating Wilson).

RESPONSE: Disputed. As Porterfield and Flack began the assessment, one of the officers said "if he doesn't want to talk to you, he doesn't want to go to the hospital." Flack, at 13:21–14:1. After the officer said, "if he doesn't want to talk to you, he doesn't want to go to the hospital," Porterfield did not ask any additional questions to Wilson. Flack, at 15:2–23.

The officers on the scene made the decision not to transport Wilson to the hospital. Flack, at 22:10–15; 25:24–26:2 ("Q. With respect to the decision not to go to the hospital that was a law enforcement decision that was made? A. Yes."). The Officers made the final decision not to transport Wilson to the hospital. Flack, at 21:2–14. If officers say no to a medical treatment, then the officers decision is final. Flack, at 21:15–22:3.

Porterfield offered to transport Wilson to the hospital, but the officers declined. Porterfield, at 82:15–83:4, 84:18–85:1. Porterfield would have transported Wilson to the hospital if the officers requested it. Porterfield, at 85:22–24.

Porterfield also did not know that "Wilson had no medical issues," as the cited deposition testimony states. A jury could find that, if Porterfield said that to the Officers, Porterfield was lying. At the time Porterfield left the scene, he knew

that he had not done a full assessment of Wilson, and did not know what caused Wilson's complaint. Porterfield, at 85:25–86:7, 87:8–87:17.

35. Relying on Porterfield's medical determination in this regard, and believing that Wilson was under no medical distress, ((Exh. E - Smith Depo. 29:18-23; Exh. C - Danley Depo. 98:21-24), Danley and Smith continued to clear and secure the scene, following which Smith departed for the Douglasville Jail with Wilson in his back seat while Danley drove Burroughs, who was seated in the back seat of his vehicle, to the jail. (Smith Video at 27:00).

RESPONSE: Disputed that the Officers believed that Wilson was not in medical distress. First, Danley and Smith both recognized, after EMS left the scene, that Wilson was not well. Prior to transporting Wilson to the jail, Officer Smith radioed dispatch and stated that, although Wilson had been checked out by medical, he would not wake up and talk, and it did not appear that he'd be able to be booked in. Danley, at 116:16–117:1; Danley, Ex. 5, filename 0000000043_Dispatch_2015-03-03_00_59_43_by_ui_startdate_asc. Officer Danley agreed that, based upon Wilson's state after the EMS evaluation, Wilson would not be able to be booked into the jail. Danley, at 117:2–5.

After EMS left the scene, Smith stated that Wilson was "foaming at the mouth." Cadwell Vid., at 51:32 (the statement is barely audible due to low volume, but it is clearly made); Composite Vid., at 38:16. Danley and Smith both testified that a seizure or foaming at the mouth would be cause for alarm, and would be

reason to summon EMS. Danley, at 41:10–23 (testifying it should be done even if EMS had just left the scene); Smith, at 59:8–23.

Both Officers also knew that EMS had been rushed through their assessment, had been provided incomplete information, and that the Officers had made the final decision not to transport Wilson to the jail. *See supra*, ¶ 34.

36. Upon arrival at the jail, Danley and Smith first took Burroughs into the police department and placed him in a holding cell, then returned to Smith's vehicle, took Wilson into the police department, and placed him in a holding cell. (Exh. C - Danley Depo. 46:23 to 47:14; Exh. E - Smith Depo. 115:15-18).

RESPONSE: Undisputed.

37. Upon placing Wilson in the cell, Danley and Smith observed that Wilson was not breathing, at which point Smith attempted CPR; medical personnel were also summoned to the scene. (Exh. E - Smith Depo. 121:9 to 122:5; Exh. C - Danley Depo. 100:8-25, 105:13 to 107:25).

RESPONSE: Undisputed.

38. Medical personnel responded to the holding cell and provided CPR and resuscitative services; however, their efforts in this regard were not successful and Wilson was pronounced dead at that time. 39 (Exh. K - GBI Autopsy, p. 10).

RESPONSE: Undisputed.

39. An autopsy was conducted on March 3, 2015 at 9:40 am by the Deputy Chief Medical Examiner for the Georgia Bureau of Investigation, who concluded that the cause of Wilson's death was "exercise-induced sickle cell crisis in an individual with sickle cell trait," and that Wilson's running away from the scene "lowered his threshold to develop sickling" and thus led to his sudden and unexpected death. (Exh. K - GBI Autopsy).

RESPONSE: Undisputed.

40. Neither Wilson nor his parents were even aware that he had sickle cell trait. (Exh. L - K. Wilson Depo. 38:21-25; Exh. M - A. Wilson Depo. 58:2-16).

RESPONSE: Undisputed and immaterial. Officers need not diagnose a medical issue to recognize that a person has a serious medical need.

41. Plaintiffs do not allege that Wilson died as a result of positional asphyxia, nor is there any evidence to support any such conclusion. (Doc. 57).

RESPONSE: Undisputed.

42. Carlton Dampier, MD, identified as an expert witness for Porterfield and Flack, has provided testimony confirming (1) that he is employed at Emory University; (2) that his clinical practice is conducted with Children's Healthcare of Atlanta; (3) that he is Board Certified in Pediatric Hematology-Oncology; and (4) that he currently sees patients with hematologic disorders, almost exclusively sickle cell disease. (Exh. N - Dampier Depo. 6:1-19).

RESPONSE: Undisputed.

43. Dr. Dampier offered his expert medical opinion, which is unrebutted in the record, that even if the medical personnel at the scene had performed an appropriate baseline of Wilson's vitals, there was nothing that could have been done to change the outcome. (Exh. N - Dampier Depo. 113:6 to 114:8).

RESPONSE: Disputed. Defendants completely ignore the testimony of Dr. Kris Sperry. *See* Ex. 10, Sperry Decl. Dr. Sperry concluded that, if Mr. Wilson had received oxygen and transport to the hospital, he can state to a medical certainty

that it is more likely than not that Wilson would have survived. *See* Pl. SMF ¶¶ 288–290.

44. Dr. Dampier concluded that Wilson died from Exercise Collapse Associated with Sickle Train (ECAST) and that his death would most likely have occurred irrespective of any modalities that could have been undertaken to save his life. (Exh. N - Dampier Depo. 113:6 to 114:8).

RESPONSE: Undisputed that Dr. Dampier made this conclusion, but the underlying conclusion is disputed. *See supra*, ¶ 43.

Submitted this 21st day of December, 2018.

| | |
|---|---|
| s/Brian Spears | s/Jeffrey R. Filipovits |
| G. Brian Spears | Jeffrey R. Filipovits |
| Georgia Bar No. 670112 | Georgia Bar No. 825553 |
| | |
| 1126 Ponce de Leon Avenue | 2900 Chamblee-Tucker Road, Bldg. 1 |
| Atlanta, Georgia 30306 | Atlanta, Georgia 30341 |
| Phone: 404-872-7086 | Phone: 678-237-9302 |
| Fax: 404-892-1128 | Fax: 770-455-1449 |
| brian@brianspearslaw.com | jeff@law.filipovits.com |