UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY WILSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: |
| | ) | |
| v. | ) | 1:17-cv-634-WMR |
| | ) | |
| CITY OF DOUGLASVILLE, et al. | ) | |

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN
RESPONSE TO CITY OF DOUGLASVILLE, ANDREW SMITH, AND
COYLEE DANLEY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs offer the following statement of additional material facts pursuant

to Local Rule 56.1(B)(2)(b).

### *Officer Danley Arrives on the Scene and Spots Wilson*

1.  Mr. Wilson was twenty-one years old when he died. A. Wilson, at 43:3–

    4.

2.  At the time Officer Danley arrived on the scene, he knew that two

    individuals who were suspected of a burglary at a motorcycle shop

    jumped a chain link fence and fled on foot when an officer pulled his

    car into the business's driveway. Danley, at 54:18–55:6.

1

3.      Mr. Wilson was was involved in the theft at the ATV dealership, along

with Carlos Burroughs. Ex. 11, Burroughs Decl., ¶ 3.

4.      Mr. Wilson and Mr. Burroughs ran from the scene for a short time, and

while running Mr. Wilson fell to the ground just before Officer Danley

arrived. This was the first time that Mr. Wilson fell. Ex. 11, Burroughs

Decl., ¶ 7.

5.      Mr. Wilson was on the ground for a minute or two before Officer

Danley arrived on the scene. Burroughs Decl., ¶ 7.

6.      Officer Danley was familiar with the area of the burglary, and knew that

the fence the suspects jumped backed up onto Catherine Street. Danley,

at 55:24–56:7.

7.      When Danley arrived on the scene, he believed there were two

suspects. Danley, at 55:15–21.

8.      The location where Danley found Wilson was less than 100 yards from

the location of the motorcycle shop. Danley, at 56:24–57:2.

9.      Officer Danley found Wilson laying face down in a driveway, with his

pants around his ankles, and his underwear down to his knees. Danley,

at 38:11–21.

2

10. Wilson's penis was exposed, and on the ground. Danley, at 122:19–123:1.

11. Wilson did not react to Officer Danley's patrol car, and did not move. Danley, at 38:22–24, 58:2–4.

12. As Wilson laid on the ground, his arms were under his chest. Danley, at 60:9–12.

13. Officer Danley exited his car and stated over his radio, "I got someone laying in the middle of the driveway here." Danley Vid., at 14:30; Composite Vid., at 14:30.[1]

---

[1] The citations to the video recording are in the following format: Any citation to Smith's video, Danley's video, or the composite video refers to the actual playing time of the video, i.e., the time counter used by the software to play the video. But because Cadwell's video is split into two separate parts, the citations to Cadwell's video refer to the time that is shown in the bottom left corner of his video (see Fig. 1). For reference, this timer is enlarged and appears in the lower right corner of the composite video (see Fig. 2). *See* Pace Decl., ¶ 9 (explaining that the timer is identical on both).



*Fig. 1*
*Cadwell video*



*Fig. 2*
*Composite video*

3

14.     Officer Danley exited his car and asked Wilson who he was, and Wilson

did not respond. Danley, at 59:2–59:4.

15.     Over Danley's radio, he heard his Sergeant stated "the person I saw

looked like he was wearing jeans and maybe a sweater." Danley, at

58:15–20.

16.     Danley radioed, "this might be one of them. He's got his pants way

down below his back." Danley Vid., at 14:40; Composite Vid., at 14:40.

17.     He then said to Wilson, "You better show me your hands right now.

Both of them mother fucker. Put them behind your back." Danley Vid.,

at 14:40; Composite Vid., at 14:40.

18.     In response, Wilson muttered incomprehensibly. Danley Vid., at 14:55;

Composite Vid., at 14:55.

19.     Danley then said, "You put your fucking arms behind your back or I'm

going to do it for you. And it ain't going to be nice. All the way behind

your back mother fucker. Behind your back." Danley Vid., at 14:57;

Composite Vid., at 14:57.

20.     Wilson moved he hands from under him so he could be handcuffed.

Danley, at 60:3–17.

Case 1:17-cv-00634-WMR   Document 156-2   Filed 12/21/18   Page 5 of 58


21.    Wilson was handcuffed at 15:14 of Danley's video. Danley, at 60:20–22.

22.    After providing his hands to be handcuffed, Wilson remained face down. Danley, at 60:18–19.

23.    Danley then radioed that he had one suspect detained. Danley Vid., at 15:20; Composite Vid., at 15:20.

24.    Danley then asked Wilson, "Where's your partner." Danley Vid., at 15:2; Composite Vid., at 15:27.

25.    Wilson can be heard breathing heavily on Danley's dash camera video as Danley spoke to him. After Danley's question, Wilson again muttered an incoherent response. Danley Vid., at 15:30; Composite Vid., at 15:30.

***Burroughs Appears on the Scene and is Quickly Handcuffed***

26.    As Danley began calling in his location to dispatch, Carlos Burroughs then appeared from the side of the house and approached Officer Danley with his arms raised. It was apparent that he was surrendering. Danley, at 61:13–22.

27.     Officer Danley then radioed to dispatch, "I have them both." Danley

        Vid., at 15:49; Composite Vid., at 15:49.

28.     As Burroughs approached, Wilson remained motionless on the ground,

        and never required instructions to lay down. Danley, at 62:15–17,

        63:20–64:1.

29.     Officer Danley ordered Burroughs to lay down on the ground.

        Burroughs complied, and Danley handcuffed him. Danley, at 61:23–

        62:14; Danley Vid., at 16:17.

30.     Danley then said to Burroughs, "Hey, just lay the fuck down, dude."

        Danley, at 63:20–23; Danley Vid., at 16:5; Composite Vid., at 16:51.

31.     Danley then radioed to dispatch that he had two in custody and "just

        needed someone to come over here." Danley Vid., at 17:03; Composite

        Vid., at 17:03.

### Officer Smith Arrives on the Scene

32.     Officer Smith arrived on the scene approximately three minutes after

        Danley's arrival. *See* Danley Vid., at 27:50 (showing Danley's arrival

        on the scene), 30:42 (showing Smith's arrival at the scene); Composite

        Vid., at 27:50, 30:42 (showing the same).

6

33.     Officer Smith arrived on the scene second and approached Danley,

Wilson, and Burroughs. Danley Vid., at 17:39; Composite Vid., at

17:39.

34.     Danley said to Smith, "I'm going to have to help him get his drawers

[underwear] up." Danley Vid., at 30:56; Composite Vid., at 30:56.

35.     Officer Smith then attempted to move Wilson, and noted that Wilson

was having problems moving. Smith asked, "What's wrong with your

legs?" Danley Vid., at 18:04; Composite Vid., at 18:04.

36.     Wilson responded incoherently. Danley Vid., at 18:06; Composite Vid.,

at 18:06.

37.     Danley responded by saying, "Guess what? We don't give a fuck right

now. Get up." Danley Vid., at 18:08; Composite Vid., at 18:08.

38.     Wilson again mumbled incoherently. Danley Vid., at 18:10; Composite

Vid., at 18:10.

39.     Wilson can be heard to be gasping for breath, and said, "Okay, sir. I just

can't breathe." As he said it, he can be heard gasping for breath. Danley

Vid., at 18:2  2; Composite Vid., at 18:22.

40.     Danley responded by saying, "You can breathe. You're talking." Danley

        Vid., at 18:24; Composite Vid., at 18:24.

41.     Officer Danley then helped Mr. Burroughs stand up while Mr. Wilson

        remained on the ground. Danley, at 68:15–69:4; Danley Vid., at 18:34–

        18:56; Composite Vid., at 18:34–18:56.

42.     Officer Smith then sat Wilson upright so that Wilson was leaning

        against Officer Smith's legs. Danley, at 69:5–15; Danley Vid., at 18:39;

        Composite Vid., 18:39.

43.     As Wilson leaned against Smith's legs, Smith could hear Wilson

        making a coughing-type sound. Smith, at 33:19–22.

44.     While Wilson was leaning on Smith's legs, Wilson fell over twice.

        Smith had to pick Wilson up and hold him in place. Smith, at 62:7–19.

45.     It was obvious to Officer Smith that Wilson was having difficulty

        breathing. Smith, at 33:23–34:3, 34:17–35:7.

46.     While Wilson was seated and leaning against Smith's legs, he began to

        fall over because he could not support himself. Officer Smith responded

        by telling Wilson that he could not lay down. Danley, at 73:7–9.

47.     No officer checked Wilson's airway or monitored his breathing. Danley, at 73:13–20.

48.     Officer Smith called to dispatch that a suspect was saying that he can't breathe. Danley Vid., at 19:20; Composite Vid., at 19:20.

49.     Officer Danley reported to dispatch that he believed Wilson was "playing possum," and intended to communicate that he believed that Wilson was faking. Danley, at 44:10–45:3.

50.     After calling EMS, Officer Smith said to Wilson that maybe he "could breathe if he wasn't over there stealing shit." Danley Vid., at 19:35; Composite Vid., at 19:35.

### *Deputy Cadwell Arrives on the Scene*

51.     When Deputy Cadwell arrived on the scene, Danley and Smith were already there. Cadwell, at 10:15–20.

52.     When he arrived, Deputy Cadwell saw Wilson seated on the ground, with his hands cuffed and legs extended in front of him, leaning on Officer Smith's legs as Smith stood behind him. Wilson was saying that he could not breathe. Cadwell, at 13:10–14:10; Smith, at 63:4–8.

53.     After Cadwell arrived, he stood with Smith while Danley moved
        Burroughs to his patrol car. Danley, at 74:8–75:8.

54.     After Cadwell arrived, Danley told him that Wilson was "calling for
        EMS or whatever." Danley Vid., at 20:09; Composite Vid., at 20:09.

55.     As Danley explained the situation to Cadwell, Wilson cried out again,
        "I can't breathe!" Danley Vid., at 20:1; Composite Vid., at 20:17.

56.     Cadwell asked Danley why Wilson's "britches were down," Danley
        stated that he found Wilson laying "face down with his britches all the
        way down, his drawers too." Danley, at 73:21–25.

57.     Cadwell responded by saying that Wilson should go to a bathroom or
        bedroom "to do that." Danley, at 74:1–3.

58.     Wilson cried out that he could not breathe again. Smith responded by
        saying, "If you're talking, you're breathing. That's how that works."
        Danley Vid., at 20:43; Composite Vid., at 20:43.

59.     Wilson again cried out that he could not breathe. This time with more
        urgency. Officers did not respond. Danley Vid., at 20:50; Composite
        Vid., at 20:50.

60.     About 15 seconds later, Wilson again cried out, "I can't breathe. Hey man, I can't breathe." Danley Vid., at 21:05; Composite Vid., at 21:05.

61.     Danley shouted back "you're breathing." Danley, at 75:11–23; Danley Vid., at 21:09; Composite Vid., at 21:09.

62.     Cadwell then approached Wilson and said, "Lookie here, man. I'm fixing to help you out. These are brand new gloves, and I'm fixing to put your junk away. I don't know why it's out. Why's your junk out?" Cadwell Vid., at 33:26; Composite Vid., at 20:09.

63.     Wilson responded by stating that he could not breathe. This time, he spoke with less force than before. Cadwell Vid., at 34:36; Composite Vid., at 21:20.

64.     Cadwell responded, "Okay. You're talking to me so you can breathe." Cadwell Vid., at 34:38; Composite Vid., at 21:23.

65.     Officer Smith asked Wilson his name, and Wilson gasped that his last name was "Wilson." Cadwell, at 02:44; Composite Vid., at 21:55.

66.     Cadwell then twice asked Wilson whether he had identification. Wilson did not respond. Cadwell Vid., at 35:14; Composite Vid., at 21:59.

67.   Cadwell then said, "Stand him up and pull his britches up. This is ridiculous." Cadwell Vid., at 35:21; Composite Vid., at 22:06.

68.   Cadwell then commanded, "C'mon, dude. Stand up." Cadwell Vid., at 34:32; Composite Vid., at 21:16.

69.   Cadwell then asked, "What's the matter with you?" Cadwell Vid., at 35:37; Composite Vid., at 22:20.

70.   Wilson, barely able to speak, again stated, "I . . . can't . . . breathe." Cadwell Vid., at 35:48; Composite Vid., at 22:22.

71.   Cadwell responded by asking, "Why? Because you are in handcuffs?" Cadwell Vid., at 35:56; Danley Vid., at 22:30; Composite Vid., at 22:30.

72.   It was apparent to Officer Smith that Wilson could not stand. Smith, at 41:23–42:2, 42:6–7.

73.   Both Danley and Smith recognized that there was something wrong with Wilson's legs. Danley, at 66:5–8.

74.   This would be the last time that Wilson spoke. Danley Vid., at 22:30 and onward; Cadwell Vid., at 33:47 and onward; Composite Vid., at 22:30 and onward.

75.     It was apparent to Officer Smith that Wilson could not stand. Smith, at
        41:23–42:2, 42:6–7.

76.     Officer Danley said, "I am going to tell you right now. You're going to
        jail either way." Danley, at 76:24–77:2.; Danley Vid., at 22:35; Cadwell
        Vid., at 33:54; Composite Vid., at 22:35.

77.     Officer Smith then said, "Yeah, bro, it don't matter. You're still going to
        jail either way," and that Smith "did not give a shit." Danley, at 77:3–6,
        124:15–20; Cadwell Vid., at 35:48 Danley Vid., at 22:32; Composite
        Vid., at 22:32.

78.     Smith then suggested, "Let's just bring him to my car." Cadwell Vid., at
        35:53; Composite Vid., at 22:38.

79.     Officer Danley then laughed and said, "You're going to jail." Danley
        Vid., at 22:3; Composite Vid., at 22:37.

80.     At that point, Officer Danley made the decision that Wilson would be
        going to jail. Danley, at 77:7–9.

### Officers Lift Wilson's Limp Body into Smith's Patrol Car

81.     Wilson was limp during Cadwell's entire interaction with him. Cadwell,
        at 14:21–23.

13

82.     The officers then all carried Wilson's completely limp body to Smith's patrol car. Cadwell Vid., at 36:01; Danley Vid., at 22:44; Composite Vid., at 22:44.

83.     At the time the police officers carried Wilson to Smith's patrol car, Wilson had not moved under his own power. Danley, at 77:17–20.

84.     As the officers carried Wilson, Danley lectured him by saying "you want to make a scene, you want to make a scene." Danley Vid., at 22:52; Composite Vid., at 22:52; Cadwell Vid., at 36:09.

85.     As the officers carried Mr. Wilson, Wilson's pants again fell down. Danley, at 80:20–81:4.

86.     After Wilson's pants fell down, Cadwell told Wilson to "have some decency about yourself." Cadwell Vid., at 36:12; Danley Vid. At 22:58; Composite Vid., at 22:58.

87.     Officer Danley then stated that Wilson was "going to be that guy," and Smith agreed, "yup, he is going to be that guy." Danley Vid., at 23:03; Composite Vid., at 23:03; Cadwell Vid., at 36:19.

88.     Wilson was completely limp as officers carried him to his car. Danley, at 81:5–7. Officer Danley knew that Wilson had been running and collapsed. Danley, at 125:20–126:4.

89.     As the officers placed Wilson into the back of Smith's patrol car, the claimed that they believed Wilson was tensing his muscles and resisting because Wilson's shoulders and arms were moving. Danley, at 81:13–21.

90.     Officer Danley yelled, "Sit down! Now you're fighting me. Now you're fighting me." Cadwell Vid., at 36:32; Danley Vid., at 23:15; Composite Vid., at 23:15.

91.     As Wilson was placed in the back of the patrol car, he had no power in his legs and his head was slumped and he was leaning forward. Danley, at 82:20–25.

92.     Officer Danley did not monitor whether Wilson was breathing as he was placed in the back of the patrol car. Danley, at 83:4–7.

93.     Danley said to Wilson, "I can feel your body being rigid, you idiot." Cadwell Vid., at 36:51; Danley Vid., at 23:36; Composite Vid., at 23:36.

94. Cadwell then commanded Wilson, "Sit up. Sit up." Cadwell Vid., at 37:02.

95. Danley then again said, "I can feel your body being rigid. Stop being a fucking idiot." Cadwell Vid., at 37:10; Danley Vid., at 23:5; Composite Vid., at 23:57.

96. Officer Danley claimed in his deposition that Wilson could have been charged with obstruction for moving his arms and shoulders as he was placed in the back of Smith's patrol cars. Danley, at 81:17–82:6.

97. Smith then said, "I am going to buckle him in too, so he can't lay over." Danley Vid., at 23:51; Composite Vid., at 23:51; Cadwell Vid., at 37:13.

98. Officer Danley then remarked that Wilson was a "fucking retard." Danley Vid., at 24:08; Composite Vid., at 24:08.

99. Officer Smith then asked Wilson what his first name was. Wilson did not respond. Cadwell Vid., at 37:33.

100. Cadwell then stated, "We're going to find out one way or the other. You can't get out of jail until you give them the information." Cadwell Vid., at 37:36; Composite Vid., at 24:19.

101.    Cadwell then lectured Wilson, who was limp and non-responsive: "It
        would be smarter for you if you would just cooperate with these men."
        Cadwell Vid., at 37:48.

102.    Cadwell then said, "Are you going to tell me your name now? You
        know, you can't get out until you give them the information they
        require. Or you can just sit in the Douglas County jail." Cadwell Vid., at
        38:24; Composite Vid., at 25:06.

103.    The officers then left Wilson, unattended, the back of Smith's patrol car.
        *See* Danley Vid., at 25:50; Composite Vid., at 25:50.

104.    Officer Danley turned his microphone off and further conversation
        between the officers would not be captured on Danley's microphone.
        Danley, at 86:19–24; Danley Vid., at 26:26 (losing audio from Danley's
        body microphone); Composite Vid., at 26:26.

105.    After placing Wilson in the patrol car, Danley told Cadwell that Wilson
        had run from the scene, and when Danley found him Wilson was laying
        face down in the drive way and not moving at all. Danley, at 125:24–
        126:4; Cadwell Vid., at 43:29; Composite Vid., at 30:13.

106.    Cadwell and Danley then discussed the subject of being naked in front

        of other men. Cadwell stated he was uncomfortable with other men

        seeing him naked, and Danley stated that, if he were Wilson, being

        arrested while his penis was exposed, he'd at least say "okay, you got

        me, let me put my junk back up." Danley, at 126:18–127:11; Cadwell

        Vid., at 43:41.

107.    Danley believed that Wilson would be embarrassed, and that such

        public embarrassment would provoke some reaction from Wilson.

        Danley, at 127:8–14; Cadwell Vid., at 43:58.

108.    Officer Smith stated that, "In Douglas County, if your body is rigid then

        you're fighting against me." Cadwell Vid., at 45:11, Composite Vid., at

        31:54.

                    *Initial Communication with Officers and EMS*

109.    As Cadwell approached the EMS[2] truck, he mockingly called out, "I

        can't breathe," and laughed out loud. Cadwell Vid., at 45:01; Composite

        Vid., at 31:49.

_____
        [2]"EMS" refers jointly to Defendants Porterfield and Flack.

                                    18

110.     EMS arrived on the scene about nine minutes after officers placed

         Wilson in the back of the patrol car. Danley Vid., at 33:41. Wilson's

         condition had deteriorated during that time. Danley, at 136:22–25.

111.     None of the communications between Officer Danley, Officer Smith,

         and EMS are captured on any audio recording, with the exception of

         one comment made by Cadwell that Wilson was foaming at the mouth.

         Danley Vid., at 33:41 and onward; Cadwell Vid., at 48:20 and onward.

112.     When EMS arrived, they had not had any contact with the officers on

         the scene; EMS knew only that there was a person who reported they

         could not breathe. Flack, at 33:19–34:2; Porterfield, at 66:10–14; Flack,

         at 44:4–13.

113.     After EMS arrived, they communicated with officers on the scene.

         Porterfield, at 67:5–8.

114.     The Officers collectively[3] presented Wilson's complaint as a non-

         emergency and a false report. Porterfield, at 67:9–69:2.

---

[3] This portion of the statement of facts refers to Officers Smith and Danley collectively because there is a disputed issue of fact as to whether Officer Danley communicated with EMS. *See infra*, ¶ 292.

19

115.    One of the City of Douglasville police officers made initial contact with Porterfield and Flack when they arrived on the scene. Porterfield, at 70:19–71:8.

116.    As EMS approached, the Officers stated that Wilson was making a false report and gave that opinion before EMS had a chance to assess Wilson. Porterfield, at 113:2–5, 114:2–19.

117.    EMS relied on the officers on the scene to communicate any information that they knew about Wilson's condition prior to the arrival of EMS. Flack, at 46:24–47:9.

118.    Officers told EMS that Wilson only complained of being unable to breathe after he was placed in the back of the patrol car. Flack, at 45:7–12, 45:19–46:3.

119.    Officers did not tell EMS that Wilson was found lying face down in a driveway. Flack, at 45:13–18; Smith, at 101:23–25.

120.    Officers told EMS that Wilson was upset because he was "going to be locked up for a long time." Porterfield, at 76:6–8.

20

121.    Officers told EMS that Wilson was "just talking to them," and then
        began to refuse to answer questions. Porterfield, at 75:9–23, 75:24–
        76:5.

122.    Officers presented Wilson's situation to the paramedics as a non-
        medical emergency, and stated that they believed Wilson was making a
        false complaint. Danley, at 52:6–17.

123.    Officers did not tell EMS that Wilson had been carried to Smith's patrol
        car. Porterfield, at 16:10–13, 102:19–103:15; Flack, at 46:4–9; Smith, at
        102:17–23.

124.    Officers did not tell EMS that Wilson had never stood under his own
        power. Porterfield, at 16:14–20; Flack, at 46:14–18, 50:19–51:9; Smith,
        at 102:1–3, 102:7–16.

125.    Officers did not tell EMS that Wilson had never taken any physical
        action between the time Danley found him, and the time EMS arrived.
        Porterfield, at 16:21–17:1.

126.    EMS did not know that Wilson had to be carried to the back of the
        patrol car, where Wilson was located when EMS arrived. Porterfield, at
        33:1–5.

21

127. Knowing that Wilson had to be carried to the back of the patrol car would have been important to know in making an assessment of Wilson's medical condition. Porterfield, at 33:6–34:1, 102:19–103:15.

128. The only thing that Porterfield knew from his conversation with the officers was that there was a police chase, that Wilson initially said that he could not breathe, and then "after discussions with the patient he no longer wanted to talk to anybody," and that Wilson "stopped talking out of fear for his situation." Porterfield, at 17:5–25.

### *The Officers Dictate that Wilson will go to Jail*

129. When Porterfield and Flack began to perform an assessment of Wilson, the officers were quick to keep them moving. Flack, at 13:11–20.

130. Porterfield and Flack had a Zoll monitor with them, which they used to assess Wilson's pulse and oxygen levels.

131. Porterfield had Officer Smith place oximeter on Mr. Wilson for several seconds to determine Wilson's pulse and blood oxygen level. Porterfield, at 25:2–17; Smith, at 89:16–20.

132. Porterfield asked Wilson if he wanted to go to the hospital. Flack, at 16:9–20.

22

133.     Wilson did not respond to anything Porterfield said. Porterfield, at 18:1–4, 34:7–15.

134.     Porterfield could not determine whether Wilson was unable or unwilling to speak. Porterfield, at 18:9–18.

135.     When EMS evaluated Wilson, Wilson's eyes were closed. Smith, at 104:22–105:1.

136.     Porterfield falsely claimed that Wilson's eyes were open during the assessment. Porterfield, at 19:22–25.

137.     About a minute or two after using the Zoll monitor, one of the officers stated that if he doesn't want to go to talk, he doesn't want to go to the hospital. Flack, at 58:19–24.

138.     After the officer said, "if he doesn't want to talk to you, he doesn't want to go to the hospital," Porterfield did not ask any additional questions to Wilson. Flack, at 15:2–23.

139.    Either Officer Smith or Danley is the officer who made the comment

that "if Wilson does not want to talk, then he does not want to go to the

hospital." Flack, at 79:1–20 (testifying that it was a City police officer

who made the comment); Danley, at 27:9–11, 27:21–22 (testifying that

he did not speak to EMS, and that Officer Smith communicated with

EMS). Smith does not deny that one of the officers made that statement

to EMS, he simply does not recall.  Smith, at 106:14–21.

140.    Porterfield did not complete a full assessment of Wilson's vital signs,

and did not complete the assessment of Wilson. Porterfield, at 37:6–9;

Flack, at 27:14–17.

141.    Porterfield offered to the officers transport Wilson to the hospital, but

the officers declined. Porterfield, at 82:15–83:4, 84:18–85:1.

142.    Porterfield would have transported Wilson to the hospital if the officers

requested it. Porterfield, at 85:22–24.

143.    The Officers made the final decision not to transport Wilson to the hospital. Flack, at 21:2–14. If officers say no to a medical treatment, then the officers decision is final. Flack, at 21:15–22:3, 25:24–26:2 ("Q. With respect to the decision not to go to the hospital that was a law enforcement decision that was made? A. Yes.").

144.    At the time Porterfield left the scene, he knew that he had not done a full assessment of Wilson, and did not know what caused Wilson's complaint. Porterfield, at 85:25–86:7, 87:8–87:17.

145.    Flack testified that his understanding is that the officers on the scene have the final decision as to whether to transport an arrestee to jail or the hospital. Flack, at 21:2–14.

### *The EMS Assessment*

146.    Porterfield and Flack did not use the Zoll monitor to measure the carbon dioxide levels, even though the monitor could be used for that purpose. Porterfield, at 11:15–23.

147.    Porterfield could have used the Zoll monitor to perform continuous cardiac monitoring, but chose not to do so. Porterfield, at 25:25–26:6.

148.    EMS did not take Wilson's blood pressure, even though doing so would
        have measured Wilson's circulation. Porterfield, at 10:14–17, 22:8–
        22:13.

149.    There was no exigency or need for Porterfield to rush through Wilson's
        assessment, and Porterfield had adequate time to make a more complete
        assessment. Porterfield, at 38:1–16.

150.    The EMS personnel spent very little time at the scene of Wilson's
        collapse and spent even less time actually with Wilson. The EMS
        personnel were present at the general location of Wilson's arrest
        approximately seven minutes. *See* Ex.  "Investigative Summary,"
        Exhibit 15, GBI Region 10 Report. Although in the area for about seven
        minutes, they were actually alongside of Wilson for four minutes. See,
        composite video exhibit, run times showing EMS personnel alongside
        Smith's vehicle at 33:36 and walking back towards their emergency
        vehicle at 37:47.

26

151.    Porterfield claims to have measured Wilson's circulation solely by looking at Wilson's lips and skin color, and that from that he could determine there was no hypoxia. Porterfield, at 21:23–22:7, 26:22–27:10.

152.    Porterfield stated that he had difficulty obtaining consent from Wilson to assess him. Porterfield, at 31:24–32:20.

153.    In cases where EMS cannot obtain consent from an individual, they can still rely upon obtaining information from individuals that may have viewed the patient. Porterfield, at 31:24–32:20.

154.    Porterfield measured Wilson's respirations solely by looking at the movement of Wilson's chest. Porterfield, at 10:18–11:14.

155.    Based upon the information Porterfield learned from the officers and the time he spent with Mr. Wilson, Porterfield concluded that Wilson "had no complaint." Porterfield, at 23:9–13.

156.    The nearest hospital to the location of Wilson's arrest was Wellstar Douglas, which was about two miles away. Porterfield, at 38:17–25; Flack, at 59:16–19.

27

157.    It would have taken Porterfield and Flack about five minutes to get

Wilson to the emergency room. Flack, at 59:20–25.

158.    Smith stated that Wilson's pulse was 111 beats per minute. Smith, at

44:20–24. Porterfield stated that Wilson's pulse was in the 50s. Ex. H,

Porterfield Interview, 02:44. Flack stated the pulse was in the 60s. Ex. I,

Sean Flack Interview, at 02:13.

159.    Porterfield falsely claims Wilson's oxygen level was 98 or 99.

Porterfield, at 90:22–25, Ex. 17.

160.    Wilson's actual oxygen level was 92. Smith, at 47:15–48:19; Ex. A,

filename: 134 Holding Cell 7, at 14:20–14:45 (explaining to the

paramedic attempting to resuscitate Wilson in the jail that Wilson's

oxygen level was 92).

161.    There is no objective recording of Wilson's pulse or oxygen level

because those readings are not saved by the Zoll monitor and

Porterfield did not create any log of the readings. Porterfield, at 60:18–

62:5; Flack, at 57:18–58:5.

162.    During EMS's assessment, Cadwell observed that Wilson was foaming at the mouth, and stated "he's foaming at the mouth now, just so you know." Cadwell Vid., at 48:40; Composite Vid., at 35:25.

163.    Cadwell directed the comment that Wilson was foaming at the mouth to EMS personnel. Cadwell, at 31:3–6.

164.    Porterfield admits to looking directly as Wilson's mouth during his assessment. Porterfield, 49:17.

165.    The pulse and oxygen readings from the Zoll monitor would have been visible to others who were nearby. Porterfield, at 104:17–25; Flack, at 57:9–17.

166.    If Wilson's pulse was over 100 beats per minute, Porterfield should have taken additional steps to diagnose Mr. Wilson. Porterfield, a 42:8–10, 42:23–43:4, 105:13–14. A pulse rate of over 100 would have required an EKG and blood pressure check. Flack, at 90:7–91:11.

167.    Porterfield agrees that if a patient is not getting enough oxygen to the brain that the patient may lose their ability to respond. Porterfield, at 60:11–17.

168.    Porterfield did not observe anything that indicated that Wilson was
        aware of his surroundings, and could not determine Wilson's level of
        consciousness. Porterfield, at 20:21–21:9.

169.    Porterfield and Flack did not supply oxygen to Wilson. Flack, at 12:21–
        24.

170.    Porterfield and Flack did not perform any airway management. Flack,
        at 12:25–13:10.

171.    Porterfield and Flack had an oxygen tank available to them to
        administer oxygen to Wilson. Flack, at 46:19–23.

172.    The first time Porterfield created a report of EMS action at the site of
        Wilson's arrest was on March 29, 2015, weeks after he learned of
        Wilson's death, and after he had been disciplined for his failure to
        prepare a Patient Care Report. Porterfield, at 13:9–14:5.

173.    Porterfield's and Flack's actions were "tantamount to no assessment
        and to no medical treatment at all." Ex. 8, Krause Decl., ¶ 6.

### *After EMS Leaves the Scene*

174.    After EMS, Danley discussed with Smith and Cadwell that Wilson was found laying motionless. He said, "I swear to god  bro he was laying motionless with his pants down and his drawers, and his dong was on the concrete." Composite Vid., 38:28.

175.    Officer Danley then stated that Mr. Wilson was "in the retard zone." Danley, at 130:2–5; Composite Vid., at 39:38.

176.    While Danley spoke, Cadwell cried out, mockingly, "I can't breathe!" Composite Vid., 38:28.

177.    Officer Smith told Danley and Cadwell that Wilson had been cleared for transport. Danley, at 48:21–23; Cadwell Vid., at 51:30.

178.    After evaluating Wilson, Porterfield did not create a patient care report and made a conscious decision not to do so. Porterfield, at 12:20–13:4. Flack, at 66:4–8.

179.    After EMS left the scene, Smith stated that Wilson was "foaming at the mouth." Cadwell Vid., at 51:32 (the statement is barely audible due to low volume, but it is clearly made); Composite Vid., at 38:16.

180.    After EMS left the scene, Smith and Cadwell finished tending to

Wilson. Smith recognizes that Wilson is non-responsive, and voices a

concern for Wilson rolling over and "getting positional asphyxia."

Composite Vid., at 38:01; Cadwell Vid., at 51:18.

181.    After EMS left the scene, Officer Smith continued to observe Wilson

and did not notice any change in his condition. The lack of changes

persisted until Danley and Smith arrived at the jail. Smith, at 110:19–

111:8, 116:17–117:4.

182.    Prior to transporting Wilson to the jail, Officer Smith radioed dispatch

and stated that, although Wilson had been checked out by medical, he

would not wake up and talk, and it did not appear that he'd be able to

be booked in. Danley, at 116:16–117:1; Danley, Ex. 5, filename

0000000043_Dispatch_2015-03-03_00_59_43_by_ui_startdate_asc.

183.    Officer Danley agreed that, based upon Wilson's state after the EMS

evaluation, Wilson would not be able to be booked into the jail. Danley,

at 117:2–5.

184.    Sgt. Sanders then replied and stated that "jailitis isn't going to work."

Danley, at 117:6–14.

32

185.     Danley did not check on Wilson before taking him to the jail, and did

          not see him from the time he was placed in Smith's patrol car until his

          arrival at the jail. Danley, at 40:11–19.

186.     After beginning the transport of Wilson, Smith did not check on Wilson

          except to look into his rearview mirror, which allowed him to see that

          Wilson was still buckled into his seat belt, but he could not determine

          whether Wilson was breathing. Smith, at 118:13–120:1.

187.     Just before transporting Wilson to the jail, Deputy Cadwell placed

          Wilson's cell phone and wallet in Danley's patrol car and stated, "I took

          his phone because I didn't want him to make no phone calls, even

          though it's hard for the dead to make phone calls." The officers all

          laughed. Danley, at 130:19–24; Cadwell Vid., at 53:10; Composite Vid.,

          at 39:53.

188.     Smith and Danley left to transport Wilson and Burroughs to the jail

          approximately 9 minutes after EMS departed the scene. *See* Smith Vid.,

          at 18:17 (showing EMS departing the scene), 27:01 (showing Danley

          and Smith departing the scene).

189.    It took Smith and Wilson approximately five minutes to arrive at the

        jail. *See* Smith Vid., at 27:01 (showing the officers' departure from the

        scene), 32:38 (showing their arrival at the jail).

### Arrival at the Jail

190.    After Smith and Danley arrived at the police station, they transported

        Burroughs into the jail first. They did not check on Mr. Wilson. Danley,

        at 45:9–24.

191.    While Smith and Danley transported Mr. Burroughs into the jail,

        Wilson remained in the back seat of Smith's car, with his hands cuffed

        behind his back. Danley, at 45:17–24. Wilson remained in the back of

        the patrol car for approximately seven minutes. Ex. J filename: [124

        mantrap twrds cell row] 39.avi, 00:42, video timestamp 1:11 (showing

        Burroughs being taken into the jail at time stamp of 1:11), 08:17, video

        timestamp 1:19 (showing Wilson being taken into the jail).

192.    When Smith and Danley removed Wilson from the back of the patrol

        car, his body was limp, and he was not moving. Danley, at 46:16–20.

193.    Smith and Danley dragged Wilson's limp body into a jail cell. See Ex.

        J, filename: [124 mantrap twrds cell row] 39.avi, at 08:15.

34

194.     Danley did not check Wilson's breathing after they arrived at the jail.

Danley, at 98:25–99:1.

195.     When Smith retrieved Wilson from the back of his patrol car, Wilson

looked the same as when EMS had left: he was limp, eyes were closed,

and he did not react to the officers. He had not changed positions.

Smith, at 120:15–21.As Smith and Danley removed Wilson from the

back of the patrol car, Wilson was still limp. Smith, at 120:22–121:8.

### *Standards Governing Police*

196.     Officers who call EMS for a person who is in their custody have a

responsibility to communicate the person's complaint, and any general

information regarding the officer's observations that would relate to the

complaint. Cadwell, at 13:1–9.

197.     Police officers have a duty to report an arrestee's complaints, what

happened on scene before EMS arrived, and what the officer observed

from the time the officer arrived until EMS arrived. Smith, at 56:23–

57:7.

198.    Officers Smith and Danley violated City of Douglasville policy by leaving Wilson unattended in the back of Smith's patrol car while they took Burroughs into the jail. Danley, at 49:6–50:8, Ex. 2.

199.    If a suspect is foaming at the mouth, that is a reason to call EMS. Smith, at 59:8–23.

200.    After police summon EMS, police officers have a duty to provide all information they learned concerning the subject of the call after summoning EMS and before the arrival of EMS. Clark Decl., ¶ 6.

201.    The standard of care governing what information law enforcement officers should provide to emergency medical personnel is based, in part, upon industry practice. Clark Decl., ¶ 7.

202.    If Danley and Smith had conformed to their duty to provide information to EMS, they would have ensured that EMS knew the following: (a) that Wilson was found lying face down in a driveway, apparently having collapsed while running; (b) that Wilson was gasping for air initially, and complaining of an inability to breathe; (c) that Wilson became less and less responsive during the time the officers were on the scene, and that the officers observed Wilson go from being able to speak audibly to being completely non-responsive; (d) that Wilson never stood or walked under his own volition; (e) that Wilson had to be carried to the back seat of Officer Smith's patrol car, and that he was seat belted into the seat to ensure he would remain upright; (f) that since moving to the patrol car, Wilson had ceased responding entirely. Clark Decl. ¶ 9.

203.    Police officers have a duty not to interfere with the medical judgment of medical providers, either by providing false information about a prisoner, by failing to provide a medical provider with information concerning the prisoner, or by directly hindering treatment by making a medical judgment about medical care and imposing that medical judgment on a medical provider. Clark Decl., ¶ 11, 14.

204.    Douglasville police officers are trained that EMS has the final decision of whether to transport an arrestee to the hospital before going to the jail. Douglasville 30(b)(6), at 56:11–18.

205.    It is "standard operating procedure" to explain the situation leading up to why an officer called EMS. Smith, at 101:3–13.

206.    A police officer should never attempt to influence the decision of EMS personnel concerning whether a suspect should be transported to the hospital. Smith, at 107:20–22.

207.    Officers are trained to report a suspect's medical complaints to EMS workers, as well as reporting what happened at the scene immediately before the arrival of EMS. Danley, at 26:20–27:2.

208.    When an arrestee is assessed by EMS, all medical decisions must be made by medical personnel, including the decision of whether to transport the arrestee to the hospital instead of jail. Clark, at 81:7–23.

209.    The training that Douglasville police officers receive that "if you can talk, you can breathe," is part of the training given to officers for dealing with individuals who are choking, and specifically deals with individuals who have a blocked airway. Douglasville 30(b)(6), at 66:21–67:14.

210.    The official policy of the City of Douglasville is that once a police officer handcuffs an arrestee, that officer is not supposed to lose sight of the arrestee. Douglasville 30(b)(6), at 68:24–69:2.

211.    If an incident occurs within the City of Douglasville that involves officers from both the City and the Douglas County Sheriff's Office, the Douglasville police officers are in control of, and in charge of, the scene. Douglasville 30(b)(6), at 72:12–24.

212.    City of Douglasville police officers are trained that a person's medical care may depend on the information they are able to communicate to EMS. Douglasville 30(b)(6), at 56:19–57:10.

213.    City of Douglasville police officers are trained that, at the time EMS arrives on the scene, officers are to give information they have about what occurred leading up to the call for EMS. Douglasville 30(b)(6), at 57:11–18.

214.    As matter of standard practice, EMS have the final decision over transportation, and that they can never override a decision. Danley, at 25:19–24.

215.    Officers should not opine or make any statements indicating whether an individual should be transported to the hospital after EMS arrives on the scene. Ryan, at 72:13–22.

216.    When multiple Douglasville officers respond to a scene and they are all of the same rank, the first responding officer is the primary officer on the call, and is responsible for gathering information and making a report of the incident, and otherwise taking charge of the incident. Douglasville 30(b)(6), at 58:15–59:7.

217.   City of Douglasville officers are not medically trained to make an assessment of a person's complaint of having trouble breathing, or whether the person is in medical distress. Douglasville 30(b)(6), at 60:14–61:1.

218.   The official policy of the City of Douglasville is that after an arrestee is assessed my EMS and and EMS deems the arrestee medically fit for incarceration, the arresting officer must retain a copy of the EMS report along with the incident report. Douglasville 30(b)(6), at 61:16–62:4, Ex. 5.

219.   Officers should not move an injured person unless they are in immediate danger. Danley, at 14:8–16.

220.   A seizure or foaming at the mouth would be cause for alarm, and would be reason to summon EMS even if they had just left the scene. Danley, at 41:10–23.

221.   A police officer should expect that if an arrestee is out of breath from running or a struggle during an arrest, that after about a minute the arrestee's condition would begin to improve. Clark, at 75:20–76:16.

222.    City of Douglasville police officers are taught that "if you can talk, you

        can breathe," applies in the context of choking or blocked airway.

        Douglasville 30(b)(6), at 66:25–67:10.

### *Standards Governing EMS*

223.    Shortness of breath is a medical emergency. Flack, at 44:14–16.

224.    A medical professional should gather all reasonably available

        information about a patient. Porterfield, at 62:6–11.

225.    A person who has difficulty breathing might not yet show any signs of

        hypoxia. Porterfield, at 28:8–11.

226.    A medical professional should always rule out the worst possibility, and

        a paramedic should not leave the scene of an assessment of a patient

        without knowing the reason for the patient's distress. Porterfield, at

        62:18–63:3.

227.    Porterfield is expected to adhere to the EMS treatment guidelines when

        he assesses and treats a patient. Porterfield, at 7:9–13.

228.    It is inappropriate for a paramedic to have a police officer place a pulse

        oximeter on a patient. Porterfield, at 78:23–79:6.

229.    Officer Smith placed the pulse oximeter on Wilson at the request of
        Porterfield. Smith, at 95:12–16.

230.    A normal reading from a pulse oximeter does not rule out respiratory
        distress. Porterfield, at 29:24–30:7.

231.    If a paramedic cannot determine the reason for a complaint of being
        unable to breathe, the patient should be transported to the hospital.
        Porterfield, at 81:6–82:8.

232.    EMS policies required Porterfield to perform an assessment on any
        patient before determining which standing order will be applied to the
        patient. Porterfield, at 7:20–8:18.

233.    Wilson was considered a "patient" for the purposes of providing a
        medical assessment. Porterfield, at 8:19–22; Flack, at 65:10–18.

234.    Exhibit 5 of Porterfield's deposition is a copy of the treatment
        guidelines in effect in March 2015. Porterfield, at 8:25–9:21.

235.    Those treatment guidelines require EMS to provide an assessment of
        the patient's mental status and baseline vitals (pulse, blood pressure,
        respiration), and to create a patient care report. Porterfield, at 9:22–
        10:13.

43

236.    Officer Danley believes that a seizure or foaming at the mouth would
        be cause for alarm, and would be reason to summon EMS even if they
        had just left the scene. Danley, at 41:10–23.

237.    Before honoring a patient's right to refuse medical treatment, an
        emergency responder must ensure the patient is of sound mind. Krause,
        at 120:24–121:7.

238.    Porterfield violated the standards of Douglas County EMS by failing to
        create a report of his encounter with Mr. Wilson. Krause, at 123:1–5.

239.    The fact that Mr. Wilson was sitting upright in the back of a patrol car
        would not given a paramedic any information concerning Mr. Wilson
        aside from that he was upright because a shoulder harness was holding
        him in place. Krause, at 124:21–125:1.

240.    To assess whether a patient has irregular breathing patterns, a
        paramedic should use a stethoscope and listen to the patient's back,
        check the lung fields in the back, and check anteriorly the apexes to
        determine if there is a sound of inflow and exhale of air, and bilateral
        clear lung sounds. Krause, at 129:6–18.

241.  To further assess a patient's breathing patterns, a paramedic should expose the chest and abdominal region to determine the chest muscle retractions and examine chest wall movement. Krause, at 162:20–163:1.

242.  If a patient is having trouble breathing and in an altered mental status as a result, the patient may not respond to questioning. Krause, at 135:8–13.

243.  A paramedic should not rely solely upon the use of a pulse oximeter as a means of measuring a persons' level of oxygenation. Krause, at 139:1–17.

244.  It would not necessarily be obvious to a paramedic if a patient was unable to breathe. Krause, at 137:16–24.

245.  A blood oxygen level of 94 percent should cause a paramedic to be concerned with a patient's oxygenation status. Krause, at 139:18–22.

246.  If there was a fluctuation of oxygen level from 96 person to 98 person, a paramedic should leave the oximeter on the patient for at least one minute to determine whether there is greater fluctuation. Krause, at 140:24–141:23.

247.     A Zoll monitor does not give an average reading for oxygenation.
         Krause, at 140:3–10.

248.     When treating a patient, a paramedic must determine the events
         surrounding the emergency, including what physically happened to the
         patient prior to their arrival. Krause, at 155:14–22.

249.     If a patient does not answer a paramedic's questions, the paramedic
         should investigate whether the patient is simply being obstinate or
         whether the patient is suffering from an emergency that is interfering
         with his ability to speak. Krause, at 158:11–159:4.

250.     The minimum assessment that a paramedic should provide is to check a
         patient's blood pressure, pulse, oxygen levels, and respirations, body
         temperature measured with a thermometer, pupillary reaction to light,
         and blood glucose level. Krause, at 158:11–20, 165:17–166:4, 167:10–
         17, 169:3–5.

251.     Under the circumstances of Wilson's case, blood pressure should be
         measured first to get a baseline reading, and later to determine whether
         there has been any change. Krause, at 164:15–165:1.

252.    Porterfield should have performed an EKG to assess the rhythm of Wilson's heart beat. Krause, at 163:25–164:8.

253.    Porterfield should have administered oxygen to Wilson. Krause, at 176:5–14. EMS's assessment constitutes a substantial deviation from the standard of care. Krause Decl. ¶ 7.

254.    Paramedics should never allow a police officer to interfere with their medical decision and Porterfield allowed the officer's statements to determine his assessment of the situation. Krause, at 181:3–182:4.

255.    "[W]here EMS personnel have a patient . . . who has an altered mental state and his appearance is consistent with being unconscious, and where they have not been able to ascertain what is wrong with that patient, then EMS should transport such a patient to the nearest Emergency Medical Department." Krause Decl., ¶¶ 4, 10.

256.    There are guidelines for patients in an "altered mental status," which applies to patients who are "disoriented, weak, dizzy, confused or are unconscious. " *See* Ex. 12, EMS Treatment Guidelines, at 3–5.

***City of Douglasville Insurance Coverage***

257.    Exhibit 4 is a true and correct copy of the Member Coverage

Agreement between the Georgia Interlocal Risk Management Agency

and the City of Douglasville ("the Insurance Agreement"), which

reflects the indemnification agreement which was in existence between

these two entities in March of 2015, including the dates of March 2,

2015, and March 3, 2015. Ex.1, Req. to Admit, ¶ 2 (admitting the

exhibit is an true and correct copy of the operative insurance

agreement).

258.    Exhibit 3 is a true and accurate copy of the declarations pages. Ex. 3,

General Coverage Declarations, at 1–3.

259.    The "Named Member" referenced in the Insurance Agreement is the

City of Douglasville. Ex. 1, Req. to Admit, ¶¶ 4, 8; Ex. 4, at 1, 32, §

I.C.3.

260.    The Insurance Agreement provides coverage of up to $1,000,000 per

occurrence for General Liability and Comprehensive Law Enforcement

Liability. Ex. 3 at 1–2 ; Ex. 4 at 1.

261.    The Insurance Agreement defines "bodily injury" as a "physical injury (including death) and any mental anguish or mental suffering associated with or arising from such physical injury." Ex. 4, at 14, § I.B.

262.    The Insurance Agreement defines "occurrence" as, "with respect to . . . Law Enforcement Liability . . . an accident or happening or a continuous or repeated exposure to conditions which result in Bodily Injury, Personal Injury . . . during the Coverage Agreement Period." Ex. 4, at 14, § I.F.

263.     The Insurance Agreement defines "Law Enforcement Liability" as
"liability for operations or activities engaged in or conducted in
furtherance of the obligation to provide law enforcement services. This
includes operations or activities which arise out of the ownership,
maintenance or use of premises designated for these operations and
activities, as well as to all operations and activities necessary and
incidental thereto, including transportation and incarceration of
prisoners. 'Law Enforcement Liability' includes liability for
constitutional or civil rights claims . . . provided that the act(s) giving
rise to such claim occur within the Coverage Agreement Period." Ex. 4,
at 32, § I.C.4.

264.     The Insurance Agreement defines "Personal Injury" as an "injury, other
than Bodily Injury, arising out of one of more of the following offenses:
. . . b. humiliation; . . . e. mental injury, mental anguish, shock, sickness
or disability . . . ." Ex. 4, at 32, § I.C.5.

265.     The Insurance Agreement provides coverage arising from "Incidental
Malpractice." Exhibit 4, at 32, § I.C.3.

266.    "Incidental Malpractice" is defined as "professional medical services
rendered or which should have been rendered to any person or persons
(other than employees of the Named Member injured during the course
of their employment) by any duly qualified medical practitioner, nurse,
or technician employed by or acting on behalf of the Named Member.
Emergency professional medical services does include services of a
school nurse." Ex. 4, at 32, § I.C.3.

***Contract Between Douglasville and Douglas County for Emergency Medical
Services***

267.    Porterfield and Flack were performing emergency medical services
within the City of Douglasville pursuant to an agreement between the
City of Douglasville and Douglas County. Douglasville 30(b)(6), at
9:25–16:17; Ex. 6, Emergency Medical Services Contract.

268.    In 2015, Douglas County was the sole emergency medical services
provider to the City of Douglasville. Douglasville 30(b)(6), at 12:4–6,
13:3–8.

269.   In March of 2015, the City of Douglasville and Douglas County

provided for Emergency Medical Services throughout Douglas County,

including within the City of Douglasville, through a "Agreement for

Provision and Funding of Fire Protection Services and Emergency

Medical Services." *See* Ex. 6.

270.   The parties entered into the agreement "pursuant to authority granted by

Article IX, Section III, Paragraph I of the Georgia Constitution." *See*

Ex. 6.

271.   Pursuant to the agreement, the City of Douglasville pays Douglas

County $133,333.33 per month from the City's general fund.

Douglasville 30(b)(6), at 17:11–23.

272.   Noting that the "City desires the County to provide fire protection

services within the boundaries of the City," the agreement required that

the County "provide emergency medical services throughout the

County," through, among other things, the use of City owned station

facilities located at 6771 Church Street and 7792 Highway 92, "both

within the City, for the provision of . . . emergency medical services."

Ex. 6, at 4–5.

52

273.    The Agreement provided that the two stations, along with two fire

trucks, were to be returned to the City at the conclusion of the

Agreement. Ex. 6, at 6.

274.    The County established a "fund entitled the Douglas County Fire

Protection Services and Emergency Medical Services Fund ) (the

"Fund"). Ex. 6, at 3. The City agreed to pay "one-half of the total

anticipated annual costs of providing" fire and emergency medical

services for the entire county. In return, the County agreed to not levy

any taxes on property within the City for providing these services. *Id*.

Going forward, the Fund would be used for the construction of any new

or additional fire and EMS facilities within the County. *Id*.

275.    Under the contract between Douglas County and the City of

Douglasville, Douglas County is granted use of two station facilities

owned by the City of Douglasville, as well as one fire truck, and one

aerial fire truck. Douglasville 30(b)(6), Ex. 2, at 6.

276.    The City of Douglasville is not licensed to provide emergency medical

services. Douglasville 30(b)(6), at 12:25–13:1.

277.    The City of Douglasville is required by law to provide emergency
        medical services within the City, and fulfills that obligation through its
        contract with Douglas County. Douglasville 30(b)(6), at 24:12–20,
        24:24–25:9.

278.    Douglasville provided its own Fire and related services until it entered
        into an agreement with Douglas County in the 1980's. Douglasville
        30(b)(6), at 11:8–21.

279.    The City does not have a license to furnish ambulance services itself,
        even for people in police custody. Douglasville 30(b)(6), at 12:25–13:2.

280.    There are no medical staff for city prisoners brought to the city's
        booking center at the city police station. Douglasville 30(b)(6) at 14:4–
        6.

### *Video Evidence*

281.    The composite video, Exhibit C, contains the video and audio from
        each of the three dash camera videos that are available of the incident.
        The only portion of the videos that is omitted is the video from Smith's
        camera showing Smith's drive from the scene of the incident to the jail.
        Ex. 9, Pace Decl., ¶¶ 11, 13, 14.

282.    The composite video, Exhibit C, shows each of the three patrol car videos synced in time, so that one can view what is heard on one officer's microphone while simultaneously viewing what is shown on a different officer's dash camera. Ex. 9, Pace Decl., ¶ 14.

283.    Officer Smith's patrol car camera did not capture any audio of the incident. *See generally* Smith Vid.; Smith, at 24:13–19 (not being able to explain why his microphone did not capture any audio).

284.    The coughing that is heard on Danley's video is from the interior microphone of Danley's police car, which held Mr. Burroughs. Danley, at 87:6–8; 138:3–12 (explaining that Burroughs was inside his patrol car).

### *Survivability*

285.    If Porterfield had followed all treatment guidelines and applicable standards of care, Wilson would have, at minimum, been given oxygen and transported to the hospital. Krause Decl., at 10; Ex. 12, at 9–10.

286.    The misinformation and lack of information supplied to EMS was important to EMS's assessment of Wilson. Porterfield, at 103:11–15; Ex. 5, Porterfield Report, at 1.

287.    Where EMS personnel have a patient who has an altered mental state
        and his appearance is consistent with being unconscious, and where
        they have not been able to ascertain what is wrong with that patient,
        then EMS should transport such a patient to the nearest Emergency
        Medical Department. Krause Decl., ¶¶ 4, 10.

288.    Dr. Sperry retired from the position of Chief Medical Examiner of the
        State of Georgia in November 2015; a position he held for 18 years.
        Sperry Decl., ¶ 3.

289.    Prior to that, he was Deputy Chief Medical Examiner for Fulton County
        Medical Examiners' Office, where he was employed for eight years. Id.
        He currently serves as a consultant in forensic medicine and pathology,
        a business he has operated for 21 years. *Id.* at ¶ 1. In total, Dr. Sperry
        has 32 years of experience as a board-certified forensic pathologist and
        an additional 8 years of medical experience prior to that, including a
        four-year residence in pathology. He has been involved in over 90,000
        autopsies throughout his career, performing over 6,600 of those himself.
        *Id.* at ¶ 4.

290.    If Wilson had received prompt treatment from EMS in the form of oxygen and immediate transport to the emergency room, it is more likely than not that he would have survived. Ex. 10, Sperry Decl., ¶¶ 23–30.

### Miscellaneous

291.    Officers should not move a person who has been injured unless that person is in immediate danger. Danley, at 14:1–5.

292.    Although Danley testified that he did not communicate with EMS at all, *see* Danley, at 27:9–11, 27:21–22, the video evidence shows him clearly conversing with EMS during the time they were attending to Wilson. At this stage, it is impossible to separate which of the two officers made the statements that are discussed here. Nevertheless, because Cadwell's microphone was running for the majority of the time EMS were on the scene, it can be determined that Cadwell was not responsible for these comments since it only captured one comment ("he's foaming at the mouth now, just so you know"). Cadwell Vid., at 48:40.

Submitted this 21st day of December, 2018.

s/Brian Spears                                          s/Jeffrey R. Filipovits
G. Brian Spears                                         Jeffrey R. Filipovits

Georgia Bar No. 670112                    Georgia Bar No. 825553

1126 Ponce de Leon Avenue                 2900 Chamblee-Tucker Road, Bldg. 1
Atlanta, Georgia 30306                    Atlanta, Georgia 30341
Phone: 404-872-7086                       Phone: 678-237-9302
Fax: 404-892-1128                         Fax: 770-455-1449
brian@brianspearslaw.com                  jeff@law.filipovits.com